# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF WISCONSIN

MARK MLSNA,

        Plaintiff,

v.

UNION PACIFIC RAILROAD COMPANY,

        Defendant.

CASE NO. 3:18-cv-00037

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

For nearly a decade, Plaintiff Mark Mlsna worked for Defendant Union Pacific Railroad Co. without incident. Then, Union Pacific told Mlsna that even though the Federal Railroad Administration ("FRA") allows employees to wear hearing aids, the company was now requiring him to wear hearing protection and prohibiting him from wearing his hearing aids under such protection. Because Mlsna cannot pass the FRA's hearing test without his hearing aids, Union Pacific's reverse of course was a de facto termination.

Mlsna researched the issue and found that there are custom-fit devices that dampen sound that is too loud and amplify sound that is not loud enough, *i.e.*, that act as ear plugs and hearing aids. Mlsna then identified one of these devices to Union Pacific and requested it as a reasonable accommodation. Union Pacific rejected Mlsna's request, telling him that it was not obligated to purchase the "expensive" device.

In this case, Union Pacific has eschewed such explanation, instead claiming that it was not obligated to accommodate Mlsna because custom-fit devices are unsafe. But the two doctors who have an opinion on the issue testified that the devices are not only safe but also safer than some of the devices Union Pacific allows employees to wear. The arguments Union Pacific has

used to try to rebut such testimony crumble under the weight of meaningful examination, which is why Union Pacific's motion cites almost exclusively to declarations and not the hundreds of pages of depositions that have been filed.

Furthermore, the evidence Mlsna has obtained through discovery demonstrates that his job's essential functions did not expose him to dangerous noise levels; therefore, there was no reason for Union Pacific to require Mlsna to wear hearing protection, much less prohibit him from wearing his hearing aids under such protection. There is no doubt that Union Pacific violated Mlsna's rights under the Americans with Disabilities Acts, as amended by the ADA Amendments Act of 2008, 42 U.S.C. § 12101, *et seq.* ("ADA").

Union Pacific has nevertheless moved for summary judgment. Union Pacific's arguments are based on a misapplication of the law to misrepresented facts. When any sensible interpretation of the law is correctly applied to this case's actual facts, it is clear that a reasonable juror not only could find that Union Pacific unnecessarily removed Mlsna from service due to his disability but also would so find.

In tacit recognition of the forgoing, Union Pacific also argues that it was free to discriminate against Mlsna with impunity because he subsequently applied for disability benefits, which—it says—entailed him admitting he could not perform his job's essential functions. Union Pacific's argument ignores that Mlsna withdrew the application before he received a dime, which means judicial estoppel does not apply. Union Pacific's argument also ignores the nature of the benefits for which Mlsna applied and what Mlsna disclosed in his application, which weigh against Mlsna being estopped from pursuing his ADA claims.

Ultimately, the Court should conclude that Union Pacific was not free to violate Mlsna's ADA rights simply because the company put him in a corner where applying for disability

benefits was an option he considered but did take. The Court should also find that a reasonable person could conclude that Mlsna's job's essential functions did not expose him to dangerous noise levels and that any such exposure could have been mitigated through one of any number of devices. Accordingly, the Court should deny Union Pacific's motion for summary judgment.

## PLAINTIFF'S RESPONSE TO DEFENDANT'S PROPOSED STATEMENT OF UNDISPUTED MATERIAL FACTS [1]

### A. MLSNA'S HEARING IMPAIRMENT AND JOB AT UNION PACIFIC

1. Plaintiff Mark Mlsna has a hearing impairment caused by genetics and prolonged exposure to loud noise on his family's farm. He has worn hearing aids for over 20 years.

   **Mlsna disputes the proposed fact insofar as it claims his hearing impairment was caused by exposure to noise:**

   > **Q. [H]ave you ever been told it was because of a genetic or health issue, or is it exposure to noise?**
   >
   > **A. Genetic, to my knowledge.**

   **(Mlsna Dep. (Dkt. 27) at 23:20-23.)**

2. Mlsna began employment with Union Pacific in 2007 and worked as a thru-freight Train Conductor. Mlsna was responsible for safely moving and operating Union Pacific's trains "in compliance with company and Federal rules and instructions." Train Conductors also attach and detach railcars at terminals, ride railcars and equipment, and perform other work incidental to the position.

   **Mlsna admits the proposed fact.**

### B. THE FEDERAL RAILROAD ADMINISTRATION'S MINIMUM HEARING STANDARDS AND HEARING PROTECTION REQUIREMENTS

---

[1] Mlsna has adopted Union Pacific's headings but omitted its citations, and proposed facts and footnotes that he neither disputes nor on which he relies.

7. In January 2012, the Federal Railroad Administration ("FRA") implemented new regulations that require Union Pacific to certify that conductors meet minimum hearing acuity standards. Under the new FRA regulations, each conductor must pass a hearing test that shows the person "does not have an average hearing loss in the better ear greater than 40 decibels with or without the use of a hearing aid …"

   **Mlsna admits the proposed fact.**

8. FRA regulations also obligate railroads to require that employees wear hearing protection in two scenarios:

   a. When an employee is exposed to sound levels equivalent to an 8-hour time-weighted average (TWA) of 90 decibels or greater; and

   b. When an employee is exposed to sound levels of 85 decibels or greater if the employee has not yet had a baseline audiogram or experiences a change in hearing sensitivity for the worse.

   **Mlsna admits the proposed fact.**

## C. UNION PACIFIC'S HEARING CONSERVATION POLICY APPLIES TO ALL CONDUCTORS

15. The dosimetry testing reveals that roughly 36 percent of the "thru-freight" conductors (62 of 172) were exposed to an 8-hour TWA of 85 decibels or greater. About 13 percent of these conductors (22 of 172) were exposed to an 8-hour TWA of over 90 decibels. Union Pacific found exposure as high as an 8-hour TWA of 97 decibels.

   **Mlsna disputes the proposed fact insofar as it implies there was a thirty-six percent chance his job's essential functions exposed him to noise levels that necessitated him wearing hearing protection. Mlsna's hearing has not changed in twenty years, which means he need not wear hearing protection unless his job's essential functions**

expose him to above an eight hour TWA of ninety decibels. (*Supra* at Def.'s Prop. Fact No. 8.) Union Pacific could have determined whether Mlsna's job's essential functions actually exposed him to an eight-hour TWA of ninety or greater decibels by having him wear a dosimeter and analyzing the data gathered by it, but it chose not to so do:

> A.  We have not done monitoring on Mr. Mlsna, to my knowledge.
>
> Q.  How hard is monitoring on an individual employee to do . . . .
>
> A.  Not very.
>
> Q. Is it expensive . . . .
>
> A.  No.
>
> Q.  Do you have any understanding as to why, instead of firing him, they didn't do the monitoring for Mr. Mlsna's position?
>
> A.  I have no knowledge of that . . . .
>
> Q.  Would that have been unreasonable, instead of firing him, to put a dosimeter on him for a day and two and find out what level of TWA he's actually exposed to?
>
> A.  I do not know.

(Def. Dep., Knight (Dkt. 69Gordon at 36:14-37:17.)

Instead, Union Pacific has relied on a study that includes nearly four decade old data on local conductors who wore dosimeters for less than an hour and worked for companies other than Union Pacific. (*Supra* and *infra* at Def.'s Prop. Fact Nos. 15-17.) In the study on which Union Pacific has relied, only nineteen thru-freight conductors who worked for Union Pacific wore a dosimeter for eight or more hours within the last decade. (Dosimetry Data for Thru-Conductors (Dkt. 53-5).) Of those

**conductors, none were exposed to an eight hour TWA of ninety or greater decibels.**
**(*Id.*)**

**Furthermore, Union Pacific has identified only three sources of noise that exposes**
**thru-freight conductors to an eight-hour TWA of ninety or greater decibels: (1)**
**riding in a train with an open window, (2) inspecting passing trains from outside of**
**their train's cab, and (3) performing switching operations with 100 feet of their**
**train. (Def. Dep., Knight at 11:6-35:25.) The employees in the study on which Union**
**Pacific relied were not told to minimize their exposure to these noises. (*Id.* at 73:24-**
**74:20.) Had they been so told, there are simple ways they could have reduced their**
**exposure to these noises. (*Id.* at 11:6-35:25.) For example, they could have closed the**
**windows. (*Id.*) As another example, they could have inspected passing trains by**
**watching them through their cabs' windows instead of going outside. (*Id.*) As a final**
**example, they could have stopped their trains more than 100 feet away from the**
**switches they needed to operate. (*Id.*)**

**The logical conclusion is that Mlsna's job's essential functions did not expose him to**
**an eight-hour TWA of ninety decibels or greater, a conclusion Union Pacific's own**
**expert cannot dispute. (Soli Dep. (Dkt. 41) at 5:23-6:6.)**

16. The dosimetry testing also reveals that roughly 32 percent of "local" conductors (29 of 91)
    were exposed to an 8-hour TWA of 85 decibels or greater. Six of these conductors (nearly
    7 percent) were exposed to an 8-hour TWA of over 90 decibels.

    *See supra* **at Def.'s Prop. Fact No. 15.**

17. Since the dosimetry testing revealed that conductors across different environments over
    several years were exposed to an 8-hour TWA of 85 decibels or more, Union Pacific

considers all conductors to be individuals who "may be subjected to noise exposures equal to or exceeding an 8-hour TWA sound level of 85 decibels." Union Pacific therefore applies the Hearing Conservation Policy to all conductors.

*See supra* **at Def.'s Prop. Fact No. 15.**

## D. FRA REGULATIONS AND UNION PACIFIC'S HEARING CONSERVATION POLICY REQUIRE TRAIN CONDUCTORS TO WEAR HEARING PROTECTION

18. Under 49 C.F.R. § 227.115(d), all Union Pacific conductors must wear hearing protection since the "representative sampling" dosimetry data shows many exposures to an 8-hour TWA of 90 decibels or more.

**Mlsna disputes the proposed fact. Section 227.115(d) states, "[t]he railroad shall require the use of hearing protectors when an employee is exposed to sound levels equivalent to an 8-hour TWA of 90dB(A) or greater." And Mlsna's job's essential functions do not expose him to such noise levels. (*Supra* at Def.'s Prop. Fact No. 15.)**

21. Consistently working within 150 feet of a locomotive is critical to the Train Conductor position. Indeed, Mlsna testified that he was constantly within 150 feet of the locomotive when working, including entering and exiting the train as well as during its operation. There were times when he was inside the locomotive with the windows open during movement.

**Mlsna disputes the proposed fact. Union Pacific has identified three sources of noise that exposes thru-freight conductors to an eight-hour TWA of ninety or greater decibels, and exposure to each of these sources can be reduced by actions as simple as shutting the train cab's windows. (*Supra* at Def.'s Prop. Fact No. 15.)**

22. Union Pacific applies its hearing protection requirements to all members of the train crew (Conductors, Locomotive Engineers, Switchpersons, and Brakepersons). A train crew

member who fails to wear hearing protection within 150 feet of a locomotive or in other mandatory hearing protection areas is subject to verbal or written discipline by a supervisor.

**Mlsna disputes the proposed fact. As an initial matter, Union Pacific is estopped from proposing this fact. (*Compare*, *e.g.*, Def. Dep., Knight at 55:16-56:6 (the representative that was produced to testify to "[w]hen did Union Pacific begin requiring employees to wear hearing protection," in response to being asked whether Union Pacific can dispute Mlsna's testimony regarding employees not being required to wear hearing protection, answering, "I can't say") *and QBE Ins. Corp. v. Jorda Enterprises, Inc.*, 277 F.R.D. 676, 690 (S.D. Fla. 2012) (prohibiting an organization from taking a position contrary to its representative's testimony). In any event, Mlsna has testified that neither he nor anyone else wore hearing protection. (Mlsna Dep. 67:10-19.)**

23. Mlsna's former supervisor, Lucas Jennings, and his former train crew member, Lou Mason, testified that Union Pacific enforces its hearing protection requirements consistently for all employees. Jennings confirms that to the best of his recollection and knowledge, Mlsna always wore hearing protection when and where required. One of Mlsna's experts, Dr. Kloss, testified that Mlsna told him he wore hearing protection over his hearing aids, even though this configuration is not advisable.

*See supra* **at Def.'s Prop. Fact No. 22.**

26. A conductor who does not meet the FRA minimum hearing criteria with unaided hearing must meet FRA minimum criteria when wearing the [Amplified Hearing Protection Device ("AHPD")].

**Mlsna disputes the proposed fact. Section 242.117(i) explicitly allows conductors who meet the FRA minimum hearing criteria "with or without use of a hearing aid[.]"**

29. An NRR is a unit of measurement used to determine the ability of a hearing protection device to decrease sound exposure within a given work environment. The NRR must be listed on the hearing protection package. The NRR is essential to determining what noise attenuation a hearing protection device can provide, and in turn, whether it is effective and safe.

**Mlsna disputes the proposed fact insofar as it claims the NRR is essential to determining noise attenuation a hearing protection device can provide and/or whether it is effective and safe. The statute to which Union Pacific cites—29 C.F.R. § 1910.95—states only that NRR is a convenient method by which employers may estimate the hearing protection of a device, and there are not only other ways to determine a device's efficacy but also ways that are more accurate:**

> **Q. Why does that matter in getting an NRR, recreational rather than industrial?**
>
> **A. The NRR's we know from the data that is out there that the average NRR to be expected -- is what is expected to be. NRR numbers, to achieve them via laboratory, are expensive. They can be $5,000 or more, and it was never requested.**
>
> **Many people, including Union Pacific as I understand, can check out the attenuation of products through fit checking. Fit checking is probably a better number to go by than is the laboratory numbers, the NRR's as currently received from laboratory.**

**Gordon Dep. (Dkt. 70) at 30:16-31:2; *see also* Kloss Dep. (Dkt. 47) at 14:7-15:21, 18:1-25; Kloss Supp. Expert Report (Ex. A) at ¶ 3.) Importantly, Union Pacific's**

**own witnesses do not disagree. (Holland Dep. (Dkt. 34-1) at 27:20-24; Soli Dep. at 46:4-7.)**

**E. MLSNA IS UNABLE TO SATISFY THE FRA'S MINIMUM HEARING REQUIREMENTS WHILE WEARING MANDATORY HEARING PROTECTION**

33. Mlsna met only the FRA minimum hearing criteria under the second scenario—that is, while wearing his hearing aids without an AHPD. He failed to satisfy the FRA standards under the other three scenarios.

**Mlsna admits the proposed fact.**

37. Although Mlsna had a hearing impairment when Union Pacific hired him, it was not until this certification testing that the railroad learned he was unable to meet the minimum hearing criteria while wearing protection.

**Mlsna disputes the proposed fact insofar as it implies Union Pacific neither knew nor should have known that he would fail a hearing test without his hearing aids. Union Pacific knew Mlsna wore hearing aids, *see supra* Def.'s Prop. Fact No. 1, and it is axiomatic that employees with hearing aids may fail a hearing test without their hearing aids.**

38. Following the January 2015 testing, Union Pacific determined that it could not certify Mlsna as a conductor. Union Pacific based its decision on Mlsna's hearing tests that showed he could not meet the FRA's minimum hearing standards with unaided hearing or when wearing an approved AHPD. But when wearing the hearing aids (and thus meeting minimum hearing standards), Mlsna could not simultaneously comply with the FRA's or Union Pacific's mandatory hearing protection requirement.

**Mlsna disputes the proposed fact insofar as it claims Union Pacific "could not" certify him as a conductor. Section 242.117(i) explicitly allows conductors to meet**

10

the FRA's minimum hearing criteria "with or without use of a hearing aid," and Mlsna passed the hearing test with his hearing aids. (*Supra* at Def.'s Prop. Fact No. 33.)

## F. MLSNA PROPOSES A CUSTOM HEARING PROTECTION DEVICE THAT UNION PACIFIC DENIES BECAUSE IT LACKED AN NRR

45. Union Pacific has adopted this position because customized earplugs have no discernable NRR. Custom earplugs may also lose their seal over time if the shape of the person's ear changes. Despite its prohibition of custom earplugs, Union Pacific still agreed to investigate the safety and efficacy of the E.A.R. Primo.

**Mlsna disputes the proposed fact insofar as it claims that custom devices have no discernable NRR:**

> **Q. And does this product have a Noise Reduction Rating?**
>
> **A. This product has one, but it was not done – let me put it this way: Let's just say it doesn't have one or report one. Most of the companies that developed customized electronic earplugs did not go ahead and do Noise Reduction Rating studies because the value of that particular information was for industrial accounts.**
>
> **This product was not targeted to industrial accounts. It was targeted for hunters, shooters, people in tactical. So that is basically why numerous laboratories didn't do it that way. There are products that have Noise Reduction Ratings. To the best of my knowledge, if there be one customized product that did have an NRR, it would be Starkey Labs.**
>
> **At the same time, an NRR, if requested and needed, could apply to this product or other products like it that don't currently report an NRR. We do know from the field or the network the average NRR to be expected on products like this will be in the neighborhood of 24 to 26 maybe 27.**
>
> **But again, there are products that are on the marketplace that have an NRR and there are more coming out that will have an NRR.**

(Gordon Dep. at 29:12-30:10; *see also* Trangle Supp. Expert Report (Ex. B) at 4 (identifying a custom device with an NRR); Soli Dep. 46:7-21 (admitting that NRRs could be obtained for custom devices).)

Mlsna also disputes the proposed fact insofar as it implies that custom earplugs are more likely to lose their seal than any other hearing-protection device and/or that the possibility of a custom earplug at some point losing its seal cannot be mitigated through annual checkups for fit. As an initial matter, Union Pacific has disavowed any argument that custom-fit devices are unsafe because of seal-related issues. (Def. Dep., Holland (Dkt. 71) at 11:24-13:8.) But even if that was not the case, custom devices not only seal the ear but do so as well, if not better, than devices Union Pacific allows employees to wear. (Trangle Supp. Expert Report at 2.) And neither Union Pacific nor its expert disagrees. (Def. Dep., Knight at 37:18-24, 40:1-22; Holland Dep. 33:10-34:11; Soli Dep. at 35:4-13.)

Finally, Mlsna disputes the proposed fact insofar as it implies that Union Pacific's "investigation" of the E.A.R. Primo consisted of anything more than it reviewing the brochure Mlsna had provided to it:

> Q. You ultimately did not approve his device; right?
>
> A. Correct.
>
> Q. Why?
>
> A. It didn't have the noise reduction rating.
>
> Q. What significance was that to you?
>
> A. We were unable to determine what, if any, attenuation the device would provide.

> **Q. Did you make any efforts to otherwise determine it; for example, calling the company?**
>
> **A. We looked at their literature.**
>
> **Q. Did you do anything else?**
>
> **A. No.**

**(Knight Dep. (Dkt. 64) at 22:21-23:8; *see also* Email From Bernbeck to Griffke-Pribyl, Holland, Knight and Owens (Ex. C); Def. Dep., Knight at 53:12-15.)**

47. Union Pacific relies on manufacturers to provide the NRR. If a particular device has no NRR, the Industrial Hygiene Department cannot approve its use because Union Pacific cannot determine what level of protection, if any, the device provides. Without an NRR, Union Pacific cannot ensure the particular device sufficiently protects the individual from injurious noise exposure.

*See supra* **at Def.'s Prop. Fact No. 29.**

48. Blake Knight ("Knight"), a Union Pacific Manager of Industrial Hygiene, led the evaluation of the E.A.R. Primo. The Industrial Hygiene Department found that the manufacturer provided no NRR for the E.A.R. Primo and Union Pacific could not determine the rating for the device. Dr. Soli, an expert in hearing and speech science, concurred that Union Pacific was correct in its assessment that the E.A.R. Primo lacked a discernible NRR.

**Mlsna disputes the proposed fact insofar as it implies that the E.A.R. Primo did not have an NRR rating. (Trangle Supp. Expert Report at 4 ("The NRR for the E.A.R. earplug is 31-32 dB . . . ."). Indeed, Knight does not dispute that the device Mlsna requested as a reasonable accommodation does, in fact, have an NRR. (Knight Dep. 28:8-12.)**

**Mlsna also disputes the proposed fact insofar as it implies that either Union Pacific's industrial hygiene department and/or Dr. Soli made reasonable efforts to determine whether the E.A.R. Primo had an NRR rating. (*Compare supra* at Def.'s Prop. Fact No. 45 *and* Soli Dep. at 27:22-25.)**

49. The Industrial Hygiene Department also noted the device was a customized earplug, which the railroad prohibits because the quality of the custom mold can be highly variable. As a result, Union Pacific determined that the E.A.R. Primo was not a safe and suitable replacement for Union Pacific's approved AHPD.

**Mlsna disputes the proposed fact insofar as it claims custom earplugs are any more likely to lose their seal than any other hearing-protection device and/or that the possibility of a custom earplug at some point losing its seal cannot be mitigated through annual checkups for fit. (*Supra* at Def.'s Prop. Fact No. 45.)**

50. Union Pacific denied Mlsna's request to use the E.A.R. Primo as an alternative device, but informed him that if he located another suitable device it would evaluate the proposal. Mlsna testified that Union Pacific has "always conveyed" to him that one of the problems with the E.A.R. Primo was its lack of an NRR.

**Mlsna disputes the proposed fact insofar as it claims that Union Pacific had always conveyed to him that one of the problems with the E.A.R. Primo was its lack of an NRR:**

> **Q. [A]re you suggesting to Union Pacific here that they should look into whether this device would work?**
>
> **A. Yes.**
>
> **Q. And so you send this in to Union Pacific, and then what do you recall happens after you send this in . . . .**

**A. Their response was that they didn't feel they had to pay for it . . . . that it was not their responsibility to furnish this to employees . . . .**

**Q. Did they tell you that they -- there was anything else wrong with it?**

**A. No.**

**(Mlsna Dep. 38:9-39:2; *see also* Owens Dep. (Dkt. 39) at 35:15-23.)**

51. Union Pacific's former Director of Disability Management, Terry Owens, testified that although she originally stated cost was a factor in denying the device, Union Pacific ultimately did not evaluate whether cost would be a factor in analyzing Mlsna's proposal. Instead, because the device did not satisfy Union Pacific's Hearing Conservation Policy, there was no reason to perform cost analysis.

**Mlsna disputes the proposed fact insofar as it claims that Union Pacific did not perform a cost analysis because the device did not satisfy some policy. It was the involvement of Union Pacific's law department that resulted in the company no longer citing cost as its basis for denying Mlsna's request. (Owens Dep. at 35:24-36:7.)**

52. Mlsna proposed no other devices or accommodations. He provided no information to Union Pacific to contradict the conclusion that the E.A.R. device had no NRR, nor did he undergo audiological testing while wearing the device to determine whether he could meet the FRA minimum hearing acuity requirements.

**Mlsna disputes the proposed fact insofar as it claims that he proposed no other devices or accommodations. Dr. Kloss and Dr. Trangle have identified AHPDs, including devices manufactured by E.A.R. Inc. and Honeywell, as devices that could be used to accommodate Mlsna. (Kloss Expert Report (Ex. D) at 1-3, 6-7; Trangle**

Expert Report (Ex. E) at 1; Trangle Supp. Expert Report at 3-4; Trangle Sec. Supp. Report (Dkt. 56) at 1, 5-8.) **Dr. Kloss and Dr. Trangle have also identified custom-fit protection, including the E.A.R. device Mlsna requested and devices made by ESP America, that could accommodate Mlsna. (Kloss Expert Report at 1, 4-5; Kloss Supp. Expert Report, ¶ 2; Trangle Expert Report at 1; Trangle Supp. Expert Report at 2, 4.)**

**Mlsna also disputes that he has provided no information to Union Pacific to contradict the conclusion that the E.A.R. device has no NRR. (*Supra* at Def.'s Prop. Fact No. 48.)**

53. Only when Mlsna served expert reports in this litigation did he suggest—for the first time—that alternative AHPDs may permit him to satisfy both FRA regulations and Union Pacific's safety policies. As explained in Section III(D)(2), these proposals are untimely because they were never mentioned during the interactive process. Even were these late disclosed accommodation proposals considered, however, Mlsna still has not presented evidence that they would allow him to meet the FRA standards and perform the essential functions of the job.

**Mlsna disputes the proposed fact insofar as it claims that his AHPD-related proposals are untimely. (*Infra* at 23.)**

**Mlsna also disputes the proposed fact insofar as it claims that he still has not presented evidence that the AHPDs he has identified would allow him to meet the FRA standards and perform his job's essential functions. (*Supra* at Def.'s Prop. Fact No. 52.)**

54. Union Pacific is unaware of any other device that provides sufficient protection that would also allow Mlsna to meet FRA hearing standards.

**Mlsna disputes the proposed fact. (*Supra* at Def.'s Prop. Fact No. 52.)**

55. Mlsna later requested Union Pacific to reconsider its decision not to certify him as a conductorIn response, Dr. Holland explained that Mlsna could not safely work as a conductor because he could not satisfy the FRA hearing acuity requirement with an AHPD, and Union Pacific was unaware of any other adaptive device that would provide sufficient protection while allowing him to meet minimum hearing standards. As a result, Union Pacific affirmed its decision that it could not certify Mlsna as a conductor because he could not safely perform the essential functions of his job. (Ex. 2C at UP_Mlsna_002122).

**Mlsna disputes the proposed fact insofar as it implies that Union Pacific, in fact, could not have accommodated his disability. Dr. Trangle has opined that "Mlsna could easily have been accommodated in his position as a conductor . . . ." (Trangle Expert Report at 1; *see also* Trangle Supp. Expert Report at 2.) Similarly, Dr. Kloss has opined that "Mlsna could be safely accommodated with current available technology such that he would comply with the FRA regulations and work as a railroad Conductor." (Kloss Expert Report at 1; *see also* Kloss Dep. at 41:10-16; Trangle Expert Report at 1.) And Garry Gordon, who works for E.A.R. Inc., testified similarly. (Gordon Dep. at 24:16-21 ("[T]here probably is a good chance, based on what I know the technology to be out there, that there are hearing devices, whether from my company or elsewhere, that would enable people like Mr. Mlsna to be able to hear well on the job as well as reduce the risk of an ongoing noise**

induced hearing loss.").) At the same time, the person Union Pacific made responsible for the accommodation decision has no opinion regarding whether there are devices that would allow Mlsna to safely perform his job's essential functions. (Knight Dep. 27:8-10.) And its own expert has conceded that it may not have been reasonable for Union Pacific to determine Mlsna's disability could not have been accommodated without first contacting an audiologist:

> **Q. I'll represent to you essentially what happened with Dr. Holland, who's an occupational doctor, discussed with their hygiene department. That's who made the decision. Would it have been better for them to reach out to someone with a hearing or ear background . . . .**
>
> **A. Perhaps so, yes.**

**(Soli Dep. at 37:6-14.)**

## G. MLSNA FAILS TO PURSUE ADDITIONAL EMPLOYMENT OPPORTUNITIES AND CLAIMS HIS MEDICAL CONDITIONS PREVENT HIM FROM WORKING

56. After Union Pacific notified Mlsna that it could not certify him as a conductor, Union Pacific advised Mlsna that it would help him locate work within the railroad for which he may be qualified. Union Pacific instructed Mlsna to call the company's Disability Management Department for assistance with his vocational future. Mlsna does not recall calling the number and admits that he never asked Union Pacific for assistance in finding another job within the company. Union Pacific asked Mlsna if he was interested in relocating to another position at the railroad, but Mlsna declined.

**Mlsna disputes the proposed fact insofar as it implies that Union Pacific actually would have accommodated his disability via another position. Union Pacific has testified that there are no other positions to which he could bump that did not require hearing protection. (Def. Dep., Deardorff (Dkt. 67) at 8:7-10.)**

58. Mlsna later abandoned his application for RRB disability benefits because he learned he could obtain retirement benefits, which the RRB granted.

**Mlsna admits the proposed fact.**

59. Mlsna admits that he has no evidence of Union Pacific discriminating against other employees with disabilities.

**Mlsna disputes the proposed fact. A court in the Eighth Circuit recently certified a class of 3,145 employees who claim Union Pacific illegally withheld them from service on the basis of their disabilities, in violation of the ADA.** *See Harris v. Union Pac. R.R. Co.*, **No. 8:16-cv-381, 2019 U.S. Dist. LEXIS 17917, at \*12, 23-24 (D. Neb. Feb. 5, 2019).**

## PLAINTIFF'S PROPOSED STATEMENT OF UNDISPUTED MATERIAL FACTS

### A. THE LEVEL OF NOISE THAT IS DANGEROUS FOR MLSNA

1. Mlsna had a baseline audiogram and experienced no change in hearing sensitivity for the worse, which means the FRA did not require him to wear hearing protection unless his job's essential functions exposed him to sound levels equivalent to an 8-hour TWA of 90 decibels or greater. (*Compare* Trangle Supp. Report at 1 *and supra* at Def.'s Prop. Fact No. 8.)

### B. UNION PACIFIC'S FAILURE TO ENGAGE IN THE INTERACTIVE PROCESS

2. Union Pacific did not consider whether other devices would allow Mlsna to safely perform his job's essential functions:

> Q. Did you look at whether any other devices would meet the Union Pacific's requirements?
>
> A. No.
>
> Q. Why not?

A.  Wasn't asked to.

(*Knight Dep. 23:16-20; see also Def. Dep., Knight at  53:12-25; compare also* Holland Dep. at 28:20-23 ("I know part of the process for Terry Owens . . . was to try to determine if there were other adaptive devices[.]") *and*  Owens Dep. at 27:15-16 ("[N]one of us were going out and looking for something else for him.").)

## C.  THE INCONSISTENCY OF UNION PACIFIC'S ARGUMENTS

3.  Union Pacific has approved at least one device that is an in-the-ear device that amplifies sound. (*See* Def. Dep., Knight at 63:7-23:7; Def. Dep., Holland at 17:15-22.)

4.  Union Pacific's own witnesses have admitted that other than its argument regarding custom-fit devices supposedly failing to seal the ear, every argument Union Pacific has made regarding custom-fit devices being unsafe applies equally to the in-the-ear device it has approved:

> Q. In it's title it says "Amplified Ear Plugs." . . . Union Pacific allows
>     employees to wear this as hearing protection?
>
> A. Yes . . . .
>
> Q. How is this safer than custom-fit devices?
>
> A. These are the expandable products I mentioned earlier.
>
> Q. So in Union Pacific's opinion, a foam ear plug with elastic properties
>     better seals the ear than a custom-fit device?
>
> A. Yes.

(Def. Dep., Knight at 63:7-23:7; *see also* Def. Dep., Holland at 17:15-22.)

5.  At the same time, Union Pacific has already disavowed any argument that custom-fit devices are unsafe for seal-related reasons. (Def.'s Prop. Fact No. 45.)

## D.  THE WITNESSES' BACKGROUNDS

6. Dr. Holland has admitted that he is not an expert on hearing aids or hearing protection, and that he therefore deferred to Knight regarding whether the custom-fit device Mlsna requested would allow Mlsna to safely perform his job's essential functions. (Holland Dep. at 25:22-27:18.)

7. Knight is not a doctor. (Knight Dep. at 7:7-11.)

8. Knight does not know how to test hearing protection for efficacy. (Knight Dep. 39:20-40:3.)

9. Knight does not know to what noise level Mlsna's job exposed him. (Knight Dep. 41:10-15.)

10. Union Pacific has provided no training on the ADA to Knight. (Knight Dep. 28:16-18.)

11. Union Pacific's expert, Soli, is also neither an audiologist nor a clinician. (Soli Dep. at 9:21-22.)

12. Dr. Kloss is an audiologist, who not only diagnoses and treats hearing loss but also works on hearing conservation programs and has fit custom earplugs for employees in those programs. (Kloss Report at 8-9; Kloss Dep. at 7:2-11:3, 13:4-14:6, 16:9-18:3.)

13. Dr. Trangle is a board-certified occupational and environmental medicine specialist, who has established and supervised hearing conservation programs for various companies. (Trangle Report at 1.)

14. Dr. Kloss has examined and performed audiometric testing on Mlsna. (Trangle Report at 1.)

15. Dr. Trangle has reviewed the results from the examination and testing Dr. Kloss performed on Mlsna, as well as Union Pacific's dosimetry data, Dr. Holland's and Soli's

disclosures, and Dr. Holland's, Knight's, and Soli's depositions. (Trangle Report at 1; Trangle Supp. Report at 1; Trangle Sec. Supp. Report at 1-3.)

## E. MLSNA'S APPLICATION FOR DISABILITY BENEFITS

16. Mlsna's withdrawn application was for occupational disability, which is different than total disability. *See* [www.rrb.gov/RB-1D/Employe_Disability_Benefits/Occupational_Disability_Annuity](www.rrb.gov/RB-1D/Employe_Disability_Benefits/Occupational_Disability_Annuity) (last visited on March 1, 2019).

17. When making a disability determination, the RRB does not take into account whether a reasonable accommodation would allow an employee to perform his job's essential functions, *i.e.*, an employee may be disabled for RRB purposes but still a qualified individual within the ADA's meaning because a reasonable accommodation enables him or her to perform his or her job's essential functions. *See*, *e.g.*, *Mayo v. CONRAIL*, No. 96-656, 1999 U.S. Dist. LEXIS 22006, at *8 (W.D. Pa. June 23, 1999).

18. In his withdrawn application, Mlsna also disclosed that he could perform each of the fourteen daily living activities about which he was asked and that he intended to continue working. (RRB Application (Dkt. 53-2) at 14-15 of 41.)

## F. THE DEPARTMENT OF WORKFORCE DEVELOPMENT

19. On June 19, 2015, Mlsna filed a complaint with the Department of Workforce Development. (DWD's Probable Cause Findings (Ex. F) at IV(A).)

20. The Department of Workforce Development conducted a thorough investigation. (DWD's Probable Cause Findings.)

21. The Department of Workforce Development found Union Pacific failed to engage in the interactive process. (DWD's Probable Cause Findings at VI(B).)

22. The Department of Workforce Development found Union Pacific failed to reasonably accommodate Mlsna. (DWD's Probable Cause Findings at VI(C).)

## LEGAL STANDARD

Summary judgment is appropriate "only if there is no genuine issue of material fact and no reasonable jury could find for [Mlsna]." *Rowlands v. UPS*, 901 F.3d 792, 798 (7th Cir. 2018). The Court "view[s] all the facts and make all reasonable inferences in h[is] favor." *Id.* The Seventh Circuit "ha[s] stressed in the past, and it is worth repeating, that a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts on summary judgment, and must avoid[ ] the temptation to decide which party's version of the facts is more likely true." *Id.* (quoting *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018)) (internal quotation marks omitted).

## ARGUMENT

Union Pacific argues that Mlsna could not perform his job's essential functions with or without a reasonable accommodation, and that Mlsna's application for RRB benefits estops him from now claiming otherwise. Under the correct framework, however, Union Pacific must prove that Mlsna's job's exposed him to dangerous noise levels that could not be mitigated through hearing protection that would also allow him to pass the FRA's hearing test, or that Mlsna took a position in his RRB application that was contrary to his claims in this case and that the RRB adopted such position. Union Pacific cannot come remotely close to demonstrating either.

## A. FRAMEWORK

Throughout its opening brief, Union Pacific argues that Mlsna is not a qualified individual within the ADA's meaning. (Def. Br. (Dkt. 51) at 21- 32.) But the real issue is whether Mlsna's job level exposed him to dangerous noise levels that could not be mitigated

through a device that also allowed Mlsna to pass the FRA's hearing test. In other words, the real issue is whether Mlsna was a direct threat.

 "The ADA prohibits employers from discriminating against qualified individuals due to a disability." *Rowlands*, 901 F.3d at 798. "A qualified individual is one who, with or without reasonable accommodation, could perform the essential functions of the employment position." *Stragapede v. City of Evanston*, 865 F.3d 861, 865 (7th Cir. 2017) (quoting *Basith v. Cook County*, 241 F.3d 919, 927 (7th Cir. 2001)) (internal quotation marks omitted). Under the ADA, a disability is "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1).

The parties agree that Mlsna suffers from loss of hearing, which is explicitly recognized as a major life activity. (*Compare supra* at Def.'s Prop. Fact No. 1 *and* 42 U.S.C. § 12102(2).) The parties also agree that Mlsna was removed from service because of his hearing loss, which is discriminatory within the ADA's meaning. (*Compare supra* at Def.'s Prop. Fact No. 38 *and* 42 U.S.C. § 12112(b).) Indeed, the only issues about which the parties disagree is whether Mlsna's job's essential functions exposed him to an eight-hour TWA that necessitate him wearing protection and whether there is protection he could wear that would allow him to pass the FRA's hearing test. (*Supra* at Def.'s Prop. Fact Nos. 15, 29, 45, 48, 52, 54.)

"The ADA explicitly recognizes as a defense to a charge that the plaintiff has been denied employment as a result of qualification standards that screen out or tend to screen out individuals with disabilities, the assertion that such standards are job-related and consistent with business necessity and that performance of the job cannot be satisfied through a reasonable accommodation." *Felix v. Wis. DOT*, 828 F.3d 560, 569 (7th Cir. 2016) (quoting 42 U.S.C. § 12113(a)) (internal quotation marks omitted). "Qualification standards are defined to include a

requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace." *Felix*, 828 F.3d at 569 (quoting 42 U.S.C. § 12113(b)) (internal quotation marks omitted); *see also Stragapede*, 865 F.3d at 866. The Seventh Circuit has explicitly recognized that the forgoing statute's language "broadens the concept of direct threat to include individuals who pose a risk of harm to themselves instead of or in addition to others in the workplace." *Felix*, 828 F.3d at 569.

It follows that the issue before the Court is not whether Mlsna is a qualified individual; rather, it is whether Mlsna's job's essential functions exposed him to an eight-hour TWA that posed a risk of harm that could not be mitigated through a reasonable accommodation. *See*, *e.g.*, *Felix*, 828 F.3d at 569. It is therefore Union Pacific's burden to not only "show that such risk exists but also to do so through evidence that is so one-sided that no reasonable jury could resolve the defense in [Mlsna's] favor." *Felix*, 828 F.3d at 569-70.

To avoid this burden, Union Pacific argues that the FRA requires conductors to pass its hearing test, that passing the FRA's hearing test is therefore an essential function of Mlsna's job, and that Mlsna cannot pass the FRA's hearing test. (Def. Br. at 21-22.) But the FRA allows employees to take its hearing test "with or without the use of a hearing aid," and the parties agree that Mlsna can pass the test with his hearing aid. (*Supra* at Def.'s Prop. Fact Nos. 7, 33.)

Union Pacific then tries to sidestep its burden by arguing that the FRA requires conductors to wear hearing protection, that wearing hearing protection is therefore an essential function of their jobs, and that Mlsna cannot pass the FRA's hearing test while wearing hearing protection. (Def. Br. at 21-22.) But for the reasons discussed *infra* at 26-36, the FRA does not require Mlsna to wear hearing protection. Even if the FRA required Mlsna to wear hearing protection, as discussed *infra* at 26-36, Mlsna can pass the FRA's hearing test while wearing it.

Finally, Union Pacific attempts to escape its burden by arguing that its safety policies and job description state that conductors must wear hearing protection, which it claims means wearing hearing protection is an essential function of Mlsna's job. (Def. Br. at 23-25.) Union Pacific is wrong. When determining whether a job duty is an essential functions, courts consider the following: (1) the reason the position exists is to perform that function; (2) there are a limited number of employees available among whom the performance of that job function can be distributed; and/or (3) the function is highly specialized so that the employee is hired for his or her expertise or ability to perform the particular function. 29 C.F.R. § 1630.2(n)(1)-(2). And the reason Mlsna's job exists is not to wear hearing protection, wearing hearing protection has nothing to do with the number of thru-freight conductors Union Pacific employs, and Mlsna wasn't hired for his ability to wear hearing protection.

Try as it might, Union Pacific cannot dispute that the real issue is whether Mlsna's job's essential functions exposed him to dangerous noise levels that could not be mitigated through a hearing protection device that also allowed Mlsna to pass the FRA's hearing test. In other words, Union Pacific cannot dispute that the issue before the Court is whether Mlsna poses a direct threat to the health or safety of either himself or other individuals in the workplace. The burden is therefore on Union Pacific to demonstrate that Mlsna's job's essential functions expose him to noise levels that would exacerbate his hearing loss and that Mlsna cannot pass the FRA's hearing test while wearing hearing protection that mitigates the risk of such harm.

**B. DIRECT THREAT**

Union Pacific chose not to obtain the only evidence that can definitively prove whether Mlsna's job's essential functions expose him to dangerous noise levels. The evidence it does

have fully supports that Mlsna's job's essential functions do not, in fact, expose him to such levels; therefore, Union Pacific is not entitled to summary judgment on its direct threat defense.

"A 'direct threat' is a significant risk to the health or safety of others that cannot be eliminated by a reasonable accommodation." *Stragapede*, 865 F.3d at 866 (quoting 42 U.S.C. § 12111(3)) (internal quotation marks omitted). "Four factors determine whether the risk is significant: (1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that potential harm will occur; and (4) the imminence of potential harm." *Stragapede*, 865 F.3d at 866 (quoting *Emerson v. N. States Power Co.*, 256 F.3d 506, 514 (7th Cir. 2001)) (internal quotation marks omitted). None of these factors support finding that Mlsna is direct threat.

For nearly a decade, Mlsna performed his job's essential functions without hearing protection, and his hearing loss is the same today as it was when he was hired. (*Supra* at Def.'s Prop. Fact Nos. 1, 22; *id.* at Pl.'s Prop. Fact No. 1.) The forgoing is nearly conclusive evidence that the likelihood of the potential harm occurring is zero, from which it follows that the duration of the risk is zero, that the nature and severity of the potential harm is zero, and that the imminence of the potential harm is zero.

Union Pacific responds by citing to a sampling survey, which it claims demonstrates that there is some hypothetical likelihood that Mlsna's job's essential functions expose him to dangerous noise levels. (Def.'s Br. at 22-23.) But Union Pacific must show that the risk exists through evidence that is so one-sided that no reasonable jury could find otherwise. *See*, *e.g.*, *Felix*, 828 F.3d at 569-70. And it chose not to have Mlsna wear a dosimeter, which is the one way it could have gathered the evidence necessary to make such a showing. (Def.'s Prop Fact Nos. 15.)

To be fair, Mlsna agrees that "[w]here circumstances such as high worker mobility, significant variations in sound level, or a significant component of impulse noise make area monitoring generally inappropriate, the [FRA requires it to] use representative personal sampling to comply with [its] monitoring requirements . . . ." 49 C.F.R. §§ 227.103(b)(2). But this is merely a starting point, after which personal dosimetry should be done on employees who the representative personal sampling suggests may be exposed to dangerous noise levels to determine if they are actually exposed to such noise levels. (Trangle Dec. (Ex. G) at ¶ 7.) Such testing is especially warranted when the alternative is to effectively terminate the employee. (*Id.*)

Even assuming *arguendo* that representative personal sampling was the end all be all, the data from the sampling on which Union Pacific relies does not support what Union Pacific would have this Court believe. Only nineteen of the employees in the study held the position Mlsna held, thru-freight conduction; worked for Union Pacific; wore a dosimeter for eight hours or more; did so within the last two decades. (Def.'s Prop Fact Nos. 2, 15.) And none of them were exposed to an eight-hour TWA of ninety decibels or greater. (*Id.*)

Furthermore, Union Pacific has identified only three sources of noise that expose thru-freight conductors to an eight-hour TWA of ninety or greater decibels, and the employees in the study on which the company relies were not told to minimize their exposure to these sources. (Def.'s Prop Fact No. 15.) Had they been so told, there are simple ways in which they could have reduced their exposure to these noises. (*Id.*) Indeed, they could have done things as easy as shutting their cabs' windows. (*Id.*)

Throughout its brief, Union Pacific tries to escape the logical conclusions from the forgoing by implying that Mlsna's removal from service was not due to any culpable act on its part and was instead a consequence of it merely enforcing FRA regulations that require

conductors to pass a hearing and wear hearing protection. (Def. Br. at 21-27.) Regarding the former, however, Union Pacific has acknowledged that the FRA requires conductors to pass its hearing test "with or without the use of a hearing aid," which Mlsna could do. (Def.'s Prop Fact No. 7.) And concerning the latter, the applicable regulation states only that railroads "shall require the use of hearing protectors when an employee is exposed to sound levels equivalent to an 8-hour TWA of 90dB(A) or greater," which is a noise level to which his job's essential functions did not expose Mlsna. (Def.'s Prop Fact Nos. 15, 18.)

At day's end, Union Pacific cannot show that Mlsna's removal from service was either necessitated by regulation or warranted by safety concerns. This is especially true when the evidence is viewed in the light most favorable to Mlsna. Union Pacific is therefore not entitled to summary judgment on its direct threat defense

## C. REASONABLE ACCOMMODATION

Even had Mlsna's job's essential functions exposed him to noise levels that necessitated him wearing hearing protection, Union Pacific had an obligation to work with Mlsna to identify reasonable accommodations that could have mitigated such risk. Union Pacific, however, did nothing more than summarily reject Mlsna's request for a reasonable accommodation. Had it done what it was required to do, Union Pacific would have found not only that the device Mlsna requested would have allowed him to safely perform his job's essential functions but also that there are a plethora of other devices that would do the same.

"A 'direct threat' is a significant risk to the health or safety of others **that cannot be eliminated by a reasonable accommodation**." *Stragapede*, 865 F.3d at 866 (quoting 42 U.S.C. § 12111(3)) (internal quotation marks omitted) (emphasis added). "After an employee has disclosed that [he or] she has a disability, the ADA requires an employer to engage with the

employee in an interactive process to determine the appropriate accommodation under the circumstances." *Spurling v. C&M Fine Pack, Inc.*, 739 F.3d 1055, 1061 (7th Cir. 2014). (quoting *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005) (quoting *Gile v. United Airlines, Inc.*, 213 F.3d 365, 373 (7th Cir. 2000))) (internal quotation marks omitted). "Both parties are required to make a good faith effort to determine what accommodations are necessary, but if a breakdown of the process occurs, courts should attempt to isolate the cause . . . and then assign responsibility." *Lawler v. Peoria Sch. Dist. No. 150*, 837 F.3d 779, 786 (7th Cir. 2016) (quoting *Beck v. Univ. of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996)).

Here, Union Pacific made an employee in its industrial hygiene department, who is not a doctor and who had received no training from the company on the ADA, responsible for determining whether to accommodate Mlsna. (*Supra* at Def.'s Prop Fact Nos. 48; *id.* at Pl.'s Prop. Fact Nos. 7, 10.) The employee in Union Pacific's industrial hygiene department, in turn, reviewed the brochure Mlsna had provided for one device and summarily denied Mlsna's request. (Def.'s Prop Fact Nos. 45.) It is worth noting that the employee Union Pacific made responsible for the accommodation decision did not call the manufacturer of the device Mlsna requested to determine whether the device had an NRR; contact an audiologist to determine whether custom-fit devices are, in fact, safe; or do anything to look at whether there were other devices that could accommodate Mlsna. (*Id.*)

The law required Union Pacific to "make a reasonable effort to explore" possible accommodations. *Lawler*, 837 F.3d at 786 (quoting *Miller v. Ill. Dep't of Corr.*, 107 F.3d 483, 486 (7th Cir. 1997)) (internal quotation marks omitted). Instead, to quote the Seventh Circuit, Union Pacific "hardly engag[ed] with [Mlsna] to determine if a reasonable accommodation could

be made." *Spurling*, 739 F.3d at 1061-62; *see also Clemens v. Speer*, No. 16-cv-467-wmc, 2017 U.S. Dist. LEXIS 95489, at *9 (W.D. Wis. June 21, 2017). And it blaming Mlsna for not requesting more devices is rich. *See*, *e.g.*, *Lawler*, 837 F.3d at 786 (holding that employers cannot shield themselves from liability by "choosing not to follow up on an employee's requests for assistance or by intentionally remaining in the dark") (quoting *Sears, Roebuck*, 417 F.3d at 803-04) (internal quotation marks omitted).

The forgoing having been said, Mlsna recognizes that "an employer's failure to engage in the interactive process alone is not an independent basis for liability" and that such failure is actionable only "if it prevents identification of an appropriate accommodation for a qualified individual." *Spurling*, 739 F.3d at 1062 (quoting *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1039 (7th Cir. 2013)) (internal quotation marks omitted). But the evidence in this case suggests that reasonable accommodations were readily available. (Def.'s Prop. Fact No. 52.) Indeed Dr. Kloss and Dr. Trangle have opined not only that the devices Mlsna requested would have accommodated him but also that there are other custom-fit devices and AHPDs that could have done the same. (*Id.*)

Citing to, among other cases, *Sieberns v. Wal-Mart Stores, Inc.,* 946 F. Supp. 664 (N.D. Ind. 1996), *aff'd,* 125 F.3d 1019 (7th Cir. 1997), Union Pacific tries to narrow the issue before the Court to only whether the device Mlsna requested would have allowed him to safely perform his job's essential functions, arguing that the he did not request other custom-fit devices or AHPDs as a reasonable accommodation until litigation. (Def. Br. at 39-41.) This Court has made clear, however, that *Sieberns* and cases like it do not stand for the proposition for which Union Pacific cites them:

> [T]hese cases are not instructive because plaintiff was not expecting defendant "to explore every feasible accommodation on its own accord." Rather, the question is

whether defendant had an obligation to consider whether there was **some** way that plaintiff could retain the job he had been performing for several years before reassigning him to an obviously less desirable position.

The cases defendant cites do not hold that an employer cannot be held liable for failing to provide a particular accommodation unless the employee requested it expressly. Rather, "[a]n employee begins the accommodation process by notifying her employer of her disability." Spurling v. C & M Fine Pack, Inc., 739 F.3d 1055, 1061 (7th Cir. 2014). "[A]t that point, . . . the ADA requires an employer to engage with the employee in an interactive process to determine the appropriate accommodation under the circumstances." *Id.* (internal quotations omitted).

*Sullivan v. Spee-Dee Delivery Serv.*, 138 F. Supp. 3d 1050, 1058 (W.D. Wis. 2015) (emphasis, omission, and substitutions in original).

Regarding the device Mlsna requested and other custom-fit devices, Union Pacific then argues that they are unsafe because they do not have NRRs. (Def. Br. at 30-31.) But they do, in fact, have NRRs. (Def.'s Prop. Fact Nos. 45, 48.) In any event, there are not only other ways to determine a device's efficacy but also ways that are better than relying on a manufacturer-provided NRR. (Def.'s Prop. Fact No. 29.)

Finally, Union Pacific argues that Mlsna has failed to show that any of the devices he has requested would allow him to pass the FRA's hearing test (Def. Br. at 28.) Such claim ignores that the devices amplify sound by an amount that should enable Mlsna to pass such testing. (Def.'s Prop. Fact Nos. 52, 54.) At best for Union Pacific, there is therefore a battle of experts on the issue, with Mlsna's experts opining that the devices will enable Mlsna to pass the FRA's hearing tests and Union Pacific's admittedly less qualified witnesses claiming they do not know one way or the other. (*Id.*)

A reasonable person not only could find that Mlsna could have been accommodation but also would so find. A reasonable person could also find that Union Pacific's failure to engage in the interactive process is what prevented such accommodations from being offered. It follows

that a reasonable person could find that by burying its head in the sand and removing Mlsna from service, Union Pacific violated the law.

## D. MLSNA's WITHDRAWN RRB APPLICATION

As a last resort, Union Pacific tries to avoid having to defend its unlawful actions to a jury by arguing that Mlsna applied to the RRB for disability benefits and that such application estops him from now claiming that he could perform his job's essential functions. But Mlsna withdrew his application before he received any benefits. Equally important, Mlsna's claims to the RRB are not irreconcilable with his claims in this case.

"The doctrine of judicial estoppel prevents a party from adopting a position in a legal proceeding contrary to a position successfully argued in an earlier legal proceeding." *Johnson v. ExxonMobil Corp.*, 426 F.3d 887, 891 (7th Cir. 2005). It "is an equitable concept providing that a party who prevails on one ground in a lawsuit may not . . . in another lawsuit repudiate that ground." *Id.* (quoting *United States v. Hook*, 195 F.3d 299, 306 (7th Cir. 1999) (quoting *Ogden Martin Systems of Indianapolis v. Whiting Corp.*, 179 F.3d 523, 526 (7th Cir. 1999))) (internal quotation marks omitted). There are therefore "certain clear prerequisites that must [be demonstrated] before judicial estoppel applies: (1) the later position must be clearly inconsistent with the earlier position; (2) the facts at issue should be the same in both cases; and (3) the party to be estopped must have convinced the first court to adopt its position." *1st Source Bank v. Neto*, 861 F.3d 607, 612 (7th Cir. 2017) (quoting *Hook*, 195 F.3d at 306 (quoting *Levinson v. United States*, 969 F.2d 260, 264-65 (7th Cir. 1992))) (internal quotation marks omitted).

In its opening brief, at 32-35, Union Pacific points to Mlsna's application to the RRB for benefits as a proceeding in which Mlsna took an opposite position than he takes in this case. But Mlsna withdrew his application before he received any benefits. (*Supra* at Def.'s Prop. Fact No.

58.) Accordingly, Mlsna did not convince the RRB to adopt his position, which means judicial estoppel does not apply. *See*, *e.g.*, *1st Source Bank*, 861 F.3d at 612.

Union Pacific responds by citing to *Lee v. City of Salem, Ind.,* 259 F.3d 667 (7th Cir. 2001), which it claims stands for the proposition that "[a]n employee's abandonment of his disability application and change of position cannot overcome judicial estoppel." (Def. Br. at 33.) In so doing, Union Pacific has cherry-picked quotes to make it appear that the plaintiff in that case had abandoned his application and that the court nevertheless found that he was judicially estopped from pursuing his ADA claims. (*Id.*) But the plaintiff in *Lee* never withdrew his application for benefits and, in fact, obtained the benefits, which is why the court found he was judicially estopped from arguing that he was a qualified individual within the ADA's meaning. *Lee*, 259 F.3d at 675.

Even assuming *arguendo* that the *Lee* court had held what Union Pacific would have this Court believe it held, Union Pacific would not be entitled to the relief it seeks. The Supreme Court has found that applicants' claims of being disabled on benefit applications, even when adopted by the benefit providing agency, "do not automatically judicially estop ADA claims." *Johnson*, 426 F.3d at 891. Indeed, the Court has explicitly found that "the two claims do not inherently conflict to the point where courts should apply a special negative presumption . . . ." *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 802-03 (1999).

As the Seventh Circuit noted in *Feldman v. American Memorial Life Insurance Co.*, 196 F.3d 783 (7th Cir. 1999), "[s]ufficient divergence exists between the definitions of 'disability' under the ADA and [benefit regulations] that, in some circumstances, an individual can claim truthfully both that [he or] she is unable 'to engage in any substantial gainful activity' under the [the benefit regulation] but is also a 'qualified individual with a disability' under the ADA."

*Feldman,* 196 F.3d at 790. Courts therefore allow employees an opportunity to explain away any apparent inconsistencies. *See*, *e.g.*, *Cleveland*, 526 U.S. at 807. Specifically, an explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless perform the essential functions of her job, with or without reasonable accommodation. *Id.*

Mlsna's explanation includes that he informed the RRB not only that he could perform each of the fourteen daily living activities about which it asked but also that he intended to continue working. (*Supra* at Pl.'s Prop. Fact No. 18.) Mlsna's explanation also includes that he claims in this case that he could continue working with a reasonable accommodation, which is a factor the RRB does not consider. (*Compare supra* at # *and id.* at Pl.'s Prop. Fact No. 17.) Finally, Mlsna's explanation includes that he was applying for occupational and not total disability. (*Supra* at Pl.'s Prop. Fact No. 16.)

Mlsna's explanations are similar to, if not better than, the explanations plaintiffs' explanations in *Self v. BNSF Ry. Co.*, No. 14-cv-618, 2016 U.S. Dist. LEXIS 15500 (W.D. Tex. Feb. 8, 2016), *Mayo*, 1999 U.S. Dist. LEXIS 22006, and *Donahue v. CONRAIL*, 52 F. Supp. 2d 476 (E.D. Pa. 1999). In those cases, the plaintiffs received occupational disability benefits from the RRB, which did not take into account whether a reasonable accommodation would allow them to perform their jobs' essential functions, and had made statements to the RRB in their applications that indicated that they may be able to work with such accommodation. *Self*, 2016 U.S. Dist. LEXIS 15500, at *21-26; *Mayo*, 1999 U.S. Dist. LEXIS 22006, at *4-8; *Donahue*, 52 F. Supp. 2d 476, 479-80. The courts therefore properly found that the plaintiffs were qualified individuals under the ADA despite the RRB's disability determination. *See Self*, 2016 U.S. Dist.

LEXIS 15500, at *21-26; *Mayo*, 1999 U.S. Dist. LEXIS 22006, at *4-8; *Donahue*, 52 F. Supp. 2d 476, 479-80.

The only case to which Union Pacific can cite regarding a court finding that an employee's application for RRB benefits estopped him or her from pursuing ADA claims is *Pickens v. Soo Line R.R. Co.*, 264 F.3d 773 (8th Cir. 2001). (*See* Def. Br. at 32-35 (otherwise citing to cases involving SSDI benefits).) But the *Pickens* court did things in reverse order, finding that the plaintiff was not able to perform his job's essential functions and that judicial estoppel applied because a reasonable juror could not find otherwise. *Pickens*, 264 F.3d at 778. Moreover, unlike Mlsna, the employee certified that he was completely unable to work. *Pickens*, 264 F.3d at 778.

*Pickens* and the other cases to which Union Pacific cites are easily distinguishable. Indeed, the facts of this case are much more similar to *Self*, *Mayo*, and *Donahue*. And the reasoning in those cases is persuasive. Union Pacific's estoppel argument should be rejected.

## CONCLUSION

When this case's actual facts are analyzed under the correct framework and viewed in Mlsna's favor, it is clear that Mlsna's job's essential functions did not expose him to a dangerous noise level and that there are devices that could have mitigated any dangerous noise levels to which Mlsna was exposed while also enabling him to pass the FRA's hearing test. It is also clear that Mlsna's withdrawn application for RRB benefits does not exempt Union Pacific from liability for its violations of Mlsna's ADA rights. Union Pacific's motion for summary judgment should be denied.

Dated: March 6, 2019

Respectfully submitted:

s/ Nicholas D. Thompson
Nicholas D. Thompson, Esq.
 (MN #1078903)
THE MOODY LAW FIRM, INC.
500 Crawford Street, Suite 200
Portsmouth, VA 23704
Telephone: (757) 393-4093
Fax: (757) 397-7257
E-mail: nthompson@moodyrrlaw.com

Thomas W. Fuller (MN #0394778)
Hunegs, LeNeave & Kvas, P.A.
1000 Twelves Oaks Center Drive
Suite 101
Wayzata, MN 55391
tfuller@hlklaw.com

**Attorneys for Mark Mlsna**

## CERTIFICATE OF SERVICE

I hereby certify that on March 6, 2019 I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic mean, as more fully reflected on the Notice of Electronic filing:

Scott P. Moore (NE# 20752)
David P. Kennison (NE# 25510)
Baird Holm LLP
1700 Farnam St. Ste. 1500
Omaha, NE 68102
402-636-8311
402-344-0588 (facsimile)
spmoore@bairdholm.com
dkennison@bairholm.com

***Attorney for Defendant***

/s/Nicholas D. Thompson_____