IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

MARK MLSNA,

                              Plaintiff,                    OPINION AND ORDER

        v.
                                                            18-cv-37-wmc
UNION PACIFIC RAILROAD COMPANY,

                              Defendant.

Plaintiff Mark Mlsna claims that defendant Union Pacific Railroad Company violated the Americans with Disabilities Act in declining to recertify him as a train conductor because of his hearing impairment. Defendant has moved for summary judgment (dkt. #50), arguing generally that Mlsna was not a "qualified individual" because he could not simultaneously meet Federal Railroad Administration hearing acuity standards while wearing required hearing protection. Because plaintiff failed to marshal enough evidence for a reasonable jury to conclude that he could fulfill the essential functions of the train conductor position with a reasonable accommodation, defendant is entitled to summary judgment.[1] Also before the court are defendant's motion to strike an expert declaration (dkt. #82) and plaintiff's motion for leave to supplement the record to provide a late expert report (dkt. #86). Both of these motions will be denied, albeit for different reasons as set forth below.

---

[1] Because defendant is entitled to summary judgment based on plaintiff's inability to make his *prima facie* case, the court need not address the parties' arguments about direct threat or judicial estoppel.

## A. Background

Mlsna has a hearing impairment and has worn hearing aids for over 20 years. He began working for Union Pacific as a thru-freight train conductor in 2007. The written job description for this position identified the following essential functions and qualifications: (1) "[f]ollowing safety precautions"; (2) "[m]onitoring, observing, interpreting, and relaying signals and placards to gather and communicate information"; (3) being "abl[e] to recognize sounds and changes in sounds"; (4) "[c]ommunicating clearly with co-workers and train dispatchers via radio"; (5) "[a]ttending to and understanding key pieces of spoken information"; and (6) "Safety Orientation: [t]he willingness to practice safe work habits." (Train Crew Job Description (dkt. #57-1) 2-3.) In describing work conditions, the job description also notes that a conductor "[m]ust wear personal protective equipment such as safety glasses, safety boots, hard hats, and hearing protection where the company requires," as well as "[e]nsure compliance with all railroad rules and

---

[2] Viewing the facts in the light most favorable to plaintiff as the non-moving party, the following facts are material and undisputed for purposes of summary judgment except where noted. At the outset, the court notes that the parties appear confused by the court's standard summary judgment procedures, particularly regarding proposed findings of fact. The party moving for summary judgment is supposed to file "[i]n a separate document, a statement of proposed findings of fact or a stipulation of fact between or among the parties to the action, or both," while the nonmoving party is supposed to respond to the moving party's proposed facts and "may propose its own findings of fact . . . to SUPPLEMENT the moving party's proposed findings of fact." (Prelim. Pretrial Packet (available at dkt. #16) 3, 4.) Additionally, the procedures explain that in responding to the moving party's proposed findings of fact, the nonmoving party is to "[a]nswer *each* numbered fact proposed by the moving party in separate paragraphs, using the same number." (*Id.* at 5 (emphasis added).) Here, not only did the parties include their proposed findings of fact *in* their briefs, but they failed to respond to all proposed facts. Obviously, facts that were not addressed will be deemed undisputed, but the court prefers to have facts laid out as described in its standard procedures.

regulations for safety, operations and Federal Railroad Administration (FRA)." (Train Crew Job Description (dkt. #57-1) 5.) As reflected by this job description, conductors rely heavily on communications from other crew members and dispatchers, including warning sounds and alerts conveying potential hazards. (Jennings Decl. (dkt. #59) ¶ 3.) Moreover, Mlsna agrees that the train conductor position is "safety-sensitive," such that an individual's inability to meet the position requirements could pose a threat to people's safety. (Mlsna Dep. (dkt. #27) 17:23-18:12.)

### B. Hearing Acuity Standards & Hearing Conservation Policy

In January 2012, the FRA promulgated new regulations, which require railroads, including Union Pacific, to certify that its conductors met specific, minimum hearing acuity standards. In particular, the regulations required conductors to pass a hearing test demonstrating that they "do[] not have an average hearing loss in the better ear greater than 40 decibels with or without the use of a hearing aid." 49 C.F.R. §§ 242.117(i), 242.109(a)(2). FRA regulations also require railroad employees to wear hearing protections in two situations: (1) when exposed to sound levels equivalent to an 8-hour time-weighted average ("TWA") of 90 decibels or greater; or (2) when exposed to sound levels of 85 decibels or greater if the employee has not yet had a baseline audiogram or experiences a worsening change in hearing sensitivity. 49 C.F.R. § 227.115(c)-(d). Under FRA regulation, hearing protectors must generally attenuate employee exposure to an 8-hour TWA of 90 decibels or lower, but for employees who have experienced worsening hearing sensitivity, the hearing protection must attenuate exposure to at most an 8-hour TWA of 85 decibels.

As required by the FRA, Union Pacific created a Hearing Conservation and Policy Program, which covers employees who "may be subjected to noise exposures equal to or exceeding an 8-hour [TWA] sound level of 85 decibels." (Hearing Conservation Policy (dkt. #58-1) 1.) Likewise, Union Pacific performs noise monitoring to determine which employees are covered by the policy, including representative sampling.[3] Over a period of approximately 30 years, Union Pacific tested the sound exposure levels for 172 "thru-freight" conductors and 91 "local" conductors, using a noise dosimeter to create a snapshot of exposure levels at different locations.

This testing revealed that 62 of 172 "thru-freight" conductors were exposed to an 8-hour TWA of 85 decibels or greater, while 22 of 172 were exposed to an 8-hour TWA of over 90 decibels. As to "local" conductors, 29 of 91 were exposed to an 8-hour TWA of 85 decibels or greater, while six were exposed to an 8-hour TWA of over 90 decibels.

Based on this dosimetry testing, Union Pacific considered all conductors to fall under the Hearing Conservation Policy. (Knight Decl. (dkt. #60) ¶ 8.) Plaintiff notes that Union Pacific did not verify whether *his* individual essential job functions *actually* exposed him to an 8-hour TWA of 90 decibels. (Opp'n (dkt. #72) 4-5.)

Union Pacific's hearing conservation policy also "requires all employees to wear

---

[3] FRA regulation directs railroads to "use a sampling strategy that is designed to identify employees for inclusion in the hearing conservation program and to enable the proper selection of hearing protection." 49 C.F.R. § 227.103(b)(1). Further, if circumstances "make area monitoring generally inappropriate, the railroad shall use representative personal sampling to comply with the monitoring requirements, . . . unless the railroad can show that area sampling produces equivalent results." 49 C.F.R. § 227.103(b)(2). "Representative personal sampling means measurement of an employee's noise exposure that is representative of the exposures of other employees who operate similar equipment under similar conditions." 49 C.F.R. § 227.5.

approved hearing protection in identified hearing protection areas," which are demarcated by signs. (Hearing Conservation Policy (dkt. #58-1) 1, 3.) This policy directs all employees to wear hearing protection when they are within a 150-foot radius of a locomotive, unless inside the cab with the doors and windows closed. (*Id.* at 6.) Union Pacific contends that working within 150 feet of a locomotive was central to the position of train conductor, and Mlsna admitted that he worked within a 150-foot radius of a locomotive. (Mlsna Dep. (dkt. #27) 20:8-11, 21:25-22:3.) These additional rules are mandatory for all employees, including those whose regular potential noise exposure is less than the 8-hour TWA of 85 decibels. Indeed, plaintiff alleges in both his complaint and amended complaint that "Train Crewm[e]n work in a noisy environment and are therefore required to wear hearing protection." (Compl. (dkt. #1) ¶ 14; Amend. Compl. (dkt. #3) ¶ 14.)[4]

There is no dispute that Union Pacific provides its employees with hearing protection under its Hearing Conservation Policy. (Hearing Conservation Policy (dkt. #58-1) 1.) This policy noted that Union Pacific declined to authorize custom molded ear plugs, but instead relied on personal protective equipment approved by the Safety

---

[4] While there is no dispute that this policy applied universally, Mlsna muddled the record somewhat by testifying at his deposition that he and his colleagues never wore hearing protection. (Mlsna Dep. (dkt. #27) 67:10-68:8.) Despite that testimony, he did not really dispute the need for hearing protection even in his deposition. (*Id.* 57:12-18 (acknowledging importance of Union Pacific protecting its employees' hearing and conductors' wearing "appropriate hearing protection devices to protect their hearing"); *see also* Decl. of Lucas Mason (dkt. #61) ¶ 4 ("To the best of my recollection and knowledge, Mark Mlsna wore hearing protection when and where required.").) Regardless, at this late date, plaintiff is bound by his affirmative pleading for purposes of this case, as discussed below.

Department.[5]  The Safety Department further authorized use of an amplified hearing protection device ("AHPD"), which is an ear-muff style protector with an external microphone and internal speaker that amplifies noise and permits the person to hear sounds, while also blocking harmful levels of sound.  In particular, the Safety Department approved the Pro Ears -- Gold device, which prevents sounds greater than 85 decibels from reaching the external ear canal and ear drum.  Union Pacific selected this product because of its certified NRR of 30 decibels.[6]  (Holland Decl. (dkt. #58) ¶ 11.)

However, the policy expressly states that "[h]earing aids are not approved UPRR Hearing Protection Devices (HPDs) and are not effective for this purpose."  (Hearing Conservation Policy (dkt. #58-1) 1.)  Likewise, Union Pacific does not permit employees to wear hearing aids under hearing protectors or AHPDs because the combination: (1) is not tested or approved; (2) lacks a laboratory-determined NRR; and (3) may result in harmful noise exposure from excessive environmental noise.  (Holland Decl. (dkt. #58) ¶ 17; Jan. 16, 2015 Letter (dkt. #53-4) 1.)

---

[5] Union Pacific's policy does not permit custom molded ear plugs because of concerns that their quality is highly variable.  (Knight Decl. (dkt. #60) ¶ 15.)  Mlsna disputes the soundness of that concern, contending that custom earplugs are no more likely than other devices to lose their seal.  (Trangle Suppl. Rpt. (dkt. #81) 2 ("Despite Dr. Holland's assertion that he had heard and believed that molded plugs deform over time, if true, this would equally apply to molded-earplugs considered acceptable to [Union Pacific.].").)  Mlsna notes that Union Pacific previously had approved in-the-ear amplification devices, but Union Pacific explains that those devices were not custom devices and had noise reduction ratings ("NRRs").  (*See* Knight Dep. (dkt. #79) 62:24-64:21 (discussing "expandable products").)

[6] The parties dispute whether an NRR is necessary to determine the noise attenuation provided by a hearing protection device (Opp'n (dkt. #72) 9-10), but as discussed below that dispute is immaterial.

### C. Mlsna's Failed Hearing Certification & Proposed Accommodations

The 2012 FRA regulations "grandfathered in" then-current conductors for thirty-six months, so Mlsna did not have to complete his hearing certification until February 2015. He first underwent the required testing on December 18, 2014, during which his hearing was tested under four circumstances: (1) unaided; (2) with hearing aids; (3) with an AHPD, but with the amplification turned off; and (4) with an AHPD and the amplification turned all the way up. (*See* Hearing Test Results (dkt. #53-3) 1.) Mlsna only met the minimum FRA hearing criteria when tested with his hearing aids and no AHPD. Comparing these results to Mlsna's baseline audiogram revealed no change in hearing sensitivity.

After receiving these results, Union Pacific arranged for additional testing by an audiologist with Mlsna wearing the Union Pacific-approved APHD. This second round of testing occurred on January 8, 2015. Again, Mlsna's hearing was tested under the same circumstances. (*See* Jan. 8, 2015 Audiology Notes (dkt. #53-1) 7.) This testing also found that Mlsna only met FRA standards when he was wearing hearing aids without protection. Union Pacific did not know that Mlsna failed to meet minimum hearing criteria until this second round of certification testing. Following that testing, Union Pacific concluded that it could no longer certify Mlsna as a conductor because he could not meet the FRA-imposed hearing requirements while wearing a required AHPD.

Union Pacific's Health and Medical Services department then (1) informed Mlsna's supervisor that the railroad could not certify Mlsna and (2) asked what reasonable accommodations would permit Mlsna to continue working. Unfortunately, Mlsna's

supervisor could not identify a reasonable accommodation permitting Mlsna to continue to safely work as a conductor.

In March 2015, Mlsna suggested he be allowed to use E.A.R., Inc.'s "Primo" device, a custom-made earplug, as a possible way for him to satisfy the FRA acuity standards, while providing an adequate level of hearing protection. Despite the Hearing Conservation Policy's prohibition on custom molded ear plugs, Union Pacific reviewed the literature regarding the E.A.R. Primo, ultimately rejecting it because the literature did not specify an NRR. (Knight Dep. (dkt. #95) 22:21-23:11.) In response, Mlsna contends that an NRR *could* apply to a custom device. (Opp'n (dkt. #72) 11-12 (citing Gordon Dep. (dkt. #70) 29:9-31:2.)

The Industrial Hygiene Department at Union Pacific is responsible for evaluating workplace conditions, developing safety and regulatory compliance programs, providing health and safety training, evaluating employee noise exposure, and identifying appropriate hearing protection devices. In evaluating hearing protection devices, the department does not test the devices and instead relies on their manufacturer-provided NRRs. Without a manufacturer-provided NRR, the department would not approve a device because the department could not be sure of the level of protection.

Blake Knight, a Union Pacific Industrial Hygiene Manager, reviewed the E.A.R. Primo to confirm that it did not have a manufacturer-provided NRR, and accordingly, that the Industrial Hygiene Department could not determine one.[7] (Knight Decl. (dkt. #60)

---

[7] Dr. Holland relied on the Industrial Hygiene Department to determine the appropriateness of hearing protection.

¶ 15.)  Prior to filing suit, Mlsna never contradicted Union Pacific's conclusion that the E.A.R. Primo lacked an NRR, nor did he undergo audiological testing while using the device to determine whether he met the FRA hearing acuity requirements.  Regardless, Mlsna does not dispute that the lack of a manufacturer-provided NRR was the reason that Union Pacific rejected the E.A.R. Primo; rather, he disputes the accuracy of that determination and the reasonableness of the effort undertaken to reach it.[8]  (Trangle Suppl. Rpt. (dkt. #81) 4 ("The NRR for the E.A.R. earplug is 31-32 dB and the E.A.R. Sensear earmuffs is NRR of 27 dB per the device representative.");[9] Knight Dep. (dkt. #95) 22:21-23:15 (testifying that the proposed accommodation was rejected because no NRR was available, but that he only reviewed the provided literature).)

In rejecting Mlsna's proposed E.A.R. Primo as an accommodation, Union Pacific also advised Mlsna that he could submit other proposed devices for evaluation.  However, Mlsna did not propose other accommodations until after litigation was already underway, meaning Union Pacific could only have investigated Mlsna's proposed device.

In response, Mlsna now points to his experts' opinions that *other* AHPDs and

---

[8] Mlsna acknowledged that Union Pacific "always" communicated its concern about custom devices not having NRRs, but contends that his proposed accommodation was initially rejected because of cost.  (Mlsna Dep. (dkt. #27) 38:12-39:2, 44:5-8; *see also* Owens Dep. (dkt. #39) 34:22-36:11 (testifying she inappropriately cited cost in rejecting Mlsna's proposed accommodation but that "[a]s it boiled down, [cost] was not [a reason for denying the accommodation]").)

[9] Defendant objects to this opinion of Dr. Kevin Trangle because the opinion is based on information in "a recent brochure from 2015" that he has in his possession but could not identify the E.A.R. representative with whom he spoke to obtain it.  (Trangle Dep. (dkt. #46) 85:8-16, 86:18-20.)  Further, as defendant points out, this opinion is contradicted by that of an E.A.R., Inc. employee:  Garry Gordon testified that the E.A.R. Primo lacked a manufacturer-provided NRR, but would be expected to have an NRR "in the neighborhood of 24 to 26 maybe 27" (Gordon Dep. (dkt. #70) 29:12-30:10), well below the 30 decibel certified standard met by the device Union Pacific adopted for its employees (Holland Decl. (dkt. #58) ¶ 11).

custom devices could be used to accommodate him, but there is *no* evidence that Union Pacific was aware of any device in 2015 that would provide sufficient noise amplification and protection to permit Mlsna to meet the FRA requirements. (*See* Kloss Rpt. (dkt. #76) 1 (opining that "Mr. Mlsna could be safely accommodated with current available technology such that he would comply with the FRA regulations and work as a railroad Conductor," identifying five models of earplugs or earmuffs that provide sufficient sound amplification and protection); Kloss Suppl. Rpt. (dkt. #74) ¶ 2 ("There are custom digital hearing protection devices that can provide the 25dB of amplification" including products by Electronic Shooters Protection, which "are custom made hearing protection devices that are similar to hearing aids but can be manufactured with . . . a 25dB . . . that would presumably allow Mr. Mlsna to meet the FRA requirement."); Trangle Rpt. (dkt. #77) 1 (opining that "Mlsna could easily have been accommodated in his position as a conductor for the railroad" through use of AHPDs); Trangle Suppl. Rpt. (dkt. #81) 2-4 (opining that "[u]se of custom-molded protection for him, like what Mr. Mlsna provided that had been tailored for his use, could have worked" and discussing suitability of the Howard Leight Impact Pro Industrial earmuff and E.A.R. earplug and earmuffs); Trangle 2d Suppl. Rpt. (dkt. #56) 1 (opining that Honeywell's Howard Leight AHPD product "would provide Mr. Mlsna with hearing protection and necessary amplification"); Holland Decl. (dkt. #58) ¶ 21.)

After Union Pacific declined to recertify Mlsna as a conductor and Mlsna's department was "unable to identify a reasonable accommodation" permitting him to return to work safely, Union Pacific referred him to its Disability Management Department for

assistance. (Jan. 30, 2015 Letter (dkt. #57-2) 1.) Specifically, Union Pacific wrote a letter on January 30, 2015, that offered "experienced[,] certified vocational rehabilitation professionals" to "sit down with [him] and help [him] plan [his] next steps." (*Id.*) The letter further advised that if Mlsna did not contact the Disability Management Department within 30 days, then Union Pacific would assume that he did not require assistance. (*Id.*) The letter also enclosed a document titled, "What are my options now that I am unable to return to my Railroad job?" (*Id.* at 3-4.) That document explained:

> Assistance is available to help you look at your job options both inside the Union Pacific Railroad and outside of the railroad in your local community. . . . Following your call, a member of UPRR[']s Disability Prevention and Management Team (DP&M) will be assigned to assist you for up to 60 days.
>
> *       *       *
>
> <u>No one at UPRR can create a job specifically for you.</u> However, the DP & M staff can
>
> A. Teach you how to access information about vacancies within the Union Pacific Railroad and help you match your current skills/level of function with available job openings within UPRR;
> B. Assist you with the application process for any UPRR jobs that you are interested [in] & qualified for;
> C. Assist you with resume preparation and interview skills;
> D. Help you to identify sources of assistance for job leads within your local community; and
> E. Identify resources within your community that can assist you with retraining and/or longer term services.

(*Id.* at 3.) The attachment also provided information about the railroad retirement board and other disability benefits. (*Id.* at 3-4.)

Mlsna contends that Union Pacific would not have been able to accommodate his disability with another position. (*See* Deardorff Dep. (dkt. #96) 8:7-10 (testifying that he did not know of any positions Mlsna "could have bumped to that did not require him to

wear hearing protection").)   However, Mlsna does not *remember* contacting the disability prevention and management team at Union Pacific, and he acknowledges never asking Union Pacific for assistance, as well as denying interest in changing jobs within the railroad. (Mlsna Dep. (dkt. #27) 34:3-35:9, 74:20-75:4.)   Instead, Mlsna applied for disability benefits from the railroad retirement board ("RRB").   On his application, he represented that his medical conditions prevent him from working.  (RRB App. (dkt. #53-2) 10.)  Upon learning that he could obtain retirement benefits, Mlsna abandoned his disability benefits application altogether.

Still, Mlsna did ask Union Pacific to reconsider its decision not to recertify him.  In response, Holland explained that: (1) safety required all train crew members "to be able to accurately hear spoken and radio communications"; (2) Mlsna had been "removed from service as a Trainman" following the December 18, 2014 audiogram showing "significant hearing loss in both ears"; (3) Union Pacific "requires all Trainmen to have a minimum hearing threshold in the better ear of 40 decibels or less . . . either with unaided hearing or when using a UPRR-approved AHPD"; (4) Mlsna's tests "indicate[d] that [he] ha[d] substantial bilateral hearing loss that poses a significant, imminent and unacceptable safety risk . . . if [he] were to work as a Trainman for UPRR"; (5) he "d[id] not have the hearing ability to safely perform [his] essential job duties as a Trainman even when . . . using a UPRR approved AHPD"; (6) Union Pacific could not locate "any adaptive device that would allow [Mlsna] to hear adequately for safe work as a Trainman and still provide adequate hearing protection in areas where this is required."  (June 9, 2017 Letter (dkt. #58-2) 1-3.)

OPINION

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At this stage, all reasonable inferences must be drawn in favor of plaintiff as the nonmoving party. *Ozlowski v. Henderson*, 237 F.3d 837, 839 (7th Cir. 2001) (citing *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)). To avoid summary judgment, plaintiff must marshal enough evidence -- not merely a scintilla -- to permit a jury to rule in his favor. *Nowak v. St. Rita High School*, 142 F.3d 999, 1002 (7th Cir. 1998) (internal citations omitted).

Defendant seeks summary judgment contending that plaintiff simply "cannot show that Union Pacific discriminated against him because of his hearing impairment." More specifically, even though Mlsna is "disabled" under the ADA, he cannot establish that: (1) he is a "qualified individual"; and (2) he suffered an adverse employment action because of his disability.[10] (Opening Br. (dkt. #51) 20-21 & n.4.) Plaintiff responds that "the real issue is whether [his] job . . . exposed him to dangerous noise levels that could not be mitigated through a device that also allowed [him] to pass the FRA's hearing test." (Opp'n (dkt. #72) 23-24.) Plaintiff misconstrues the issue at summary judgment. Confronted with defendant's motion, *plaintiff* must point to enough admissible evidence

---

[10] Defendant contends that plaintiff failed to make his case through either direct or indirect methods of proof, including that he failed to identify any comparators -- non-disabled, similarly-situated employees who were treated more favorably. Plaintiff does not address that argument and the court will focus its analysis on the direct method of proof. *See Hooper v. Proctor Health Care Inc.*, 804 F.3d 846, 853 (7th Cir. 2015) ("Lack of evidence [of similarly situated individuals] is sufficient to end the inquiry under the indirect method, as it is [plaintiff's] responsibility to identify and present evidence of a comparator at the summary judgment stage." (internal citations omitted)).

that a reasonable jury could conclude that he has met his *prima facie* case. Plaintiff has not met his burden.

"The ADA and Rehabilitation Act prohibit an employer from discriminating against a qualified individual with a disability because of the disability." *Jackson v. City of Chic.*, 414 F.3d 806, 810 (7th Cir. 2005) (quoting *Silk v. City of Chic.*, 194 F.3d 788, 798 (7th Cir. 1999)). Regardless of whether plaintiff's claim is viewed as outright discrimination or a failure-to-accommodate claim, he must establish that he is "disabled" under the ADA and that with or without accommodation he could perform the job's essential functions. *See Hooper*, 804 F.3d at 853 (citing *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 683 (7th Cir. 2014)) (identifying elements of discrimination claim as: being disabled under the ADA, qualified to perform job's essential functions, and termination because of the disability); *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005) (citing *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 572 (7th Cir. 2001)) (identifying elements of failure-to-accommodate claim as: being "a qualified individual with a disability"; employer knowledge of disability; and the employer's failure to accommodate the disability).

In order to be a "qualified individual" an employee must "satisf[y] the prerequisites for the position" and be able to "perform the essential functions of the position . . . with or without reasonable accommodation" at the time he was fired. *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 285, 287 (7th Cir. 2015); *see also Whitaker v. Wis. Dept. of Health Servs.*, 849 F.3d 681, 684 (7th Cir. 2017) (explaining that an "otherwise qualified" employee is one who "is capable of performing the 'essential functions' of the job with or without a reasonable accommodation"); *Nowak*, 142 F.3d at 1003 (explaining that the

qualified individual determination "must be made as of the time of the employment decision" (internal citation omitted)).  Plaintiff bears the burden of establishing that he was a qualified employee.  *Nowak*, 142 F.3d 1003.

There is no dispute that plaintiff had the requisite background, experience, and knowledge to serve as a train conductor, as he had been employed by Union Pacific in that role since 2007.  The relevant dispute is over plaintiff's ability to perform the position's essential functions with or without accommodation.  Since there can be no dispute that federal regulation requires a person not to "have an average hearing loss in the better ear greater than 40 decibels with or without use of a hearing aid, at 500 Hz, 1,000 Hz, and 2,000 Hz," 49 C.F.R. § 242.117(i), the parties' dispute centers on whether hearing protection is an essential function of the position.

## A. Essential Functions

"[T]o determine whether a particular duty is an essential function," the court considers factors like "the employee's job description, the employer's opinion, the amount of time spent performing the function, the consequences for not requiring the individual to perform the duty, and past and current work experiences."  *Stern*, 788 F.3d at 285 (quoting *Gratzl v. Office of the Chief Judges of the 12th, 18th, 19th & 22nd Judicial Circuits*, 601 F.3d 674, 679 (7th Cir. 2010)); *see also* 29 C.F.R. § 1630(n)(2) (listing potential reasons that "[a] job function may be considered essential").  While the employer's judgment is important, it is not controlling; workplace practices are also considered.  *Stern*, 788 F.3d at 285-86 (quoting *Miller v. Ill. Dep't of Transp.*, 643 F.3d 190, 198 (7th Cir. 2011)).

Defendant contends that wearing hearing protection is an essential function of the

train conductor position because: (1) FRA regulations require railroad employees to use hearing protection when exposed to an eight-hour TWA of 90 decibels or more (Opening Br. (dkt. #51) 22 (citing 49 C.F.R. § 227.115(d));[11] (2) Union Pacific performed representative sampling to measure noise exposure, consistent with FRA regulations (*id.* (citing 49 C.F.R. §§ 227.103(b)(2), 227.5));[12] (3) the representative sampling revealed a "reasonable likelihood that Union Pacific conductors will be exposed to excessive noise" (*id.*); and (4) Union Pacific, therefore, required all conductors to wear hearing protection under the Hearing Conservation Policy (*id.*).[13] The policy covered all employees who "may be subjected to noise exposures equal to or exceeding an 8-hour [TWA] sound level of 85 decibels," as well as all employees "in identified hearing protection areas" and within 150-feet of a locomotive. (Hearing Conservation Policy (dkt. #58-1) 1, 3, 6.) Union Pacific's policy is more conservative than FRA regulations, but the standards set by the FRA present the floor, not the ceiling, for safety procedures. 49 C.F.R. § 227.1 ("This part prescribes *minimum* Federal health and safety noise standards for locomotive cab occupants. This part does *not* restrict a railroad . . . from adopting and enforcing additional or more stringent

---

[11] As noted previously, the FRA also requires hearing protection for employees exposed to sound levels of 85 decibels or greater if the employee has not yet had a baseline audiogram or experiences a worsening change in hearing sensitivity. 49 C.F.R. § 227.115(c).

[12] Representative personal sampling measures representative noise "exposures of other employees who operate similar equipment under similar conditions." 49 C.F.R. § 227.5.

[13] Relatedly, defendant moved to strike the March 6, 2019, declaration of Dr. Kevin Trangle, opining about industry standards governing hearing conservation programs. (*See* Mot. Strike (dkt. #82) 1; Trangle Decl. (dkt. #78) ¶¶ 5, 6, 10.) Defendant argued that the declaration: (1) was a belated expert disclosure served after the close of discovery; (2) fails to disclose the bases for new opinions; and (3) imposes undue prejudice on defendant because Union Pacific lacks an opportunity to respond. (Mot. Strike (dkt. #82) 1.) As the court did not rely on the declaration, this motion is DENIED AS MOOT.

requirements." (emphasis added)).

Accordingly, plaintiff's argument that he may not have been personally exposed to excessive noise is not determinative. First, train conductors' work environments vary making personal noise exposure level monitoring a difficult, if not pointless, exercise. As defendant points out, "dosimetry data measures historically where he has *been*, not where he *will be* on a given day." (Reply (dkt. #85) 23.) Second, as plaintiff himself acknowledged in his complaint, "Train Crewm[e]n work in a noisy environment and are therefore required to wear hearing protection." (Amend. Compl. (dkt. #3) ¶ 14.) Accordingly, the court is inclined to credit Union Pacific's assertion that requiring *some* conductors but not others to wear protective gear "would produce administrative and legal chaos," as well as "invite FELA liability." (Reply (dkt. #85) 23.)

Plaintiff also argues that since the train conductor job does not *exist* "to wear hearing protection, wearing hearing protection has nothing to do with the number of thru-freight conductors Union Pacific employs, and Mlsna wasn't hired for his ability to wear hearing protection." (Opp'n (dkt. #72) 26.) Whether a position exists to perform a function, the number of employees who perform a function, and whether an employee was hired for the ability to perform that function are all factors a court may consider when evaluating whether that function is essential. But Union Pacific is also required to provide a safe work environment for its employees. Moreover, Union Pacific may do so by requiring the use of protective gear, even when doing so is above-and-beyond the federal requirements. Indeed, keeping train conductors safe is such a priority that Union Pacific noted in the train crew job description that it required train conductors to "[f]ollow[] safety

precautions," be "willing[] to practice safe work habits," "wear personal protective equipment such as . . . hearing protection where the company requires," and "[e]nsure compliance with all railroad rules and regulations for safety." (Train Crew Job Description (dkt. #57-1) 2-4.)

Accordingly, no jury could conclude that Union Pacific acted unreasonably in making the wearing of hearing protective devices an essential function of the train conductor position. An arguably closer question is whether Union Pacific did *in fact* make wearing headgear an essential function of plaintiff's train conductor position, but only because plaintiff testified at his deposition that he and his colleagues never wore hearing protection. However, plaintiff is bound by his affirmative pleading that "Train Crewm[e]n work in a noisy environment and are therefore required to wear hearing protection" because they "work in a noisy environment." (Amend. Compl. (dkt. #3) ¶ 14.) *Robinson v. McNeil Consumer Healthcare*, 615 F.3d 861, 872 (7th Cir. 2010) ("A judicial admission is a statement, normally in a pleading, that negates a factual claim that the party making the statement might have made or considered making.");[14] *Keller v. United States*, 58 F.3d 1194, 1199 n.8 (7th Cir. 1995) ("Judicial admissions are formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party making them. They may not be controverted at trial or on appeal.").[15] Moreover, plaintiff also acknowledged

---

[14] The Seventh Circuit in *Robinson* rejected plaintiff's argument that defense counsel's closing argument constituted a judicial admission as "in order to qualify as judicial admissions, an attorney's statements must be deliberate, clear and unambiguous." 615 F.3d at 872 (quoting *MacDonald v. General Motors Corp.*, 110 F.3d 337, 340 (6th Cir. 1997)).

[15] The Seventh Circuit rejected Keller's argument for judicial admissions finding the statements were "not admissions at all" and were "misstated or misconstrued." 58 F.3d at 1199.

in his deposition the importance of Union Pacific protecting its employees' hearing and for the conductors to wear appropriate hearing protection. (Mlsna Dep. (dkt. #27) 57:12-18.)

### B. Reasonable Accommodation

This brings the court to whether a reasonable accommodation would have permitted plaintiff to meet the FRA hearing acuity standards *while* wearing hearing protective devices. "[A]n accommodation is any change in the work environment or in the way things are customarily done that enables an individual with a disability to enjoy equal employment opportunities." *Bunn*, 753 F.3d at 682 (quoting 29 C.F.R. pt. 1630 app. § 1630.2(o)). Where a disabled employee establishes that he did not receive a reasonable accommodation, his "employer will be liable only if it bears responsibility for the breakdown of the interactive process." *Sears, Roebuck*, 417 F.3d at 797 (citing *Beck v. Univ. of Wisc. Bd. of Regents*, 75 F.3d 1130, 1137 (7th Cir. 1996)).[16]

Here, there is no dispute that plaintiff could *only* meet the FRA hearing acuity

---

[16] To be clear, an employer does not have to provide any particular accommodation requested by an employee, rather the employer may choose any reasonable accommodation "that effectively accommodates the disabled employee's limitations." *Sears, Roebuck*, 417 F.3d at 802 (internal citations omitted). However,

> if the employee has requested an appropriate accommodation, the employer may not simply reject it without offering other suggestions or at least expressing a willingness to continue discussing possible accommodations. . . . An employer cannot sit behind a closed door and reject the employee's requests for accommodation without explaining why the requests have been rejected or offering alternatives.

*Id.* at 806.

standard with assistance from his hearing aids. However, as noted above, Union Pacific's Hearing Conservation Policy does not permit conductors to wear hearing aids under their hearing protection. Moreover, plaintiff's experts also do not recommend wearing hearing aids under hearing protection. (Trangle Dep. (dkt. #46) 58:13-59:19; Kloss Dep. (dkt. #47) 55:1-10.)

Plaintiff *only* offered the E.A.R. Primo as a proposed reasonable accommodation during the interactive process.[17] Despite its policy of not authorizing the use of "custom molded ear plugs" (Hearing Conservation Policy (dkt. #58-1) 1), Union Pacific considered plaintiff's proposal, rejecting it because it lacked an NRR. (*See* Mlsna Dep. (dkt. #27) 38:12-39:2, 44:5-8.) While plaintiff contends that an NRR could be ascertained for a custom device, his evidence actually shows conflicting NRRs for his proposed accommodation. (*Compare* Trangle Suppl. Rpt. (dkt. #81) 4 (opining that the "E.A.R. earplug" has an NRR of 31-32 dB "per the device representative")[18] *with* Gordon Dep. (dkt. #70) 29:12-30:10 (testifying that the E.A.R. Primo lacked a manufacturer-issued NRR and opining that "the average NRR to be expected" on such products "will be in the neighborhood of 24 to 26 maybe 27").

Further, the evidence shows an inability to accurately measure an NRR because of

---

[17] The court need not consider accommodations proposed after the start of litigation because plaintiff did not propose them during the interactive process back in 2015. Union Pacific cannot be faulted for failing to consider proposed accommodations plaintiff did not suggest at the time of the employment decision, especially in light of its offers to consider other suggestions or to provide assistance in finding alternative employment.

[18] However, as noted above, the basis for this opinion is murky, if not inadmissible hearsay. (*See* Trangle Dep. (dkt. #46) 85:8-16, 86:18-20.)

the device's electronics. (Gordon Dep. (dkt. #70) 55:13-56:16 (explaining that noise reduction testing is performed with the device in the "off" position because testing cannot be done "while it's turned on"); Soli Dep. (dkt. #41) 41:19-21, 62:1-6, 73:15-74:13 (testifying that NRR is "calculated based on the passive characteristics of the device" and that custom devices do not have NRRs).) Plaintiff's contention about the availability of other methods of determining the level of hearing protection provided by a device is not enough to create a material dispute of fact, however, because plaintiff failed to produce any evidence from which a reasonable jury could conclude that Union Pacific's stated reason -- the lack of a discernable NRR -- was a pretext for discrimination. *See Nolan v. Arkema, Inc.*, 809 F. Supp. 2d 356, 365 (E.D. Penn. 2011) (explaining that "a plaintiff may defeat a motion for summary judgment" by showing "some evidence . . . from which a factfinder would reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action" that required plaintiff to show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence" (internal citations omitted));[19] *Mont-Ros v. City of W. Miami*, 111 F. Supp. 2d 1338, 1358 (S.D. Fla. 2000) (finding plaintiff had failed to

---

[19] The *Nolan* court found that the plaintiff *had* provided enough evidence that could show his employer terminated him because of its misconceptions about his abilities. However, in *Nolan*, the plaintiff marshalled evidence that: (1) despite constant communication during his absence, no one told him that his job had been filled until after he tried to return to work with restrictions; (2) the person who filled his job was not formally appointed until after plaintiff's termination; and (3) despite defendant's representatives promising to keep plaintiff in mind for future positions, plaintiff was not contacted about open positions. 809 F. Supp. 2d at 365-66.

show defendant's reasons were pretext for discrimination because he failed to marshal evidence "sufficient to permit a reasonable fact finder to conclude the reasons given by the employer were not the real reasons for the adverse employment decision" (citation omitted)). Union Pacific reasonably rejected the E.A.R. Primo as a proposed accommodation because it lacked a manufacturer-provided NRR and that decision is entitled to deference absent evidence that this reason masks discrimination.[20]

Even if Union Pacific's reason was a pretext for discrimination, plaintiff has another problem with his proposed accommodation: there is no evidence in the record to permit a reasonable jury to find that the E.A.R. Primo would actually permit him to fulfill the essential functions of a train conductor. (*See* Kloss Dep. (dkt. #47) 55:17-56:16 (testifying that he would need to test a product to determine if it would permit Mlsna to meet the FRA requirements).) Plaintiff's belated motion for leave to supplement the record with Kloss's most recent report is both too little and too late. (*See* Mot. Leave Suppl. (dkt. #86) 1.)

As to being too late, plaintiff knew from the outset that central factual issues in this suit were (1) his failure to meet FRA hearing acuity standards without assistance and (2) the lack of a manufacturer-provided NRR on his proposed accommodation. Indeed, Union Pacific ostensibly rejected the E.A.R. Primo *because* it did not have an NRR, and plaintiff had plenty of time to build a record on this question well *before* summary judgment was fully briefed. At the *very* latest, plaintiff should have provided this supplemental report

---

[20] As noted previously, when plaintiff first proposed the E.A.R. Primo, a Union Pacific employee cited cost as a reason for rejection. However, there is no evidence that would permit a reasonable jury to infer that the lack of a reliable NRR is being used as a pretext for cost or discrimination.

with his brief in opposition, which was filed March 6, 2019 -- one day *after* the date of the report. Regardless, there is no justification for plaintiff instead waiting to file the report one day *after* defendant filed its summary judgment reply.[21] This is the type of sandbagging that the rules governing expert disclosure seek to prevent.

As for too little, the supplementation does not solve plaintiff's evidentiary problems. The report describes the tested devices as having been "ordered through E.A.R., Inc[. and] manufactured by Persona Medical," but fails to identify them as the accommodation actually proposed by plaintiff in 2015. Likewise, the report only concludes that "with the volume turned to FULL-ON," Mlsna "DOES MEET FRA minimal hearing criteria." (Kloss. 2d Suppl. Rpt. (dkt. #86-1) 1.) Accordingly, this opinion adds practically nothing, since there is no dispute that with hearing aids plaintiff met this standard back in 2015. Assuming that meeting FRA hearing acuity standards is only one of the essential functions at issue here, Kloss's opinion is silent about the level of *hearing protection* offered by the tested device.

For all these reasons, Union Pacific's rejection of the E.A.R. Primo was reasonable, and Union Pacific cannot be held responsible for the breakdown of the interactive process, having met its burden by evaluating plaintiff's proposed accommodation and offering to review others. Indeed, the undisputed evidence is that plaintiff did not propose additional accommodations in 2015, and he declined defendant's offer for assistance in seeking

---

[21] Assuming that the court granted the motion for leave to supplement the record and that the report was sufficient to warrant a jury trial, defendant would not have the opportunity to re-depose Kloss or obtain its own rebuttal expert opinion in advance of trial. Accordingly, fairness concerns also militate in favor of exclusion.

alternate employment. Further, because plaintiff cannot meet FRA requirements while wearing appropriate hearing protection, he is not a "qualified individual." Accordingly, defendant is entitled to judgment.

## ORDER

IT IS ORDERED that:

1)  Defendant's motion for summary judgment (dkt. #50) is GRANTED.

2)  Defendant's motion to strike (dkt. #82) is DENIED AS MOOT.

3)  Plaintiff's motion for leave to supplement the record (dkt. #86) is DENIED.

4)  The clerk's office is directed to ENTER judgment for defendant and CLOSE this case.

Entered this 15th day of May, 2019.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge