**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WISCONSIN**

---

MARK MLSNA,

        Plaintiff,

v.

UNION PACIFIC RAILROAD COMPANY,

        Defendant.

---

CASE NO. 3:18-cv-00037

**DEFENDANT'S BRIEF IN SUPPORT
OF MOTIONS IN LIMINE**

      Defendant Union Pacific Railroad Company ("Union Pacific") submits this brief in support of its Motions in Limine. Any evidence, testimony, comment, or argument (in opening, closing, voir dire, or otherwise) on the subjects discussed below should be excluded from trial.

**I.
STANDARD OF REVIEW**

      Motions in limine are used to "exclude evidence before trial in order to prevent the trial from being interrupted by wrangles over admissibility or the jury from getting a whiff of prejudicial evidence that may in fact be inadmissible." *Am. Int'l Adjustment Co. v. Galvin*, 86 F.3d 1455, 1463 (7th Cir. 1996). Motions in limine "aid the trial process by enabling the court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." *H.B. by Bartolini v. Abbott Lab'ys Inc.*, No. 17-CV-1146-SMY-SCW, 2017 WL 11435484, at *1 (S.D. Ill. Nov. 16, 2017) (citing *Wilson v. Williams*, 182 F.3d 562, 566 (7th Cir. 1999)). Trial courts have broad discretion when ruling on motions in limine. *See Jenkins v. Chrysler Motors Corp.*, 316 F.3d 663, 664 (7th Cir. 2002).

**II.**
**ARGUMENT AND AUTHORITIES**

**A.**  **Mlsna Should Be Prohibited From Presenting Evidence About Any Alleged Device that Has Not Been Tested**

Much of this case revolves around whether Mark Mlsna ("Mlsna") can meet the Federal Railroad Administration's ("FRA") minimum hearing acuity threshold with a hearing amplification device—an accommodation he alleges Union Pacific failed to provide. Mlsna asserts that several devices (not identified until years after Union Pacific's decision) might allow him to meet the acuity standard, but only two of them have actually been tested.[1] Mlsna's own audiologist, Dr. Douglas Kloss, was clear: without test results, whether a particular device will be effective for Mlsna is unknowable.

As explained below, Mlsna's experience with the Howard Leight Industrial Pro ("Howard Leight"), one of the two tested devices, illustrates the severe prejudice that would arise if Mlsna can argue the efficacy of a device without ever having tested it. Mlsna represented that the Howard Leight would be a viable accommodation only for test results to prove that wrong. Rules 401 and 403 should preclude Mlsna from offering testimony or argument about any after-the-fact device that has never been tested.

**1.**  **Without Audiological Test Results, the Jury Must Speculate About the Efficacy of a Device**

Mlsna admits that he proposed no accommodations except the E.A.R. Primo. (Filing No. 27, Mlsna Dep. 44:1-3; 59:7-10; 75:18-20). He now claims that his retained experts have since discovered several other devices that would allegedly allow him to

---

[1] Those devices are the Howard Leight Impact Pro Industrial and a device manufactured by Persona Medical. (Filing No. 163, Dr. Kloss report, p. 2). As explained in detail below, Mlsna represented to this Court and the Seventh Circuit that the Howard Leight would be an effective accommodation despite possessing test results proving that was untrue.

satisfy Union Pacific's and the FRA's requirements.

Mlsna must show that he could perform the essential functions of his job with or without a reasonable accommodation. *Clemens v. Esper,* No. 16-CV-467-WMC, 2018 WL 3733930, at *7 (W.D. Wis. Aug. 6, 2018) (Conley, J.). Meeting this burden requires more than mere "speculative, untested suggestions." *Id.* at *9 (citing *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 289 (7th Cir. 2015)). It requires actual evidence that the proposed accommodation will allow the employee to perform the essential functions of the job, including medical or scientific evidence. *Weigel v. Target Stores*, 122 F.3d 461, 469 (7th Cir. 1997) (finding insufficient a doctor's statement that "there was a good chance" proposed accommodation would succeed); *Basith v. Cook Cty.*, 241 F.3d 919, 930 (7th Cir. 2001) ("[Plaintiff's] bare assertion that a wheelchair would accommodate his inability to perform delivery of medications is sheer speculation."). Test results, in other words.

Mlsna's expert, audiologist Dr. Kloss, admits that without audiological test results he does not know whether a particular device allows Mlsna to meet the FRA's minimum hearing requirement:

> Q:    How do we know that Mr. Mlsna could meet the minimum FRA hearing requirements and also have adequate hearing protection when he's not wearing his hearing aids with [the electronic earplugs referenced in Dr. Kloss's report]?
>
> A:    Well, these would be -- you couldn't – you couldn't do that with these because they're custom products, but **you would have to have the product, and I would have to test.**
>
> Q:    So as we sit here right now, we don't know if they'd work?

> A:  **No, we would have to get the product**. I mean, looking at the specs, on paper it looks like they would work, but **I would have to have the product to find out for sure and to test it.**
>
> Q:  So as we sit here right now, we don't know if they work?
>
> A:  **We don't.**

(Filing No. 47, Dr. Kloss Dep. 55:11-56:16) (emphasis added). Dr. Kloss's admission confirms that the jury would only be speculating that any device that has not been tested will improve Mlsna's hearing enough to meet the minimum acuity standard.

The jury may not "speculate on a subject on which laypersons are not knowledgeable and on which expert testimony [is] missing." *Simonson v. Hepp*, No. 07-CV-00397-BBC, 2007 WL 5490149, at *1 (W.D. Wis. Nov. 21, 2007), *aff'd,* 549 F.3d 1101 (7th Cir. 2008). *See also Berry v. Deloney*, 28 F.3d 604, 609 (7th Cir. 1994) (reasoning that evidence is properly excluded when it "would have merely invited the jury to speculate"). "Neither hypothesis nor speculation is proof." *Clevenger v. Bolingbrook Chevrolet, Inc.,* 401 F. Supp. 2d 878, 885 (N.D. Ill. 2005). Baldly suggesting to the jury that a particular device is effective with no test results is "the kind of conclusory and untested opinion/hope" that the Seventh Circuit has "repeatedly deemed insufficient." *Wheatley v. Factory Card & Party Outlet,* 826 F.3d 412, 418–19 (7th Cir. 2016).

Mlsna should not be allowed to argue or introduce evidence of any device that has never been audiologically tested. His own expert admits that test results are needed to determine whether a device sufficiently improves Mlsna's hearing. Without that testing, the jury would only be guessing that a given device will be effective, and the Court should not permit this sort of wholesale speculation.

## 2.    Mlsna's Misrepresentations about the Howard Leight Show Why Test Results are Needed

Mlsna has only produced test results for two devices: (1) the Howard Leight, and (2) a device manufactured by Persona Medical. (Filing No. 163, Dr. Kloss report, p. 2).[2] There is no better argument for the jury not being allowed to speculate about the efficacy of a device than the Howard Leight example.

Dr. Kloss tested Mlsna with the Howard Leight device on March 5, 2019 and discovered that "[a]t full volume, this AHPD[3] could not reach the levels necessary for Mr. Mlsna to meet the FRA criteria." (Filing No. 163, Dr. Kloss Dec. 21, 2020 Report, p. 1). Dr. Kloss even explained that "[u]pon review of over-the-ear (earmuff) type devices that were available in 2015, [he] could not find a device that would definitively provide the necessary amplification to compensate for the amount of hearing loss Mr. Mlsna has today." *Id.* But it was only *after* remand (in December 2020) that Mlsna disclosed this information. Prior to summary judgment or the appeal, Mlsna never informed Union Pacific or, more importantly, this Court, that Dr. Kloss had discovered the Howard Leight was ineffective. (Filing No. 160, Moore Decl. ¶ 2).

That did not stop Mlsna from arguing to both this Court and the Seventh Circuit that the Howard Leight would still be a viable accommodation. He told this Court, "Dr. Kloss and Dr. Trangle have identified AHPDs, including devices manufactured by E.A.R. Inc. and **Honeywell[4]**, as devices that could be used to accommodate Mlsna."

---

[2] Although it is not clear, Dr. Kloss seemed to suggest that this device was the E.A.R. Primo. (Filing No. 162, Kloss Dep. 113:1-25).

[3] Amplified Hearing Protection Device

[4] Honeywell manufacturers the Howard Leight device. Its website calls the device the "Howard Leight by Honeywell." https://www.howardleightshootingsports.com/

(Filing No. 72, Mlsna SJ Opposition Br., p. 15 (citing Kloss Report) (emphasis added). This Court, in turn, cited Mlsna's representations about the efficacy of the Howard Leight in its summary judgment order issued two months *after* Dr. Kloss discovered the device did not work. (Order, Filing No. 97, p. 10). Then on appeal, Mlsna represented to the Seventh Circuit: "Specifically, Kloss recommended several available devices, including the 'Impact Pro Industrial' electronic earmuff manufactured by Howard Leight Co., Inc.…." (Filing No. 161-1, Appellant's Br., p. 38).

The Seventh Circuit's opinion reflects the prejudicial danger of allowing Mlsna to argue that a device sufficiently improves his hearing without test results to prove it. The Seventh Circuit found that there were "no shortage of devices" that could be considered "possible accommodations." *Mlsna v. Union Pac. R.R. Co.,* 975 F.3d 629, 637–38 (7th Cir. 2020). Of course, the Seventh Circuit did not know what only Mlsna did at the time, that the Howard Leight "could not reach the levels necessary for Mr. Mlsna to meet the FRA criteria." (Filing No. 163, Dr. Kloss report, p. 1). The same is true at trial: if Mlsna can introduce evidence of untested devices, the jury might speculate that they sufficiently improve his hearing. The Howard Leight test results prove otherwise.

**B.**     **Mlsna Should Be Prohibited From Presenting Evidence About Any Alleged Device or Technology that Did Not Exist During the Interactive Process**

Under Rules 401 and 403, Mlsna should not be allowed to introduce evidence on hearing devices or technology that did not exist in 2015.[5] Because Union Pacific could not have accommodated Mlsna with a device that had not yet been created, the

---

[5] This motion is consistent with the Seventh Circuit's declaration that a proposed accommodation is not necessarily limited to what the plaintiff introduced at the time. *Mlsna*, 975 F.3d at 638-39. Still, Union Pacific cannot be liable for not locating something that did not exist in 2015.

introduction of any such evidence is irrelevant, unfairly prejudicial, and likely to result in jury confusion.

The only device that Dr. Kloss has tested and purportedly shown to be "effective" is the one he claims is manufactured by Persona Medical. (Filing No. 163, Dr. Kloss report, p. 2). But he has no admissible evidence that this device existed in 2015 (when Mlsna proposed an accommodation), let alone that the technology was the same. Dr. Kloss indicated somewhat unclearly that this was the same device (the E.A.R. Primo) that Mlsna originally proposed. (Filing No. 162, Kloss Dep. 113:1-25). At deposition, however, Dr. Kloss testified that this device was first manufactured "in early January 2019." (Filing No. 162, Kloss Dep. 37:15-16). Dr. Kloss opined that the device's *technology* existed in 2015, but that belief rests exclusively on hearsay.

> Q.   []So let me ask you this: In the four years between early 2015 and January of 2019, did EAR or Persona Medical, whoever made the device, did they have any changes in technology for their hearing -- assisted hearing protective devices?
>
> A.   I would assume so. I did ask that question.
>
> Q.   And what did they say?
>
> A.   **They said the technology that I had was available in 2015**. Actually, I believe, to be more accurate, I **believe they said it was available all the way back to 2014.**
>
> Q.   Okay. … Did they inform you that the device that you tested in January of 2019, the exact same device, could have been made in early 2015?
>
> A.   Yes.
>
> Q.   Is there any way to independently verify if it's the exact same product?

A.    I, I wouldn't know. I'm, I'm **assuming what they tell me is correct. They, they made the device, they have the technology, and I take them at their word.**

Q.    But you didn't do any independent analysis of that; correct?

A.    I, I wouldn't have a device from 2014 to compare to.

Q.    Well, but why do you need a device to compare it to?

A.    Well, I -- other than them telling me, yes, **this technology, this particular circuit came out in 2014, it's the same circuit you're using right now in 2019, that's, that's enough. That was enough for me.**

Q.    **But it's just based upon what they told you; correct?**

A.    **Right, right, the manufacturer of the product.**

Q.    Did they indicate whether they had any examples of this type of product from back then that they could show you, that they had made back then?

A.    I didn't ask.

Q.    **You just took them at their word?**

A.    **Correct**.

(Filing No. 162, Kloss Dep. 110:19-112:17) (emphasis added).

Dr. Kloss's hearsay testimony that the technology for the E.A.R. device existed in 2015 presents the same problem as his lack of test results for other products: the jury would only be speculating. That is, maybe the technology that *currently* allows Mlsna to allegedly meet the acuity threshold existed in 2015. Maybe not.

Either way, Union Pacific could not have accommodated Mlsna with a device and technology that the jury must speculate into existence. *See Webb v. Clyde L. Choate Mental Health & Dev. Ctr.*, 230 F.3d 991, 1000 (7th Cir. 2000) (rejecting as unreasonable

employee's "requested accommodations … because it would be impossible for a facility such as [the employer's]" to implement them); *Rabb v. Sch. Bd. of Orange Cty., Fla.,* 590 F. App'x 849, 853 (11th Cir. 2014) (explaining that a proposed accommodation that "does not exist is not a reasonable accommodation") (quotation omitted). Even Dr. Kloss, an audiologist, acknowledged the difficulty *if not impossibility* of locating an effective over-the-ear device available in 2015. *See*, Filing No. 163, Dr. Kloss Report, p. 1 ("Upon review of over-the-ear (earmuff) type devices that were available in 2015, I could not find a device that would definitively provide the necessary amplification to compensate for the amount of hearing loss Mr. Mlsna has today.").

As a result, evidence of any device or technology that did not exist during the interactive process is irrelevant, unfairly prejudicial, and likely to confuse the jury. It should be excluded.

## C.   Mlsna Should Be Prohibited From Offering Testimony that the E.A.R. Primo has an NRR

Mlsna should be precluded from arguing or eliciting testimony that the E.A.R. Primo has a "noise reduction rating" (NRR) when there is no admissible evidence to support that contention. An NRR is a unit of measurement that assesses the ability of a hearing protection device to decrease sound exposure in a given work environment.  29 C.F.R. § 1910.95, App. B.[6] Several experts confirm that the E.A.R. Primo does not have an NRR and that an NRR cannot be determined for a custom-made electronic hearing protection device like the E.A.R. Primo:

Garry Gordon, the corporate representative from E.A.R., Inc., testified that the

---

[6] Without an NRR, Union Pacific cannot ensure that a particular device sufficiently protects Mlsna from injurious noise exposure. (Filing No. 60, Knight Dec. ¶¶ 13-14).

Primo has no manufacturer-issued NRR although "the average NRR to be expected on products like [the Primo] will be in the neighborhood of 24 to 26 maybe 27." (Filing No. 70, Gordon Dep. 29:12-19, 30:4-7). He also testified that an NRR cannot be determined when a custom protective device is "on," only when its electronics are off. (Filing No. 70, Gordon Dep. 56:10-16; 55:13-56:13).[7]

Dr. Douglas Kloss, Mlsna's audiological expert, is "unaware" of how to measure the NRR of a custom device with its electronics turned on (in its "active" state). (Filing No. 47, Dr. Kloss Dep. 58:2-19). Dr. Kloss testified that obtaining an NRR for an electronic (i.e., "active") hearing protective device requires "real ear measurement," a testing procedure that he has never done. (Filing No. 47, Dr. Kloss Dep. 18:1-19:23; 20:19-25).

Dr. Sigfrid Soli, Union Pacific's expert, confirmed that the NRR for a custom-made, "active" device like the one Mlsna proposed cannot be determined with its electronics on. (Filing No. 41, Dr. Soli Dep. 41:19-21; 62:1-6; 73:15-74:13; 80:14-17).

The only witness who even tried to identify an NRR for the Primo is Mlsna's retained expert, Dr. Kevin Trangle, but his testimony on the issue presents several levels of inadmissible hearsay. An expert witness is not a vehicle to circumvent the hearsay rule. *Matter of James Wilson Assocs.,* 965 F.2d 160, 172-73 (7th Cir. 1992). While hearsay may be admissible to explain the basis for an expert's opinion, it cannot be used as independent proof of the underlying fact. *Id.* at 173.

Dr. Trangle claimed that the Primo has an NRR of "31-32 dB," information that came "per the device representative." (Filing No. 81, Trangle Supp. Report, p. 4). At his deposition, Dr. Trangle testified that he obtained this information when "one of [his] staff

---

[7] When the electronics are off, the device provides no amplification to improve Mlsna's hearing. (Filing No. 41, Dr. Soli Dep. 40:25-41:10; 42:16-20).

talked to somebody [at E.A.R., Inc.]." (Filing No. 46, Dr. Trangle Dep. 85:17-18; 86:18-20). However, Dr. Trangle could not identify either his staff member or the "somebody" at E.A.R., Inc. to whom the staff member spoke. *Id.* This is two levels of inadmissible hearsay—an unidentified "somebody" at E.A.R., Inc. allegedly talked to a member of Dr. Trangle's staff, who then relayed the message to Dr. Trangle. Mlsna cannot rely on this out-of-court game of telephone to establish that the Primo has an NRR. Fed. R. Evid. 801. Nor can Mlsna couch Dr. Trangle's testimony about the NRR as an "opinion" because Dr. Trangle is simply repeating a factual matter that one of his staff members allegedly learned from an unknown "somebody" at E.A.R., Inc. *Gonzalez v. ADT LLC*, No. 3:15CV290-PPS/MGG, 2019 WL 762512, at *3 (N.D. Ind. Feb. 20, 2019) ("Allowing an expert to 'parrot' testimonial hearsay is improper…"). This Court has already acknowledged that "the basis for this opinion is murky, if not inadmissible hearsay." (Filing No. 97, p. 20 fn 18).

On top of hearsay, Dr. Trangle's claim that "somebody" at E.A.R., Inc. told his staff the NRR is "31-32 dB" is materially inconsistent with testimony *from the E.A.R., Inc. representative*, Garry Gordon, who testified that the manufacturer provided no NRR and "the average NRR to be expected on products like [the Primo] will be in the neighborhood of 24 to 26 maybe 27." (Filing No. 70, Gordon Dep. 29:12-19, 30:4-7). So according to E.A.R., Inc., itself, the Primo *has no* NRR, much less one that is "31-32 dB." And to close the loop, Dr. Trangle cannot even confirm that the device he claims has an NRR of "31-32 dB" was, in fact, the E.A.R. Primo. (Filing No. 46, Dr. Trangle Dep. 85:8-86:1).

Mlsna should not be allowed to argue or suggest that the Primo has an NRR based on inadmissible hearsay and unwarranted speculation that contradicts statements from

E.A.R.'s representative and other experts.

**D.**     **Mlsna Should Be Prohibited From Arguing that Union Pacific Should Have Individually Tested His Noise Exposure**

The Court should not allow Mlsna to argue or elicit testimony that Union Pacific should have individually tested him to determine his personal exposure to harmful noise levels. Doing so misstates the law and risks the jury unfairly holding Union Pacific to a standard that FRA regulations do not mandate.

The FRA does not require individual noise monitoring to determine whether any particular conductor must wear hearing protection. Instead, it requires railroads to develop a noise monitoring program to determine what employees "may be exposed to noise that may equal or exceed an 8-hour TWA of 85 dB(A)." 49 C.F.R. 227.103(a).[8] The FRA instructs railroads to use a "sampling strategy" to monitor and identify such employees. 49 C.F.R. § 227.103(b)(1). Since conductors are highly mobile and work in many different environments, the FRA requires "representative sampling" to monitor their noise exposures. 49 C.F.R. § 227.103(b)(2). "Representative sampling" is a "measurement of an employee's noise exposure that is representative of the exposures of other employees who operate similar equipment under similar conditions." 49 C.F.R. § 227.5. Nowhere in the regulations does the FRA require railroads to individually test a conductor's noise level exposure.

Union Pacific followed the FRA regulations and performed "representative sampling" for nearly 300 conductors in several different locations and environments over many years. (Filing No. 60, Knight Dec. ¶¶ 3-8). This "representative sampling" was

---

[8] Under FRA regulations, some conductors must wear hearing protection if exposed to an 8-hour TWA of 85 decibels, while *all* conductors must wear hearing protection if exposed to an 8-hour TWA of 90 decibels. 49 C.F.R. § 227.115(c)-(d).

designed to measure a conductor's noise exposure emblematic of other Union Pacific conductors who operate similar equipment under similar conditions. (Filing No. 60, Knight Dec. ¶¶ 3-4; 49 C.F.R. § 227.5).

The Court should prohibit Mlsna from arguing, as he did in his summary judgment opposition, that the FRA-mandated "representative sampling" is "merely a starting point" and that Union Pacific should have personally tested Mlsna. (Filing No. 72, p. 28). The plain text of the regulation, 49 C.F.R. § 277.103, contradicts Mlsna's argument. Union Pacific has an "unconditional obligation to follow [federal] regulations and [a] consequent right to do so." *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 570 (1999).

Allowing Mlsna to argue that Union Pacific should have individually monitored him mischaracterizes the law and risks jury confusion in that jurors may be inclined to hold Union Pacific to a higher standard than the FRA requires. *See Zimmer Tech., Inc. v. Howmedica Osteonics Corp.*, No. 3:02cv425, 2008 WL 11504969, *1-2 (N.D. Ind. Nov. 25, 2008) (granting motion in limine where plaintiff's proposed argument would "mischaracterize the law," because "the jury must make [its] determination based upon the correct law"); Fed. R. Evid. 403.

**E.** **Mlsna Should Be Prohibited from Arguing That Union Pacific Was Required To Offer a Variety of Hearing Amplification Devices under FRA Regulations**

Mlsna should not be allowed to argue that FRA regulations require Union Pacific to offer multiple hearing amplification devices as an accommodation to hearing-impaired employees. This argument misstates the applicable regulations and would therefore be unfairly prejudicial and likely confuse the jury.

In his brief to the Seventh Circuit, Mlsna invoked 71 Fed. Reg. 63,103-04, which requires that employers offer employees "several different types" of hearing protection,

"whether ear plugs, ear muffs, and/or electronic headsets." (Filing No. 161-1, Appellant's Br. at 15).  Union Pacific does so, offering its conductors a catalogue of different protection devices to choose from. (Filing No. 51-6 at 1; 51-9 at 3 ¶ 11). But these regulations do not obligate a railroad to offer multiple kinds *of amplification* devices as an *accommodation* for hearing-impaired employees. *See, generally*, 71 Fed. Reg. 63,103-04. Mlsna therefore misconstrued the regulations when he argued to the Seventh Circuit that Union Pacific "runs afoul" of the regulations by failing to offer hearing-impaired conductors more than one amplification device, the "Pro Ears – Gold," as an accommodation. (Filing No. 161-1, Appellant's Br. at 28). Besides, Dr. Kloss admits that his review of devices did not reveal any over-the-ear product that provides the necessary amplification to sufficiently improve hearing loss as severe as Mlsna's. (Filing No. 163, Dr. Kloss Dec. 21, 2020 Report, p. 1).

A party may not "mischaracterize the law" in its arguments at trial. *Zimmer Tech.*, 2008 WL 11504969, at *1. Doing so unfairly prejudices the other party, and leads to jury confusion. Additionally, misstatements of law are excludable as irrelevant. *See United States v. Schiff*, 2:09-CV-001274-KJD, 2012 WL 4355543, *7 (D. Nev. Sept. 21, 2012) ("These items were properly excluded by the Court because they stated Defendant's incorrect interpretation of the law, because of the risk of misleading or confusing the jury, and because they were not relevant."). Mlsna should thus be precluded from arguing that federal regulations required Union Pacific to offer hearing-impaired conductors multiple options for hearing amplification devices as an accommodation under the ADA.

**F.**     **Mlsna Should be Prohibited from Arguing that "Newer Technology" is Causing Allegedly Lower Decibel Readings in Dosimetry Data**

Mlsna should not be permitted to argue that new technology is *causing* supposedly lower decibel readings in Union Pacific's dosimetry data because he has no expert opinion to support that theory. Expert testimony is needed to avoid jury speculation on a technical issue. *Simonson v. Hepp*, DP, 549 F.3d 1101, 1106-07 (7th Cir. 2008) (affirming exclusion of evidence that would have required the jury to speculate on a medical causation issue that was "far from obvious"); *Manpower Inc. v. Ins. Co. of Pennsylvania,* No. 08C0085, 2010 WL 3730968, at *3 (E.D. Wis. Sept. 20, 2010) ("[A]bsent competent expert testimony, the trier of fact could only speculate as to whether there was any causal connection between the managers' actions and the increased growth, and thus expert testimony is needed on this issue.").

One of the focal points of Mlsna's appeal was that newer locomotives and technological advances since 2007 are allegedly causing fewer instances of 90 decibel exposure, an assertion he made without any expert or other testimony. (Filing No. 161-1, Appellant's Br., p. 53-54). Whatever is *causing* supposedly lower readings—technology, as Mlsna insists—is "far from obvious." *Simonson*, 549 F.3d at 1106. Indeed, the level of noise in any individual locomotive cab will "vary greatly" depending on a wide variety of factors: "the locomotive model, locomotive age, condition of the locomotive, length of the route, traffic on the route, number of highway-rail grade crossings on the route, physical characteristics of the route, weather conditions during the run, and any one or more of several other factors." 71 FR 63066-01. Expert testimony must explain why only new technology is allegedly affecting readings and not some other factor.

The alleged causal relationship between newer locomotives and allegedly lower

recent decibels readings is not an inference or factual assumption the jury can make, and the data underscores why. For example, supposedly "outdated" samples show exposure as high as 93 decibels (Filing No. 53-5 at 7/11/2001) on the same locomotive model, the SD40-2, still in use long after 2007 (*e.g.*, Filing No. 53-5 at 8/4/2010). Or the "local" conductor data shows recent readings above 90 (*e.g.*, Filing No. 53-6 at 6/22/2016), but there is no evidence that "local" conductors and "thru-freight" conductors ride different locomotives with different technology. A jury cannot speculate about those dichotomies— an expert must explain them. The Seventh Circuit even recognized the importance of expert testimony on this issue. *Mlsna,* 975 F.3d at 635 ("We decline to adopt Mlsna's suggestion that the analysis be limited to data after 2007. Doing so would require that a bright line be drawn without the guidance of expert testimony.")

To be clear, Mlsna may identify any dosimetry data he believes relevant or argue that the jury should give more weight to some readings than others. But argument or suggestion that new technology is "causing" allegedly lower recent readings requires expert testimony, and Mlsna has disclosed none.

## G.   Mlsna Should Be Prohibited From Providing the Jury with Information About Other Lawsuits Against Defendant

Mlsna claimed in his summary judgment opposition that he has evidence of Union Pacific discriminating against other employees by citing a pending lawsuit against the railroad: *Harris v. Union Pac. R.R.*. (Filing No. 72, p. 19, ¶ 59) In addition, Mlsna's counsel have recently filed a separate lawsuit in the United States District Court for the District of Colorado, *Waldschmidt v. Union Pacific Railroad Co.*, in which the plaintiff has asserted

putative class action claims[9] and misleadingly cited the Seventh Circuit's decision to support its allegation that proceedings in this case "have revealed that Union Pacific discriminates broadly against its hearing-impaired employees." *Waldschmidt,* Case No. 1:20-cv-03808-STV, Doc. # 20 ¶ 8. These and other lawsuits against Union Pacific should not be referenced at trial.

These pending-but-undecided suits against Union Pacific "involve mere allegations against Defendant, not facts that could be used to establish motive or intent." *Montgomery v. Union Pac. R.R. Co.,* No. CV-17-00201-TUC-RM, 2019 WL 1787326, at *7 (D. Ariz. Apr. 24, 2019) (granting Defendant's Motion in Limine to exclude references to *Harris* and other pending lawsuits under Rule 403). References to these pending lawsuits should be excluded because the "likelihood of jury confusion and the need to conduct a 'trial within a trial' on each allegation [will be] considerable." *Henderson v. Wilkie,* No. 15 C 4445, 2019 WL 356804, at *5 (N.D. Ill. Jan. 29, 2019), *aff'd on other grounds,* 966 F.3d 530 (7th Cir. 2020) (excluding under Rule 403 testimony about other race discrimination lawsuits that were "pending but not decided").

The Seventh Circuit "has recognized consistently that evidence of discrimination against other employees is relevant only if the plaintiff is able to show that the action taken against the other employee was based on discrimination" and therefore "when the evidence appears to be of slight probative value, district courts may properly exclude it under Rule 403 to avoid a series of collateral 'trial[s] within the trial' which would result in confusion and undue delay." *Stopka v. All. of Am. Insurers*, 141 F.3d 681, 687 (7th Cir. 1998); *see also McCluney v. Joseph Schlitz Brewing Co.*, 728 F.2d 924, 929 (7th Cir.

---

[9] Union Pacific has moved to dismiss the putative class claims in *Waldschmidt*, and that motion is pending.

1984) ("If the district court had allowed [evidence of other complaints of discrimination], it would have had to explore whether [plaintiff] had a reasonable belief of discrimination in each instance and would have had to allow [defendant] the opportunity to counter each instance. The evidence would have consumed a great deal of the district court's time and had very slight probative value….").

The Eighth Circuit's decision reversing class certification in *Harris* helps explain why reference to these other ADA lawsuits would unfairly prejudice Union Pacific. The Eighth Circuit determined that Union Pacific's Fitness-for-Duty process "leads to varying—and individualized—outcomes." *Harris v. Union Pac. R.R. Co.*, 953 F.3d 1030, 1037 (8th Cir. 2020). "Thus, employees with the same disability do not automatically receive the same outcome under Union Pacific's policy." *Id.* The Eighth Circuit therefore found that the class could not be certified because "the district court cannot determine whether the policy is unlawfully discriminatory under the ADA without considering whether it is job related and consistent with business necessity *in each situation.*" *Id.* at 1038 (emphasis added).

The same is true of claims in these pending in other lawsuits. Indeed, in some ADA lawsuits against Union Pacific, the plaintiff's claims failed as a matter of law. *See, e.g.*, *Owen v. Union Pac. R.R. Co.,* 2020 WL 6684504, at *7 (D. Neb. Nov. 12, 2020)*; Jackson v. Union Pac. R.R. Co.*, 4:19-cv-00060-RGE-RAW (S.D. Iowa 2021); *Witchet v. Union Pac. R.R. Co.*, 8:18CV187 (D. Neb. Feb. 21, 2020). Yet if Mlsna or his counsel are allowed to reference these other lawsuits, "the jury might unfairly conclude that Defendant is liable in this case merely because there are many similar lawsuits pending against Defendant." *Montgomery*, 2019 WL 1787326, at *7. Such an assumption would unfairly prejudice

Union Pacific. Thus, references to other ADA lawsuits against Union Pacific should be excluded.

## H.   Mlsna's Counsel Should be Prohibited from Asking About, Referencing, or Arguing Inferences Based on Privileged Discussions with In-House Counsel

In Mlsna's brief to the Seventh Circuit, he alleged that Union Pacific "walked back its claim that cost was a factor" in denying Mlsna's request for accommodation after "speaking with Union Pacific's law department." (Filing No. 161-1, Appellant's Br. at 34, citing testimony from Terry Owens, Union Pacific's director of disability management). In doing so, Mlsna implied that Union Pacific's law department had decided or advised that cost was not a factor. At trial, Mlsna's counsel should not be allowed to ask about, reference, or argue any inferences based on privileged discussions between Union Pacific's law department and its employees. Several courts in various contexts have excluded evidence of consultations with counsel to avoid an adverse inference or evidentiary presumption about the nature of the advice given by counsel.

For example, in *Knorr-Bremse Systeme Fuer Nutzfahrzege GmbH v. Dana Corp.*, 383 F.3d 1337 (Fed. Cir. 2004), a patent case evaluating a finding of willful infringement, the court ruled that it was not appropriate for the trier of fact to draw an adverse inference from either the invocation of the attorney-client and/or work product privilege or from the failure to seek independent legal advice. The court noted that while there "is precedent for the drawing of adverse inferences in circumstances other than those involving attorney-client relationships, …courts have declined to impose adverse inferences on invocation of the attorney-client privilege." *Id.* at 1344. The court explained that risk of liability in disclosures to and from counsel "can intrude upon full communication and ultimately the public interest in encouraging open and confident relationships between

client and attorney." *Id.*; *see also, McKesson Info. Sol., Inc. v. Bridge Medical, Inc.*, 434 F. Supp. 2d 810 (E.D. Cal. 2006) ("Indeed, how can the court honor the shield of the attorney-client privilege and then allow [plaintiff] to use it as a sword to prove its case?").

Similarly, in *Parker v. Prudential Ins. Co. of Am.*, 900 F.2d 772 (4th Cir. 1990), an appeal from the grant of a directed verdict on the plaintiff's claim for benefits of a life insurance policy, the court of appeals found that "the trial court impermissibly used testimony from [defendant's attorney] to draw an inference about the substance of her conversations with him." *Id.* at 775. This inference, the court held, "would intrude upon the protected realm of the attorney-client privilege," and "[t]o protect that interest, a client asserting the privilege should not face a negative inference about the substance of the information sought." *Id.*; *see also*, *Hale v. State Farm Mut. Auto. Ins. Co.*, No. 12-0660-DRH, 2018 WL 4052413, at *16 (S.D. Ill. Aug. 21, 2018) (granting in part motion in limine to prohibit argument to the jury that an adverse inference may be drawn from defendant's invocation of privilege because "it is inappropriate to advise the jury that it can take an adverse inference from the non-production of the evidence"); *Goldberg v. 401 N. Wabash Venture LLC*, No. 09 C 6455, 2013 WL 1816162, at *7 (N.D. Ill. Apr. 29, 2013) ("Plaintiff's attempt to circumvent the protections afforded by the attorney-client privilege is based on pure speculation and not grounded in evidence.")

Here, discussions by Owens and other Union Pacific employees with the company's law department—particularly about any analysis of whether Mlsna could be accommodated—are privileged. Thus, Mlsna should not be allowed to circumvent that privilege by arguing for any negative inferences as to the nature and substance of those privileged discussions.

I.  **References to Pretrial Motions and Orders, including the Seventh Circuit's Opinion, Should be Excluded**

Mlsna should be precluded from making any reference or comment about any action or orders of the Court concerning any pretrial motions, including, but not limited to, orders on summary judgment, the Seventh Circuit Court of Appeal's order reversing summary judgment, motions in limine, the court's order reopening discovery, and orders on discovery disputes. The disposition of such motions is irrelevant, would be unfairly prejudicial, and would mislead and confuse the jury. Fed. R. Evid. 401-403.

Mlsna and his counsel have already demonstrated a willingness to misrepresent the nature of the Seventh Circuit's ruling. *Mlsna v. Union Pac. R.R.*, No. 18-CV-37-WMC, 2021 WL 1200596, at *2 (W.D. Wis. Mar. 30, 2021) ("[T]he court agrees with defendant that plaintiff goes too far in asserting that the Seventh Circuit "*expressly decided* that Mlsna *could* perform his essential functions.") (emphasis in original). Thus, Union Pacific is reasonably concerned that Mlsna will try to unfairly use the Seventh Circuit's opinion to its favor in front of the jury. The Seventh Circuit's opinion and the broader procedural history of this case—even if accurately described—have no relevance to the jury's deliberations at trial, and any evidence or argument related to these matters would distract from a fair trial.

J.  **The FRA's Operating Crew Review Board Decision Should Be Excluded**

In 2019, the Operating Crew Review Board of the FRA issued an order determining that Union Pacific's decision to revoke Mlsna's conductor certification was not proper under the FRA's regulations. (Filing No. 106). The FRA's decision should be excluded at trial for several reasons.

First, the FRA's decision has no binding effect on Mlsna's claim under the ADA.

*Cf. Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 57–58 (1974) (explaining that "the factfinding process in arbitration usually is not equivalent to judicial factfinding. The record of the arbitration proceedings is not as complete; the usual rules of evidence do not apply; and rights and procedures common to civil trials, such as discovery, compulsory process, cross-examination, and testimony under oath, are often severely limited or unavailable"). Introduction of the FRA's decision may even invade the province of the jury. *Cf.*, *Wright v. BNSF Ry. Co.*, Case No. 4:13-cv-24, 2016 WL 1621698, at *4 (N.D. Okla. April 22, 2016) (because "plaintiff's termination was based on the precise incident and claimed injuries at issue in this case … any reference to said administrative proceedings and findings would invade the province of the jury.")

Second, the FRA was asked to determine only whether the revocation of Mlsna's conductor certification violated the FRA's regulations—not whether it violated the ADA. As a result, the FRA's decision is irrelevant to Mlsna's claims in this case. *Cf. Gilmore v. Union Pac.*, 857 F. Supp. 2d 985 (E.D. Cal. 2012) (because the National Railroad Adjustment Board's decision was "limited to establishing good cause," it was "not relevant to a pretext analysis even though the facts leading to the discharge and considered at the hearing are relevant to both discharge claims"). As this Court has already correctly found, the FRA's decision "has no bearing … as to whether Union Pacific violated the ADA." (Filing No. 115 at 4).

Third, even if the FRA's decision has some limited relevance, it is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and undue delay. The jury could unfairly conclude that the FRA's decision must mean that Union Pacific discriminated against Mlsna on the basis of disability. In addition, Union Pacific would

have to be allowed to defend itself with rebuttal evidence as to why the FRA was wrong in determining, for example, that Union Pacific "in its response to [the FRA] misrepresented a more stringent company policy as FRA's hearing acuity standards" (Filing No. No. 106 at 4)—a conclusion that has nothing to do with Mlsna's ADA claims but could sow doubt for the jury as to the credibility of Union Pacific's other representations at trial.

For all of these reasons, the FRA's June 4, 2019 decision should not be introduced as evidence or referenced to the jury.

### III.     CONCLUSION

For these reasons, Union Pacific requests that the Court enter an Order granting its Motions in Limine.

Dated this 18th day of May, 2021

UNION PACIFIC RAILROAD COMPANY,
Defendant

By:  /s/ Scott P. Moore
    Scott Parrish Moore (admitted pro hac vice)
    David P. Kennison (admitted pro hac vice)
    BAIRD HOLM LLP
    1700 Farnam Street, Suite 1500
    Omaha, NE  68102-2068
    Phone: 402-344-0500
    spmoore@bairdholm.com
    dkennison@bairdholm.com

### CERTIFICATE OF SERVICE

I hereby certify that on May 18, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

Nicholas D. Thompson
Thomas W. Fuller
Adam W. Hansen

and I hereby certify that I have mailed by United States Postal Service, postage prepaid, this document to the following non CM/ECF participants:

None.

/s/ Scott P. Moore_____

DOCS/2270778.10