**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WISCONSIN**

MARK MLSNA,

           Plaintiff,

v.

UNION PACIFIC RAILROAD COMPANY,

           Defendant.

Case No. 3:18-cv-00037

**PLAINTIFF'S RESPONSE
TO DEFENDANT'S MOTIONS
IN LIMINE**

In accordance with Section I(B) of this Court's procedures concerning pretrial submissions for jury trials, Plaintiff Mark Mlsna submits this response to Defendant Union Pacific Railroad Co.'s motions in limine.

## INTRODUCTION

Union Pacific's motions in limine should be denied. Through its submission, Union Pacific steadfastly ignores Mlsna's theory of liability in this case, which seeks to hold Union Pacific accountable for its facially discriminatory testing procedures. It seeks to impose burdens on Mlsna that are directly contrary to binding FRA regulations and Union Pacific's obligations under the ADA. It repeatedly violates the golden rule: asking the Court to hold Mlsna to higher standards of proof than Union Pacific holds itself. It ignores and distorts the record. And it asks for several rulings that have already been foreclosed by the Seventh Circuit's ruling in this case. And not least: Union Pacific repeatedly asks for blanket evidentiary rulings excluding relevant evidence, in violation of the Rules of Evidence.

In short, Union Pacific's motions in limine provide this Court with a roadmap to try a false case: one where the facts and law stand in Union Pacific's favor, and everything that runs counter to Union Pacific's chosen narrative is kept out of sight and mind. This Court should not let Union

Pacific proceed even one more inch down this path. "[E]vidence is not irrelevant and unduly prejudicial merely because it conflicts with one party's side of the story." *Johnson v. C.R. Bard Inc.*, No. 19-cv-760-wmc, 2021 WL 2070448, at \*13 (W.D. Wis. May 24, 2021). This case must be tried in view of the actual theory of liability presented by Mlsna, the evidence developed in discovery, and the law as set forth in the FRA regulations, the ADA, and the Seventh Circuit's decision in this case. In light of those background principles, Union Pacific's motions must be denied.

## ARGUMENT

### A) Legal Standard.

A motion in limine is a request for the court's guidance concerning an evidentiary question. *Wilson v. Williams*, 182 F.3d 562, 570 (7th Cir. 1999). Trial judges are authorized to rule on motions in limine pursuant to their authority to manage trials, even though such rulings are not explicitly authorized by the Federal Rules of Evidence. *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984). Judges have broad discretion when ruling on motions in limine. *Jenkins v. Chrysler Motors Corp.*, 316 F.3d 663, 664 (7th Cir. 2002). "[B]ut evidence should not be excluded before trial unless it is clearly inadmissible on all potential grounds." *Consumer Fin. Prot. Bureau v. Mortg. Law Grp., LLP*, No. 14-cv-513-wmc, 2017 WL 3581146, at \*2 (W.D. Wis. Apr. 19, 2017) (quoting *Ley v. Wis. Bell, Inc.*, 09-C-1108, 2011 WL 4729764, at \*1 (E.D. Wis. Oct. 5, 2011)). "Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." *Hawthorne Partners v. AT & T Techs., Inc.*, 831 F. Supp. 1398, 1400 (N.D. Ill. 1993). Thus, the party moving to exclude evidence in limine has the burden of establishing that the evidence is not admissible for any purpose. *Big Daddy Games, LLC v. Reel Spin Studios, LLC*, No. 12-cv-449-

bbc, 2013 WL 12233912, at *5 (W.D. Wis. May 29, 2013); *Robenhorst v. Dematic Corp.*, No. 05 C 3192, 2008 WL 1821519, at *3 (N.D. Ill. April 22, 2008).

## B) Mlsna (Nor Union Pacific) Should Not Be Prohibited From Presenting Evidence About Any Alleged Device that Has Not Been Tested.

Union Pacific's claim that Mlsna should be barred from presenting evidence about any device that was not tested is wrong for several interlocking reasons.

First, the motion misapprehends the nature of Mlsna's claims. Union Pacific states that "[m]uch of this case revolves around whether Mark Mlsna ('Mlsna') can meet the Federal Railroad Administration's ('FRA') minimum hearing acuity threshold with a hearing amplification device." Dkt. 187 at 2. That is not true. The Seventh Circuit and the Federal Railroad Administration ("FRA") have definitively foreclosed Union Pacific's misguided "the government made me do it" defense. *See Mlsna v. Union Pac. R.R. Co.*, 975 F.3d 629, 636 (7th Cir. 2020); Dkt. 106, at 4 (FRA decision determining that Mlsna *met* the FRA's hearing-acuity requirements and that Union Pacific "misrepresented a more stringent company policy as FRA's hearing acuity standards."). Nothing in the governing FRA regulations requires Mlsna to meet the relevant acuity standard *while wearing hearing protection*.

In fact, even requiring Mlsna (and other hearing-impaired employees) to meet the FRA's hearing acuity standards *while wearing hearing protection* amounts to a brazen act of discrimination. Non-hearing-impaired employees are not required to meet the same standard while wearing hearing protection. For example, an employee who passed the FRA exam without hearing aids and with an average hearing loss in the better ear of 40 decibels would further attenuate his hearing loss to *70 decibels* when wearing a standard set of 30 decibel hearing protectors. In other words, the very premise that someone like Mlsna would need to locate and test a hearing protection

device that allows him to hear at 40 decibels (or better) takes Union Pacific's discriminatory policies as a given.

Even then, Mlsna's experts both opined that hearing protection devices existed that would allow Mlsna to reach the 40-decibel hearing-loss threshold. This is an alternative argument. It is Mlsna saying, "Union Pacific has a discriminatory policy, but I can meet the terms of that discriminatory policy."

On this count, Mlsna retained two experts to analyze whether Mlsna could, in fact, meet the terms of Union Pacific's discriminatory policy. They concluded he could.

On August 24, 2018, audiologist Dr. Douglas Kloss examined Mlsna and found that despite Mlsna's hearing deficits, "with the proper hearing device, which provides both amplification of sound and protection by dampening excessive noise, Mr. Mlsna could be safely accommodated with current available technology such that he would comply with the FRA regulations and work as a railroad conductor." Dkt. 76 at 1. Kloss also identified several available in-the-ear and over-the-ear devices. Dkt. 76 at 1. Kloss wrote:

> [W]ith the proper hearing device, which provides both amplification of sound and protection by dampening excessive noise, Mr. Mlsna could be safely accommodated with current available technology such that he would comply with the FRA regulations and work as a railroad Conductor. For example, Howard Leight Co, Inc. manufactures an "Impact Pro Industrial" electronic earmuff that could be utilized for Mr. Mlsna. There are also electronic earplugs, similar to hearing aids that amplify sound and protect hearing, that are commonly worn by sportsmen for hunting. There are 4 models (classic, digital, stealth, dynamic) that are made by Electronic Shooters Protection Company that could provide enough benefit for Mr. Mlsna to meet FRA regulations.

*Id.*

Dr. Kevin Trangle, a board-certified occupational medicine specialist, seconded Kloss's opinion:

When asked a specific question about how he could have been accommodated to the work situation where there may be excessive noise with a hearing deficit, Dr. Kloss related that there are hearing amplification devices, either in the form of hearing aids or in the form of hearing protective devices, that include the ability to amplify sounds to a certain level to be understandable and simultaneously dampen above another excessive noise level. This allows the worker to be able to hear in the environment, but yet protects him against excessive noise.

Dr. Kloss obviously even determined on an initial basis what would be the most appropriate brand-name hearing protection for him, all of these readily available on the market. He also stated that, in order to determine the best actual hearing device, it would be helpful to have a better handle on the amount of ambient noise during the course of the day in this individual. This data is easily obtainable by way of personal noise monitors at any point in time and is routinely performed in companies. These results would allow precise determination of the type of device needed.

This is the typical practice done in companies in occupational medicine departments in order to accommodate individuals with hearing deficits and protect them from further hearing loss. As such, it is my opinion that Mr. Mlsna could easily have been accommodated in his position as a conductor for the railroad at Union Pacific using the technology and approach that both Dr. Kloss and I agree should have been done in this matter

Dkt. 77 at 1.

These opinions were based on the manufacturers' specifications for several devices. And this information, standing alone, is more than sufficient to form an opinion about how such devices will work. For example, Dr. Kloss testified at his deposition that he would "form [his] opinion" by "looking at [the]…technical specs of the product." Dkt. 47 at 11. Dr. Trangle concurred, testifying that "you can determine" the extent to which a device will improve a wearer's hearing. Dkt. 46 at 14. Of course, both experts agreed that testing a device is a second method for ascertaining its efficaciousness. But testing is not the sole method. Dr. Trangle even pointed out the absurdity of Union Pacific's position during his deposition. No one would claim, for example, that you have no relevant indication of whether a pacemaker will work until you insert it into the patient's chest.

*Id.* Here, too, it is possible to evaluate with a high degree of confidence how well a hearing protection device will work based on its specifications alone. Dkt. 47 at 11; Dkt. 46 at 14.

The notion that testing is the *only* relevant method of evaluating hearing protectors is refuted by Union Pacific's own conduct in this case. After all, Mlsna proposed a device to Union Pacific. And Union Pacific rejected that device *without testing it*. Blake Knight, a senior manager of industrial hygiene, evaluated the E.A.R. Primo device proposed by Mlsna. D.E. 60 at 3. Knight rejected the device because it was a custom earplug and the manufacturer did not publish a noise reduction rating (or "NRR"). Dkt. 60 at 3–4; 64 at 20. When Knight was asked at his deposition how he evaluated the use of the device, he stated, "[w]e got the manufacturer's literature [and] reviewed it." Dkt. 64 at 20. In other words, Union Pacific *evaluated*—and rejected—Mlsna's proposed device based on the *device's specifications alone*. Union Pacific did not test the device (or any other device). Union Pacific presumably wants to present this evidence to the jury. It has identified no reason why Mlsna should be held to the higher standard of presenting only laboratory-tested devices.

Union Pacific's argument also runs counter to its own procedural obligations under the ADA. As the Seventh Circuit explained in its opinion in this case, it is "the railroad's obligation to engage in an interactive process with the disabled individual to determine an appropriate reasonable accommodation." *Mlsna*, 975 F.3d at 638.

> During such a process, the defendant employer must consider more than just what the plaintiff employee proposes. *EEOC v. Sears,* 417 F.3d at 807 (noting an employer's duty to work with employee to "craft a reasonable accommodation"). A proposed accommodation is not limited to what the plaintiff introduced into the process, here the E.A.R. Primo. *Lawler v. Peoria Sch. Dist. No. 150*, 837 F.3d 779, 786-787 (7th Cir. 2016) (employer must do more than "s[i]t on its hands" when employee requests accommodation). Union Pacific was obliged to do more than just conclude that Mlsna's proposal must fail because it is contrary to the railroad's policy.

*Id.* at 638-39. The jury could find for Mlsna if it concludes that Mlsna was qualified, that Union Pacific failed to engage in the interactive process, and that Union Pacific's failure prevented the identification of a workable device. *See, e.g.*, *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 961 (7th Cir. 2021); *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 292-93 (7th Cir. 2015). This is not a tall order. Dr. Holland, Union Pacific's Medical Director, stated that "[a]fter an extensive search, [Union Pacific] has found no adaptive devices" that would allow Mlsna to hear adequately while providing proper hearing protection. Dkt. 27 at 16. No such search, extensive or otherwise, ever occurred. In other words, the jury could find that Union Pacific's own failure to engage in the interactive process resulted in a failure to accommodate Mlsna. No testing on Mlsna's part is required to make that claim.

The FRA regulations point in the exact same direction. They provide three methods for evaluating hearing protectors: "derating by type, Method B from ANSI [American National Standards Institute] S12.6-1997…, [and] objective measurement. 71 Fed. Reg. 63,104, Vol. 71, No. 208; 49 C.F.R. § 227.117(a); *id.* Pt. 227, App. B. Only one of those methods—objective measurement—involves testing the device with the subject. *Id.* The FRA regulations, then, fully embrace the premise that there are multiple avenues available, other than testing, to evaluate hearing protection devices.

Union Pacific's attacks on the credibility of Dr. Kloss don't move the ball for Union Pacific either. After Union Pacific complained that Mlsna had not tested his proposed device, he ordered it and tested it. Mlsna ordered the in-the-ear device he had requested for testing by Kloss. Dkt. 86-1 1-4. Mlsna also ordered an over-the-ear device for testing by Kloss. Dkt. 163 at 1. Testing of the in-the-ear device demonstrated that, as expected, it would allow Mlsna to meet the FRA's acuity threshold. Dkt. 86-1 at 2. The testing also demonstrated that the device would not expose Mlsna

to excessive noise. As Kloss wrote, "[t]he devices were manufactured with a maximum output limit set at 85dB." *Id.* Testing of the over-the-ear device, however, demonstrated only that the device was broken:

> Q   When you tested the Howard Leight over-the-ear device, did you tell Dr. Trangle that you thought the device, itself, was broken?
>
> A. Yeah, I, I said I don't think it's, it's working the way that it should.

Dkt. 159 at 132.

Mlsna immediately disclosed the test results for the in-the-ear device to Union Pacific. Dkt. 86-1 at 2-4. Because they were meaningless, Mlsna did not disclose the test results for the broken over-the-ear device. Dkt. 159 at 80:11-19. For two reasons, neither did Mlsna order another over-the-ear device for testing. First, the test results for the in-the-ear device conclusively proved that devices existed that would allow Mlsna to meet the FRA's hearing acuity standards, from which it follows that further testing was superfluous:

> Q Did Dr. Trangle tell you why he didn't want you to order another one of those and pay for more testing for that?
>
> A I don't think so . . . .
>
> Q Have you ever had a conversation with Dr. Trangle about why we shouldn't request and pay for more devices to be tested?
>
> A I believe I did, yes.
>
> Q And what was his response?
>
> A We found one that works.

Dkt. 159 at 133. Second, not only had the expert disclosure deadline come and gone, but also summary judgment would be fully briefed before a device could be ordered, received, and tested. Compare Dkt. 50 and Dkt. 163 at 1 (demonstrating that above-discussed testing occurred on March 5, 2019, more than two weeks after Union Pacific filed its motion for summary judgment, from

which it follows that Mlsna could not have ordered and tested another over-the-ear device before

summary judgment was fully briefed).

 After this Court reopened discovery, Mlsna reengaged his experts. Thereafter, Kloss came

to doubt whether an over-the-ear device would allow Mlsna to meet the FRA's acuity standards:

> Q Did you review your old notes and file on Mr. Mlsna after you were retained,
> after the Seventh Circuit remanded this case?
>
> A Yes.
>
> Q Did you talk to any over-the-ear protection device manufacturers after you were
> retained after the Seventh Circuit remanded the case?
>
> A Yes.
>
> Q Was it after that point that you came to believe that the over-the-ear device
> protections, you, you became skeptical they would work, was it after that point?
>
> A Yes.

Dkt. 159 at 125. Kloss engaged in further communications with over-the-ear device manufacturers

and subsequently changed his opinion based on his communications with them. Dkt. 163 at 1.

 Dr. Trangle's opinion has not changed. Further research confirmed for him that over-the-

ear devices will allow Mlsna to meet the FRA's acuity standards:

> Further discussions occurred in the ensuing weeks with Honeywell in regard to their
> different hearing protection devices, the discussions primarily focused on over-the-
> ear amplification and hearing protection devices, including AHPD (amplified
> hearing protection devices). I once again reviewed with the technical staff at
> Honeywell, the Leight series of hearing protection as well as newer very similar
> technology. According to the discussion with Honeywell, they believe Leight has
> all of the requirements necessary.
>
> The Honeywell group also pointed out that there are several devices that have a
> microphone placed within the ear muffs and can offer feedback to the wearer. All
> of their devices, according to Honeywell, do dampen anything over 85 db and do
> not allow ambient sounds greater than that to enter into the hearing space. This
> would be true whether one was wearing a hearing aid or not. Honeywell continues
> to maintain that Leight available in 2015 is a device that could amplify the sound
> sufficient and would also dampen it.

Dkt. 164 at 7-8.

These opinions do not demonstrate that testing is the only relevant method for evaluating hearing-protection devices. Rather, they show that evaluating devices leaves room for some reasonable disagreement. When Kloss studied over-the-ear devices more closely, he concluded that the "specs . . . [we]re unclear to [him]." Dkt. 159 at 127. That hardly means that evaluating devices based on their specifications has no relevance at all.

The applicable precedent shows that courts should not pick and choose which evidence they prefer when a variety of relevant evidence supports the same conclusion. In *Gile v. United Airlines, Inc.*, for example, an employee suffering from a psychological disability requested to be given a daytime shift, was denied, and brought suit. 213 F.3d 365, 368 (7th Cir. 2000).  Her doctor's testimony on the *likely* efficacy of her proposed accommodation was allowed by the Seventh Circuit, because it served as "credible evidence about [the employee's] condition and the *expected* effect of a transfer to a daytime shift.  *Id.* at 372-73 (emphasis added).  Given the witness's expertise, "a rational jury easily could [have] conclude[d] that" a shift change would have been an effective accommodation.  *Id.* at 373. *Gile* demonstrates that there is no rule against expert testimony as to accommodations that are *expected by experts* to work. Union Pacific's demand for "test results" is misplaced.

The cases cited by Union Pacific are inapplicable. First, in *Wheatley v. Factory Card & Party Outlet,* the Seventh Circuit rejected a plaintiff's *own* claims that she could do her job with a walking boot, when she explicitly chose not to call her doctor as a witness. 826 F.3d 412, 419 (7th Cir. 2016). Similarly, in *Clemens v. Esper,* this court found that no reasonable accommodation will be *presumed,* when a plaintiff produces no evidence that one exists, and when the trip from his dwelling to his work includes a "minimum one-way trek of nearly four hours."  16-CV-467-WMC,

2018 WL 3733930, *9 (W.D. Wis. Aug. 6, 2018).  These cases differ from Mlsna's because they lack expert witnesses altogether.

Union Pacific's remaining cases are hardly more relevant. In *Basith v. Cook County,* the Seventh Circuit rejected a physician's claim that an employee could perform a core function of his job with a wheelchair, because there were "various hurdles" of that job with which the doctor was unfamiliar, meaning his assertion was "sheer speculation." 241 F.3d 919, 930 (7th Cir. 2001).  Such concerns have no bearing on the testimony of Dr. Kloss, which relates directly to his expertise—hearing.

In *Stern v. St. Anthony's Health Ctr.*, the Seventh Circuit did not find a physician's suggested accommodations promising, *because* the physician expressed "lack of confidence in his proposed accommodations," and "was outright *pessimistic* about [the employee's] ability to perform his supervisory responsibilities," which were an essential function of his job.  788 F.3d 276, 288 (7th Cir. 2015) (emphasis added).  The Seventh Circuit's reliance on the doctor's pessimism reflected its *respect* for medical determinations made by doctors like Dr. Kloss, who was not pessimistic in his testimony.

Lastly, in *Weigel v. Target Stores*, the Seventh Circuit gave little weight to a doctor's claim that "there was a good chance" an employee could return to work with certain accommodations, but only because the doctor provided "nothing more than a naked conclusion unsupported by any factual foundation." 122 F.3d 461, 468 (7th Cir. 1997). Indeed, the Seventh Circuit did not disregard this testimony until it "carefully reviewed the entirety of [the doctor's] deposition in an effort to discern whether it contain[ed] any seeds of justification for his expressed opinion," and found it did not. *Id.* at 469. Dr. Kloss's testimony relies on ample justification for his judgment, and it should be respected. The *Weigel* court made clear that it was "confronted with the question

11

of how much weight should be accorded to the [doctor's] evidence, *not its admissibility*." *Id.* (emphasis added). Even Union Pacific's cases grant that Dr. Kloss's testimony on promising accommodations should be admitted. They are sufficiency-of-the-evidence cases, not admissibility cases. In sum, Union Pacific has created a novel theory to rob the jury of its fact-finding power to evaluate expert witnesses. Its motion should be denied.

**C) Mlsna Should Not Be Prohibited From Presenting Evidence About Any Alleged Device or Technology that Did Not Exist During the Interactive Process.**

Union Pacific next claims that Mlsna should be prohibited from discussing technology that did not exist during the interactive process. Mlsna does not plan on doing so. But what Union Pacific is really after is an elevated standard of proof on *what* technology was available during that time. That request is inappropriate. The jury should be free to find, based on direct evidence, circumstantial evidence, and reasonable inferences, that the device technology discussed by Mlsna and his experts was available in 2015.

As a matter of fact, all of the technology proposed by Mlsna or reviewed by Mlsna's experts was available in 2015. Dr. Kloss testified that, according to his expert knowledge as informed by conversations with manufacturers, the Primo's technology was available as early as 2014. Dkt 76 at 1. Dr. Trangle testified similarly. Dkt. 77 at 1.[1] Accordingly, Union Pacific could have worked with Mlnsa to obtain a similar device in 2015. Mlsna does not ask the jury to speculate whatsoever. If Union Pacific wishes to demonstrate that some technology that Mlsna proposed was supposedly unavailable, it can put on evidence to that effect.

---

[1] For the reasons stated in the next section, this testimony presents no hearsay concerns. This data is precisely the sort of information "reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.'" *Karahodzic v. JBS Carriers Inc.*, No. 12-cv-1040-DRH, 2015 WL 11181973, at *8 (S.D. Ill. Apr. 27, 2015) (quoting Fed. R. Evid. 703).

**D)  Mlsna Should Not Be Prohibited From Offering Testimony that the E.A.R. Primo has an NRR.**

Union Pacific's request to bar Mlsna from presenting evidence of a device's NRR should also be denied.

As a starting place, Mlsna does not intend to make the NRR the centerpiece of his case, for a simple reason. The FRA regulations rejected calls to require railroads to evaluate devices using the NRR and instead selected three different standards. The FRA defines "hearing protector" broadly, as "any device or material, which is capable of being worn on the head, covering the ear canal or inserted in the ear canal; is designed wholly or in part to reduce the level of sound entering the ear; and has a scientifically accepted indicator of its noise reduction value." 49 C.F.R. § 227.5. That last clause—"scientifically accepted indicator of its noise reduction value"—is important. During the rulemaking, several stakeholders urged the FRA to mandate the "use [of] a specific indicator, the Noise Reduction Rating ([abbreviated as] NRR)." 71 Fed. Reg. 63,083, Vol. 71, No. 208. The FRA rejected using the Noise Reduction Rating as the sole permissible indicator. *Id.* The FRA expressed concern that limiting the definition to a single standard "would prevent the industry from availing themselves of advances in science and technology." *Id.* The FRA also found it inappropriate to adopt the Noise Reduction Rating standard because "there are several possible indicators that FRA could use and…there is not widespread public support for any particular one." *Id.* The Association of American Railroads—Union Pacific's industry group—also opposed using the Noise Reduction Rating as the solely accepted benchmark:

> The [Association of American Railroads] wrote that railroads should not be limited to the [Noise Reduction Rating] for evaluating [hearing protectors] attenuation, because it does not provide the flexibility to employ current science. The [Association of American Railroads] explained that there is current technology, such as in-the-ear microphones, which measure actual attenuation, and that technology would not be available if railroads were limited only to the [Noise Reduction Rating].

13

*Id.*

The FRA's regulation on evaluating hearing-protector attenuation is also framed broadly. That regulation "directs that a railroad shall use one of" three evaluation methods: "derating by type, Method B from ANSI [American National Standards Institute] S12.6-1997…, [or] objective measurement." *Id.* at 63,104; 49 C.F.R. § 227.117(a); *id.* Pt. 227, App. B. The FRA had originally proposed adopting the methods used in OSHA's regulations: the Noise Reduction Rating (NRR) and the National Institute for Occupational Safety and Health (NIOSH) methods #1, #2, and #3. 71 Fed. Reg. 63,104, Vol. 71, No. 208. The FRA rejected these metrics and adopted the three it did as better suited to the railroad industry. *Id.* at 63,104–05. Only the first-listed method—derating by type—even mentions the Noise Reduction Rating. 49 C.F.R. Pt. 227, App. B. Of the three available methods, objective measurement—where the evaluator "[u]ses actual measurements of the level of noise exposure…inside the hearing protector when the employee wears the hearing protector in the actual work environment"—is the most accurate. 71 Fed. Reg. 63,105.

These regulations present a big problem for Union Pacific. Union Pacific prohibits the use of any hearing protection device that does not include an NRR. Dkt. 60 at 3–4; 64 at 20. This limitation, naturally, further constrains the hearing protection options available to hearing-impaired employees who are attempting to pass Union Pacific's discriminatory test. With respect to the NRR, then, Union Pacific is talking out of both sides of its mouth. When dealing with the U.S. government, Union Pacific insists that mandating the use of the NRR would unfairly constrain railroads and spurn science. When dealing with its disabled employees, however, Union Pacific is more than willing to impose the very same arbitrary and discredited limitations. And Union Pacific rejected Mlsna's proposed accommodation because it supposedly lacked an NRR.

14

In any event, as Dr. Trangle learned, the E.A.R. earplug proposed by Mlsna does have an NRR of 31 to 32 decibels. Dkt. 35-8 at 4. Dr. Trangle learned this while researching the device and speaking to a manufacturer representative. *Id.* And there is nothing wrong with presenting this testimony. "[E]xperts may base their testimony upon information not within their personal knowledge or observation." *United States v. Kalymon*, 541 F.3d 624, 637 (6th Cir. 2008) (citing Fed. R. Evid. 702, 703). Indeed, "an expert witness[] may base his opinions on inadmissible hearsay evidence, provided that the evidence is of the type 'reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.'" *Karahodzic v. JBS Carriers Inc.*, No. 12-cv-1040-DRH, 2015 WL 11181973, at *8 (S.D. Ill. Apr. 27, 2015) (quoting Fed. R. Evid. 703); *United States v. Floyd*, 281 F.3d 1346, 1349 (11th Cir. 2002) (same). Dr. Trangle is an expert in the field of hearing conservation programs and hearing protections devices. This is precisely the sort of underlying data he is permitted to reasonably rely on.

### E) Mlsna Should Not Be Prohibited From Arguing that Union Pacific Should Have Individually Tested His Noise Exposure.

Union Pacific claims that Mlsna should be barred from arguing that Union Pacific should have individually tested his noise exposure. This is wrong as well.

The sole basis of Union Pacific's argument here is the FRA regulations mandating sampling. But as it has done again and again in this case, Union Pacific misinterprets the FRA regulations. The regulations require representative sampling. But representative sampling is just a floor. Railroads remain free to conduct more personalized noise sampling. Nothing prohibits Mlsna from suggesting the Union Pacific should have conducted noise sampling in Mlsna's work environment.

The regulations governing noise monitoring require railroads to "take noise measurements under typical operating conditions" using a sound level meter or noise dosimeter. *Id.* § 227.103(c);

71 Fed. Reg. 63,088. In making those measurements, the regulations require railroads to "use a sampling strategy that is designed to identify employees for inclusion in the hearing conservation program and to enable the proper selection of hearing protection." 49 C.F.R. § 227.103(b)(1). Where factors such as "high worker mobility, significant variations in sound level, or a significant component of impulse noise make area monitoring generally inappropriate," the regulations generally require railroads to "use representative personal sampling to comply with the monitoring requirements of this section." *Id.* § 227.103(b)(2). "Representative personal sampling means measurement of an employee's noise exposure that is representative of the exposures of other employees who operate similar equipment under similar conditions." *Id.* § 227.5. Although the FRA adopted a representative sampling standard, the agency made clear that railroads remain "free to employ continuous monitoring," where each discrete workspace is monitored on an ongoing basis. 71 Fed. Reg. 63,087.

Nothing in the regulations prohibited Union Pacific from monitoring Mlsna's work environment specifically. *Id.* And as Dr. Trangle testified, it is critically important to measure noise levels in the actual work environment to determine the amount of attenuation required. Dkt. 77 at 1; 78 at 2. He described this process as "industry standard." Dkt. 78 at 3.

Union Pacific's argument here is particularly egregious because Union Pacific imposes more-stringent company standards across many different areas regulated by the FRA. Presumably Union Pacific wants to explain to the jury why, in its view, these policies are needed. It stands to reason, then, that Union Pacific should not be allowed to prevent Mlsna from presenting evidence that Union Pacific did not monitor the noise in his work environment—one more activity that, while not required, is permitted and encouraged under the FRA regulations and industry practice.

**F) Mlsna Should Not Be Prohibited From Arguing That Union Pacific Was Required To Offer a Variety of Hearing Amplification Devices Under FRA Regulations.**

Mlsna should not be prohibited from arguing that Union Pacific was required to offer a variety of hearing amplification devices under the FRA regulations. Here, too, the FRA regulations themselves don't support Union Pacific's position.

Railroads must "give employees the opportunity to select their hearing protectors from a variety of suitable hearing protectors" including "devices with a range of attenuation levels." 49 C.F.R. § 227.115(a)(4). This provision "underscore[s] the importance of railroads offering employees with sufficient options." 71 Fed. Reg. 63,103. "When offering hearing protectors, employers should offer employees several different types, whether ear plugs, ear muffs, and/or electronic headsets. *Within any given type*, the employer should offer several different designs and models." *Id.* at 63,104 (emphasis added). The regulations require a "range of attenuation levels" because railroads must "evaluate hearing protector attenuation for the specific noise environments in which the protector will be used." 49 C.F.R. § 227.117(a). Hearing protectors need only return the employee to noise exposures below the triggering threshold, "attenuat[ing] employee exposure to an 8-hour TWA of 90 decibels [or 85 decibels in the special cases described in the previous paragraph]." *Id.* § 227.117(b).

Union Pacific didn't do this. It offered exactly one device—the Pro Ears Gold—to all employees who could not pass the conductor-certification exam without hearing aids. Dkt. 51-5 at 4. This one-device policy violated Union Pacific's obligation to "offer employees several different types" of hearing protection devices, including "electronic headsets." And Union Pacific's failure directly implicates the reason the FRA requires a variety of devices. Union Pacific's Pro Ears – Gold device has an attenuation rating of 30 decibels—on the very high end of the attenuation scale. Dkt. 51-5 at 4. But as the FRA has cautioned, attenuation overkill is bad: an employee whose work

environment is right at the threshold for requiring hearing protection should not wear high-attenuation hearing protectors. 71 Fed. Reg. 63,102; 49 C.F.R. § 227.117(a). In this case, Union Pacific's own noise-monitoring data shows that no conductor has been exposed to excessive noise for 20 years. So assuming *any* hearing protection was required, Union Pacific violated the FRA regulations by not approving lower attenuation devices for hearing-impaired employees.

### G) Mlsna Should Not Be Prohibited from Arguing that Newer Technology is Causing Allegedly Lower Decibel Readings in Dosimetry Data.

Union Pacific asks the Court to exclude "[a]rguments or evidence that new technology is causing allegedly lower decibels readings in Union Pacific's dosimetry data." Dkt. 186 ¶ 6; Dkt. 187 at 15–16. Union Pacific's argument rests on the false premise that Mlsna needs an expert opinion to make any causal claims on this subject.

The FRA has issued regulations concerning the noise requirements for locomotives. Those regulations require that "all locomotives of each design or model that are manufactured after October 29, 2007, shall average less than or equal to" a time-weighted average of 85 decibels. 49 C.F.R. § 229.121(a)(1). "[A] railroad shall not make any alterations that cause the average sound level for that locomotive design or model to exceed" certain specified limits. *Id.* § 229.121(a)(2).

The FRA has explained at great length why it was "establishing design, build, and maintenance standards for new locomotives and maintenance requirements for existing locomotives." Occupational Noise Exposure for Railroad Operating Employees, Fed. Reg. 63,066, Vol. 71, No. 208 (Oct. 27, 2006) (to be codified at 49 C.F.R. Parts 227 & 229; *see generally id.* at 63,066–63,138. The FRA explained that it "expect[ed] that this rule will reduce the likelihood of noise-induced hearing loss for railroad operating employees." *Id.* at 63,066. This Court must take judicial notice of the contents of the FRA's final rule, as it was included in the Federal Register. 44 U.S.C. § 1507; *CMFG Life Ins. Co. v. RBS Sec., Inc.*, 799 F.3d 729, 734 n.3 (7th Cir. 2015);

*Wei v. Robinson*, 246 F.2d 739, 743 (7th Cir. 1957). It is also admissible as a public record. *See* Fed. R. Evid. 803(8).

No expert testimony is necessary to supplement the FRA's analysis. The FRA, after all, is the subject-matter expert on our nation's railroads. *See Ass'n of Am. Railroads v. Adams*, 485 F. Supp. 1077, 1084 (D.D.C. 1978) ("The FRA clearly possesses expertise in the area of railroad operations, particularly on the subject of safety regulations."). The FRA "noted that since the early 1990s, the [railroad] industry has taken delivery of thousands of newer locomotives engineered to reduce noise levels." Fed. Reg. 63,072, Vol. 71, No. 208. "The cabs of most of these locomotives provide an environment where, for the great majority of operating circumstances, employees will not experience 8 hour TWA exposures approaching 90 dB(A)." *Id.* The FRA recognized that "[e]ngineering controls," such as "the design and build requirements in § 229.121(a)," are preferable to requiring employees to use hearing protection, because these kinds of controls "block out noise at its source." *Id.* "Engineering controls are generally understood to be the modification or replacement of equipment or any other related physical change at the noise source or along the transmission path that reduces the noise level at the employee's ear (not including hearing protectors)." *Id.* at 63,075.

The "FRA has identified the specific engineering controls which railroads must use." *Id.* "Specifically, railroads must buy locomotives manufactured such that they do not exceed a certain decibel level, must maintain those 'new' locomotives in such a way that alterations do not cause the sound level to increase beyond certain decibel levels, and must maintain all pre-existing locomotives so that they do not reach excessive noise levels." *Id.* at 63,075–76 (citations omitted). These engineering controls "modify or replace equipment at the noise source so that it reduces the noise level at the employee's ear." *Id.* at 63,076. With the use of engineering controls like these,

"over the past decade and a half, the locomotive fleet has come to be dominated by cabs that are sufficiently quieter such that hearing protection is not required under most conditions of operation." *Id.*

With the FRA's analysis in hand, no expert testimony is necessary. "Expert testimony is often needed to eliminate speculation." *Simonson v. Hepp*, 549 F.3d 1101, 1107 (7th Cir. 2008). That's not a legitimate concern in this case. There's no danger of the jury having to speculate about whether the new locomotives that the FRA mandated in 2007 account for lower decibel readings since then. The regulations already tell the jury what it needs to know. The regulations are rife with causal language explaining that the new locomotives and new technology lead to less noise. *See, e.g.*, 29 C.F.R. § 229.121(a)(2) ("[A] railroad shall not make any alterations that *cause* the average sound level for that locomotive design or model to exceed" certain specified limits." (emphasis added)); Fed. Reg. 63,076, Vol. 71, No. 208 (noting engineering controls "modify or replace equipment at the noise source so that it *reduces* the noise level at the employee's ear" (emphasis added)). The jury will not need to "speculate as to whether there was any causal connection between" the new locomotive technology and reduced noise. If the FRA's conclusions are good enough to warrant new regulations to reduce locomotive noise, they are also good enough for the jury to rely on to make inferences about why locomotive noise has been reduced.

What Mlsna offers here are commonsense inferences drawn from the evidence, not a scientific theory. The jury is fully capable of understanding the evidence without the assistance of an expert—indeed, Union Pacific offers no expert of its own though it surely will seek to persuade the jury of its own theory of what caused lower noise readings in its dosimetry data. *See* Fed. R. Evid. 702 (permitting expert testimony for *opinions* where expert's specialized knowledge will

help the trier of fact understand the evidence). It requires no expert to realize that railroads will become less noisy when they are required to have quieter locomotives.

And even if expert testimony were needed, Mlsna has provided it. Dr. Trangle wrote in his report that "[n]ew technology has produced quieter, more acceptable and safer locomotives." Dkt 164 at 9. Dr. Trangle relied upon his deep expertise with hearing conservation programs and the rail industry to support this conclusion.

To be blunt: Union Pacific is simply running from the truth here. Union Pacific's own dosimetry data shows that average noise levels have consistently decreased for over 30 years. What could possibly cause this other than quieter locomotives? Before the Seventh Circuit, Union Pacific made the audacious claim that the decrease in noise levels could be caused by statistical chance alone. That is not remotely plausible.

Union Pacific, of course, is free to argue that the jury should discount this evidence. *See* Your Honor's Standard Jury Instr. – Civ. at 30 ("You are to decide how much weight to give any evidence."); Pattern Jury Instr. 7th Cir. § 1.11 ("You should use common sense in weighing the evidence and consider the evidence in light of your own observations in life."); *id.* § 1.21; *Marsh v. Stevens Const. Corp.*, No. 06-C-310-S, 2007 WL 5431021, at *2 (W.D. Wis. Apr. 11, 2007) ("It was the jury's role to decide who was telling the truth."). But there is no per se rule that expert testimony is required to prove causation, and it would be especially inappropriate to impose such a rule here where there is admissible evidence in regulatory materials on the very matter at hand.

## H) Mlsna Should Not Be Prohibited From Providing the Jury With Information About Other Lawsuits Against Union Pacific.

Union Pacific next asks the Court to exclude "[a]rguments, evidence, or reference to any other lawsuits against Union Pacific" on the grounds that such evidence is not relevant and would be unduly prejudicial.  Dkt. 186 ¶ 7; Dkt. 187 at 16–19. The request should be denied.

21

Other ADA lawsuits against Union Pacific, especially those containing the identical claims and defenses as this case, are relevant to Mlsna's claims for punitive damages. *See Weber v. Wells Fargo Bank, N.A.*, No. 3:13CV158, 2014 WL 1618378, at *2–3 (N.D. W. Va. Apr. 22, 2014). That's because the jury will be "instructed to consider the reprehensibility of the Defendants' conduct and the likelihood that a defendant would repeat the conduct absent an award of punitive damages." *Alexander v. City of Milwaukee,* 474 F.3d 437, 454 (7th Cir. 2007); Pattern Civ. Jury Inst. 7th Cir. § 3.13. The jury will also be instructed that it may assess punitive damages against Union Pacific if it finds that Union Pacific acted "in reckless disregard of Plaintiff's rights," and that "[a]n action is in reckless disregard of Plaintiff's rights if taken with knowledge that it may violate the law." Pattern Civ. Jury Inst. 7th Cir. § 3.13. Evidence of lawsuits describing similar acts by Union Pacific therefore fits within Rule 404(b)'s exception to the prohibition on other-acts evidence because it is probative of Union Pacific's motive, intent, and knowledge. *See* Fed. R. Evid 404(b) (providing that evidence of other wrongs or acts may be admissible to prove "*motive*, opportunity, *intent*, preparation, plan, *knowledge*, identity, absence of mistake, or lack of accident" (emphases added)).

Other ADA lawsuits against Union Pacific about the same policies and practices relevant to this case speak to Union Pacific's awareness of the ADA's requirements, the likelihood that it would continue to apply its facially discriminatory testing standards against hearing-impaired employees, and the reprehensibility of its unlawful conduct. *See Philip Morris USA v. Williams*, 549 U.S. 346, 355 (2007) (holding that harm to other victims is relevant to reprehensibility). Excluding mention of such lawsuits therefore may impair the proper calculation of punitive damages.

This is not the kind of case in which reference to other lawsuits against Union Pacific would lead to jury confusion and mini-trials on each allegation. Mlsna is not alleging that he was targeted for discrimination by a rogue co-worker or supervisor. He fell prey to a facially discriminatory company-wide policy that Union Pacific acknowledges that it applies to all train employees. *See* Dkt. 182 at 4 ¶ 22 (Union Pacific's Proposed Stipulated Facts) ("Union Pacific applies its hearing protection requirements to all members of the train crew (Conductors, Locomotive Engineers, Switchpersons, and Brakepersons."). Charles Waldschmidt, a conductor, brakeman, and yardman at Union Pacific for nearly a decade, met the exact same fate as Mlsna. *See Waldschmidt v. Union Pac. R.R. Co.*, No. 1:20-cv-03808-FM-GPG (D. Colo.). As it did with Mlsna, Union Pacific held Waldschmidt out of service because he could not meet the FRA's hearing-acuity standard without hearing aids and while wearing hearing protection, even though he satisfied that standard *with hearing aids*. Union Pacific has done this to Waldschmidt time and again, as recently as December 2020. Mlsna's and Waldschmidt's claims, and Union Pacific's defenses, are identical in these cases. Unlike in *Harris v. Union Pacific Railroad Co.*, 953 F.3d 1030 (8th Cir. 2020), which was a class action on behalf of *all* disabled employees at Union Pacific challenging the railroad's fitness-for-duty evaluation policies under the ADA, *id.* at 1033, there are no "varying—and individualized—outcomes" for train-crew employees who have hearing disabilities like Mlsna and Waldschmidt, *id.* at 1037. *See also id.* at 1039 ("[H]ad some number of employees from the same or similar positions with the same or similar disabilities sought to challenge Union Pacific's policy, class certification may have been appropriate."). Employees in Mlsna's and Waldschmidt's shoes all suffer the same fate.

Moreover, like many of Union Pacific's other requests in its motion, this request for exclusion is premature. "[E]vidence should not be excluded before trial unless it is clearly

inadmissible on all potential grounds." *Consumer Fin. Prot. Bureau*, 2017 WL 3581146, at *2 (quoting *Ley*, 2011 WL 4729764, at *1). That principle counsels using caution here. The admissibility of evidence regarding other lawsuits against Union Pacific depends on the evidence adduced at trial, including whether it may be used as impeachment evidence if Union Pacific opens the door to it, which could happen if Union Pacific denies that it has applied and continues to apply these discriminatory policies to other employees.

Other courts in this circuit have taken a similarly cautious approach to motions like this one. *See Sumner ex rel. Lewis v. Ja-Ru, Inc.*, No. 09-CV-0427-MJR, 2011 WL 13359416, at *2 (S.D. Ill. Mar. 15, 2011) (denying motion "[to preclude testimony/evidence regarding recalls, other lawsuits and/or other incidents" on the ground that "[t]he admissibility of this evidence substantially depends upon the facts developed at trial and the laying of an appropriate foundation" and "[t]herefore, a ruling at this juncture would be premature"). That would be a reasonable resolution of the motion here as well.

Alternatively, the Court should deny this motion and instead issue a limiting instruction, should the need arise, about the inferences that the jury may—and may not—draw from this evidence. The Seventh Circuit repeatedly has explained that providing "limiting instructions often will suffice to cure any risk of prejudice." *United States v. Warner*, 498 F.3d 666, 700 (7th Cir. 2007) (cleaned up). Courts in this district have taken this approach before. *See Davis v. Meisner*, No. 15-cv-268-slc, 2017 WL 4570796, at *4 (W.D. Wis. Oct. 12, 2017) (stating that court would provide limiting instructions rather than granting motion in limine). It is appropriate here as well.

As a final note, if the Court does grant Union Pacific's motion, then there is no question that it should also grant Mlsna's motion asking the Court to bar Union Pacific from "presenting evidence or argument regarding the Federal Employers' Liability Act ('FELA')." Dkt. 193 ¶ 4;

Dkt. 194 at 7–9. Union Pacific should not be able to avoid having the jury hear about *actual* lawsuits against it containing allegations that it violated the ADA, while simultaneously telling the jury about *nonexistent* lawsuits that it may face under FELA.

## I)  Mlsna's Counsel Should Not be Prohibited from Asking About, Referencing, or Arguing Inferences Based on Discussions with In-House Counsel.

Union Pacific asks the Court to bar Mlsna from introducing "[a]rgument, evidence, or reference to inferences based on privileged discussions with in-house counsel." Dkt. 186 ¶ 8; Dkt. 187 at 19–20. The purpose of this motion is to keep the jury from learning that Terry Owens, Union Pacific's Director of Disability Management, said that cost was not a factor in denying Mlsna's request for an accommodation after consulting with Union Pacific's legal department and after initially saying that cost *was* a factor. Union Pacific's motion must be denied. The attorney-client privilege does not apply to these communications, and even if it does, Union Pacific has waived it. But Union Pacific's motion seeks more than just to exclude evidence about these particular communications. It appears to ask for a complete prohibition on "evidence of consultations with counsel." *See* Dkt. 187 at 19. There is no justification for a blanket prohibition, especially at this early stage. Union Pacific's motion must be denied.

Some background is necessary to understand Union Pacific's motion. Union Pacific's reasons for rejecting Mlsna's proposed accommodation were inconsistent and shifting. At her deposition, Owens testified that she was initially told that Mlsna's proposed device was too costly and that the "particular product didn't meet our safety standards." Dkt. 39 at 22, 35. This decision was made by Dr. Holland and Union Pacific's industrial hygiene department and its legal department. *Id.* at 22. Union Pacific made no objections to these questions. Owens acknowledged telling Mlsna that cost was a factor in denying his accommodation. Dkt. 27 at 12; Dkt. 39 at 35.

25

Mlsna was told that Union Pacific "didn't feel they had to pay for it… that it was not their responsibility to furnish this to employees" and "that it was too expensive." Dkt. 27 at 11. He was not initially told that anything else was wrong with the device. *Id.*

Owens later retracted her claim that cost was a factor. She testified that she talked to Union Pacific's law department after first telling Mlsna that cost was a factor. Dkt. 39 at 35. After her conversation with the law department, she then sent Dr. Holland an email that stated, "I probably jumped the gun on this case." *Id.* at 34; *see* Dkt. 40-1. She explained that this statement referred to telling Mlsna that the device was too costly, and that "I didn't have a right to tell Mr. Mlsna that cost was any factor." *Id.* at 35–36. "As it boiled down," according to Owens, cost "was not" a reason for denying the accommodation, because there was no reason to reach a cost determination after it was determined that the product would not satisfy Union Pacific's safety policy. *Id.* at 36. Although Union Pacific objected to questions about Owens's communications with one of Union Pacific's attorneys at an earlier point in the deposition, *see id.* at 33, it did not object during this later testimony.

Union Pacific has relied on Owens' testimony about cost and the reasons for Union Pacific's denial of Mlsna's accommodation in both its summary-judgment and its appellate briefing. *See* Dkt. 51 at 16 ¶ 51 (Statement of Undisputed Material Facts); *Mlsna v. Union Pac. R.R. Co.*, No. 19-2780, Dkt. 25 at 20–21 (7th Cir.). And though Union Pacific took issue in its Seventh Circuit brief with Mlsna's characterization of Owens's testimony, it has never asserted that anything in that testimony is privileged. It is too late in the day for it to do so now.

Union Pacific has not demonstrated that Owens's conversations with Union Pacific's law department about Mlsna's accommodation are privileged. The Seventh Circuit "has adopted the general principles of the attorney-client privilege as outlined by Wigmore":

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

*United States v. White*, 950 F.2d 426, 430 (7th Cir. 1991) (quoting *United States v. Lawless*, 709 F.2d 485, 487 (7th Cir. 1983)). "The burden falls on the party seeking to invoke the privilege to establish all the essential elements." *Id.* Union Pacific has not carried its burden. Owens's testimony does not make clear—nor does Union Pacific in its motion—that Owens sought *legal* advice from the law department. *See Upjohn v. United States*, 449 U.S. 383, 394-95 (1981) (communications between corporate counsel and company personnel are privileged so long as the information is related to the purpose of obtaining legal advice). What Owens's testimony *does* make clear is that the law department was one voice—along with Dr. Holland's and the industrial hygiene department's—in the decision to deny Mlsna's accommodation. *See* Dkt. 39 at 22. Union Pacific has not shown that the law department contributed legal analysis to that decision. That is necessary because corporate communications about the general business of the company do not attain privileged status just because in-house counsel is involved. *See F.C. Cycles Int'l, Inc. v. Fila Sport, S.p.A.*, 184 F.R.D. 64, 71 (D. Md. 1998). There is reason to believe that is what happened here.

Assuming *arguendo* that Owens' conversations with Union Pacific's law department are privileged, Union Pacific has waived that privilege by failing to timely object to deposition questions about these conversations and by relying on Owens' testimony in this litigation. Failing to object to questions that elicit information about privileged communications with an attorney constitutes a waiver of that privilege. *See Hawkins v. Stables*, 148 F.3d 379, 384 (4th Cir. 1998); *Perrignon v. Bergen Brunswig Corp.*, 77 F.R.D. 455, 459 (N.D. Cal. 1978); *Sidney I. v. Focused*

*Retail Prop. I, LLC*, 274 F.R.D. 212, 218 (N.D. Ill. 2011). That rule applies to Owens' deposition testimony.

There is another reason for finding that Union Pacific has waived any privilege that may attach to Owens's communications with Union Pacific's attorneys. "The attorney-client privilege is generally waived when the client asserts claims or defenses that put his attorney's advice at issue in the litigation." *Garcia v. Zenith Electrs. Corp.*, 58 F.3d 1171, 1175 n.1 (7th Cir. 1995). Union Pacific has done that by insisting that cost was not a factor in denying Mlsna's accommodation, even though Owens originally stated that cost was a factor and only changed her position after speaking with Union Pacific's counsel. *See* Dkt. 51 at 16 ¶ 51 (Statement of Undisputed Material Facts); *Mlsna*, No. 19-2780, Dkt. 25, at 20–21 (7th Cir.). Union Pacific's defense that cost did not matter therefore appears to be predicated on its attorneys' advice.

But even if Owens' communications are privileged and this privilege has not been waived, Union Pacific's motion asks for far too much. It may be true that no negative inference can be drawn based on the invocation of attorney-client privilege. *See Parker v. Prudential Ins. Co. of Am.*, 900 F.2d 772, 775 (4th Cir. 1990). But that does not mean that Mlsna "should not be allowed to ask about [or] reference… privileged discussions between Union Pacific's law department and its employees," or that all "evidence of consultations with counsel" must be barred. Dkt. 187 at 19. There is no general prohibition on this kind of evidence. *See Knox Energy, LLC v. Gasco Drilling, Inc.*, No. 1:12CV00046, 2014 WL 4546049, at *3 (W.D. Va. Sept. 12, 2014). The "attorney-client privilege only protects the communications themselves and not the underlying facts or the mere occurrence of a consultation." *Id.*

Union Pacific's request is premature and "excessively broad in scope." *Hale v. State Farm Mut. Auto. Ins. Co.*, No. 12-0660-DRH, 2018 WL 4052413, at *16 (S.D. Ill. Aug. 21, 2018). Even

if Union Pacific asserts a privilege, "upon examining it the Court may decide it is not protected by any privilege." *Id.* Mlsna must not be barred from inquiring into Union Pacific's defense that it decided that cost did not matter and why and when it changed its tune on that topic. To the extent this line of inquiry requires discussion of Owens's consultation with Union Pacific's law department, a cautionary instruction can remedy any possible undue prejudice this might cause Union Pacific.

**J) References to Pretrial Motions and Orders, including the Seventh Circuit's Opinion, Should Not be Excluded.**

Union Pacific requests an order excluding any "[a]rguments or references to pretrial motions and orders, including the Seventh Circuit's opinion." Dkt. 186 ¶ 9. Union Pacific claims that the "disposition of such motions is irrelevant, would be unfairly prejudicial, and would mislead and confused the jury." Dkt. 187 at 21. This motion should be denied as premature and unsupported. Tellingly, Union Pacific fails to cite a single case in support of its motion.

Union Pacific's motion is purportedly motivated by a fear that Mlsna's counsel will "unfairly use" this Court's and the Seventh Circuit's rulings. *Id.* It seems more likely that Union Pacific is concerned that Mlsna will "use" the Seventh Circuit's ruling at all, since that decision ruled that Union Pacific's central defense—that Union Pacific could not certify Mlsna "because he failed a federally-regulated hearing test while wearing mandatory hearing protection," Dkt. 51, Union Pacific's Br.In Supp. of Motion for Summ. J., at 1—is wrong as a matter of law, *see Mlsna v. Union Pac. R.R. Co.*, 975 F.3d 629, 636 (7th Cir. 2020). Union Pacific's motion, therefore, appears to be another attempt to keep anything out of the trial that might conflict with its chosen narrative. The law does not permit that. *See Johnson*, 2021 WL 2070448, at *13. Union Pacific's motion should be denied.

It should also be denied as premature. Premature grants of motions in limine should be avoided. "Often…the better practice is to wait until trial to rule on objections, particularly when admissibility substantially depends upon facts which may be developed there." *Landmark Am. Ins. Co. v. Green Lantern Roadhouse, LLC,* No. 07-CV-0535-MJR, 2009 WL 458561, *1 (S.D. Ill. Feb. 24, 2009). That is the best course to take here, too. Union Pacific's concerns can be dealt with better by relying on objections at trial. Union Pacific can object if it believes that Mlsna is unfairly using the Seventh Circuit's decision. But if Union Pacific pursues a theory that is foreclosed by prior rulings, then Mlsna needs to be able to discuss those rulings. And Union Pacific gives every indication that that is just what it intends to do. Its proposed jury instruction, for instance, ask the Court to do what it cannot: misrepresent the law and facts to the jury. *See, e.g.*, Dkt. 182 at 6 (falsely claiming that Mlsna "could not simultaneously meet the Federal Railroad Administration's minimum hearing acuity standard and wear hearing protection"), 19 (incorrectly stating, in direct-threat instruction, that Union Pacific *learned* that Mlsna could not meet the FRA's hearing standards and safely wear hearing protection). Mlsna must be able to discuss the applicable law, which includes the Seventh Circuit's decision, in the event it becomes necessary.

**K) The FRA's Operating Crew Review Board Decision Should Not Be Excluded.**

Union Pacific last asks the Court to exclude the FRA's decision concerning Union Pacific's revocation of Mlsna's conductor certification. Dkt. 186 ¶ 10; Dkt. 187 at 21–23. Union Pacific makes three arguments for excluding the decision. None has merit.

First, it argues that the decision has no binding effect on Mlsna's ADA claims and may invade the province of the jury. But if having a binding effect were a prerequisite for evidence to be admissible, the only evidence a jury would hear would be evidence that the parties had stipulated to or that had been judicially noticed. There wouldn't be much need for juries then. Nor

is there a risk that the FRA's decision would invade the province of the jury. This isn't a case where the jury and the administrative tribunal were asked to weigh in on the same contested facts. *Cf. Wright v. BNSF Ry. Co.*, No. 4:13-CV-24-JED-FHM, 2016 WL 1621698 (N.D. Okla. April 22, 2016), at *4. There is little dispute about the underlying facts in this case. Indeed, the FRA's decision was based on "the undisputed facts and FRA's hearing acuity requirements." Dkt. 106 at 4. The jury will learn the same undisputed facts and requirements here. It will then be up to it to decide how much weight to assign to them.

Second, Union Pacific argues that the FRA's decision is irrelevant to Mlsna's ADA claims because the FRA determined only whether Union Pacific's revocation of Mlsna's conductor certification violated the FRA's regulations. The Court should not be fooled by this argument. All along, Union Pacific has asserted that the FRA *is* relevant to this case. Indeed, Union Pacific has consistently taken the position that the FRA *required* it to do what it did to Mlsna. *See* Dkt. 51, Union Pacific's Br. in Supp. of Motion for Summ. J., at 1 ("[Union Pacific] could not certify [Mlsna], a hearing-impaired employee, as a Train Conductor because he failed a federally-regulated hearing test while wearing mandatory hearing protection. Federal law and Union Pacific's safety policies require Train Conductors to meet minimum hearing acuity standards and wear hearing protection to prevent exposure to dangerous noise levels in the railroad environment. Mlsna could not simultaneously perform these essential functions, and he is therefore not a qualified person with a disability under the Americans with Disabilities Act."); *id.* at 21 ("The ability to meet FRA minimum hearing standards is an essential function of the Conductor position. Indeed, the FRA prohibits individuals from working as conductors if they cannot meet the hearing threshold." (citing 49 C.F.R. §§ 242.101(a)(3), 242.117)); *id.* at 2 ("[Union Pacific] instructed [Mlsna] to notify the railroad if he believed other devices would allow him to meet the FRA

standards and Union Pacific's policies. To this day, Mlsna has offered no credible evidence that the custom earplugs he proposed or any other device would allow him to meet the FRA minimum hearing acuity standards.").

At summary judgment, Union Pacific defended pulling Mlsna from service on the ground that FRA regulations required it to test Mlsna without his hearing aids and with hearing protection. *See id.* at 1–2 ("[T]he [FRA] adopted a regulation requiring Union Pacific to certify that its Train Conductors meet minimum hearing acuity standards… [Mlsna] failed the tests while wearing protection designed for employees with impaired hearing."); *id.* at 10 ("A conductor who does not meet the FRA minimum hearing criteria with unaided hearing must meet FRA minimum criteria when wearing the AHPD.").

It took the same positions on appeal. *Mlsna*, No. 19-2780, Dkt. 25 at 29 (7th Cir.) ("Union Pacific instead requires all conductors to meet the FRA acuity threshold with unaided hearing or with an approved AHPD. Mlsna cannot do either."); *id.* at 46–47 ("When Mlsna does not wear hearing aids he cannot meet the FRA minimum hearing level—an essential function. And when he wears hearing aids, he cannot abide by the mandatory hearing protection requirement—also an essential function. Mlsna cannot safely do both and he is therefore unable to perform the essential functions of his position."); *id.* at 48 ("Mlsna cannot identify a device that allows him to meet the FRA acuity threshold and satisfy the hearing protection requirement.").

The Seventh Circuit rejected these arguments. *See Mlsna v. Union Pac. R.R. Co.*, 975 F.3d 629, 636 (7th Cir. 2020) ("[T]he plain text of the hearing acuity regulation does not mention hearing protection. Rather, the hearing test must show, without qualification, that" the person does not have hearing loss in his better ear greater than 40 decibels, with or without the use of a hearing

aid…. If the hearing acuity regulation was meant to require hearing protection, it could have said so, but it does not."). So did the FRA. *See* Dkt. 106 at 4.

Union Pacific's theory is "the government made me do it" defense. But the Seventh Circuit and the FRA have both determined that Union Pacific's justification for revoking Mlsna's certification and holding him out of service—that he could not meet the hearing-acuity standard while simultaneously wearing hearing protection—finds no support in the regulations. The government, in other words, *did not* make Union Pacific discriminate against Mlsna.

Despite these rulings, Union Pacific gives every indication that it wants to persist in this defense. It incorporates the defense into its jury instructions. *See* Dkt. 182 at 6 ("Defendant denies that it discriminated against Plaintiff and says that it could not allow Plaintiff to safely work as a railroad conductor because Plaintiff could not simultaneously meet the Federal Railroad Administration's minimum hearing acuity standard and wear mandatory hearing protection."); *id.* at 19 ("In this case, Defendant says that it restricted Plaintiff from working as a conductor after it learned that he could not meet the FRA acuity standard and safely wear hearing protection because he posed a significant risk of substantial harm to himself and/or others in the workplace."). Since the Seventh Circuit has already decided that this defense has no basis in the law, Union Pacific should not be permitted to present it to the jury. But be that as it may, Union Pacific's litigation strategy shows that it believes that the FRA regulations are relevant to this case. It would be improper to allow Union Pacific to cite the FRA's requirements as a defense but bar consideration of whether Union Pacific holds a legally defensible interpretation of the FRA.

Third, Union Pacific argues that even if the FRA's decision is relevant, it should be excluded because its relevance "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and undue delay." Dkt. 187 at 22. There is no merit to this argument. A

cautionary instruction would take care of any concerns about what the jury could infer from the FRA's decision. And Union Pacific is wrong that it would have to defend itself with additional evidence to rebut the FRA's decision about the FRA's hearing-acuity standards and Union Pacific's hearing policies. No extra defense about these issues would be necessary, since the relationship between the FRA's standards and Union Pacific's policies are already part of the case.

The Court must instruct the jury about what the FRA regulations require. *See* Dkt. 189 at 33–35. The FRA's decision is relevant to that determination. And the Court can admit the FRA decision itself as a public record under Federal Rule of Evidence 803(8). *See BNSF Ry. Co. v. Box*, 470 F. Supp. 2d 855, 861 (C.D. Ill. 2007) (permitting plaintiff to introduce FRA reports under Fed. R. Evid. 803(8)). It's well-established that courts can admit agency decisions into evidence. *See, e.g.*, *Abrams v. Lightolier, Inc.*, 841 F. Supp. 584, 592–93 (D. N.J. 1994) (affirming jury verdict for plaintiff in which EEOC letter finding that defendant violated ADEA was admitted into evidence); *King v. N.C. Dep't of Public Safety*, No. 5:12-CV-152-F, 2014 WL 69601, at *4 (E.D. N.C. Jan. 8, 2014) ("[I]t is well settled that a district court may find determinations made by the [EEOC] admissible under Rule 803(8) as long as the circumstances do not indicate lack of trustworthiness."); *see also Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 170 (1988) (holding that portions of reports otherwise admissible under Rule 803(8) "are not inadmissible merely because they state a conclusion or opinion"). Nothing suggests anything untrustworthy in the FRA's decision. *See* Fed. R. Evid. 803(8)(B); *Slocum v. Del., L & W.R. Co.*, 339 U.S. 239, 243 (1950) (A railroad board is "well-equipped to exercise its congressionally imposed functions. Its members understand railroad problems and speak the railroad jargon. Long and varied experiences have added to the Board's initial qualifications."). After all, the FRA's decision was based on "the

undisputed facts and FRA's hearing acuity requirements." Dkt. 106 at 4. Union Pacific's request must be denied.

## **<u>CONCLUSION</u>**

Union Pacific's motions in limine should be denied in their entirety.

Dated: June 1, 2021

Respectfully submitted:

s/ Nicholas D. Thompson
Nicholas D. Thompson, Esq.
 (MN #1078903)
THE MOODY LAW FIRM, INC.
500 Crawford Street, Suite 200
Portsmouth, VA 23704
Telephone: (757) 393-4093
Fax: (757) 397-7257
nthompson@moodyrrlaw.com

Thomas W. Fuller (MN #0394778)
Hunegs, LeNeave & Kvas, P.A.
1000 Twelves Oaks Center Drive
Suite 101
Wayzata, MN 55391
tfuller@hlklaw.com

Adam W. Hansen
Colin R. Reeves
APOLLO LAW LLC
333 Washington Avenue North
Suite 300
Minneapolis, MN 55401
(612) 927-2969
adam@apollo-law.com
colin@apollo-law.com

***Attorneys for Mark Mlsna***

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on June 1, 2021, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic filing:

Scott P. Moore (NE# 20752)
David P. Kennison (NE# 25510)
Baird Holm LLP
1700 Farnam St. Ste. 1500
Omaha, NE 68102
402-636-8311
402-344-0588 (facsimile)
spmoore@bairdholm.com
dkennison@bairholm.com

***Attorneys for Defendants***

s/ Nicholas D. Thompson