IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

MARK MLSNA,

                          Plaintiff,                          OPINION AND ORDER

        v.
                                                              18-cv-37-wmc

UNION PACIFIC RAILROAD COMPANY,

                          Defendant.

With this case set for trial Monday, June 28, 2021, with the final pretrial conference ("FPTC") set for Thursday, June 17, 2021, at 2:00 pm.  In advance of the FPTC, the court issues the following preliminary rulings with respect to the parties' respective motions *in limine.*


BACKGROUND

Plaintiff Mark Mlsna has a hearing impairment and has worn hearing aids for over twenty years.  He began working as a train conductor in the late 1990s, and in 2007, he was hired by Union Pacific.  After Union Pacific terminated him in 2015, Mlsna filed suit alleging that Union Pacific's actions violated the Americans with Disability Act ("ADA"), 42 U.S.C. § 1210 *et seq.*

To understand the present dispute, a review of the 2012 revisions to the Federal Railroad Administration ("FRA") regulations is required.  These new regulations required railroads, including Union Pacific, to protect the hearing of vulnerable employees by establishing hearing conservation policies. As a part of this requirement, hearing protection is required if: (1) the employee is exposed to sound levels equivalent to an eight-hour, time-

weighted average ("TWA") of 90 decibels or greater; or (2) the employee is exposed to sound levels equivalent to an eight-hour, time-weighted average ("TWA") of 85 decibels or greater *and* the employee has not yet had a baseline audiogram *or* has experienced hearing loss. 49 C.F.R. § 227.115(c)-(d). To measure these decibel levels, railroads conduct dosimetry testing.

Importantly, the FRA hearing conservation regulation sets a floor, not a ceiling. 49 C.F.R. § 227.1 ("This part prescribes minimum Federal health and safety noise standards . . . . This part does not restrict a railroad . . . from adopting and enforcing additional or more stringent requirements."). And, in fact, Union Pacific set a stricter policy, requiring *all* employees to wear hearing protection if they "*may* be subjected to noise exposures equal to or exceeding" an eight-hour TWA of 85 decibels. (Hearing Conservation Policy (dkt. #58-1) 1 (emphasis added).) Based on the results of its dosimetry testing, Union Pacific further concluded that Mlsna was required to wear hearing protection under *both* the FRA regulations and its Hearing Conservation Policy. Mlsna disputes whether this dosimetry testing did in fact require him to wear hearing protection.

Another aspect of the 2012 FRA regulations required railroads to ensure that train conductors met certain minimum hearing acuity benchmarks. Thus, as a train conductor, Union Pacific required Mlsna to undergo hearing acuity testing in December of 2014 and in January of 2015.[1] However, he could only pass the hearing acuity tests while wearing his hearing aids and *without* wearing the hearing protection provided by Union Pacific,

---

[1] The FRA regulations "grandfathered in" then-current conductors for thirty-six months, so Mlsna did not have to complete his hearing certification until February 2015.

commercially known as "Pro Ears-Gold."  According to Union Pacific, therefore, Mlsna could not meet the FRA's minimum hearing acuity requirements without being in violation of its Hearing Conservation Policy.

To address this problem, Mlsna proposed that he use a custom-made hearing protection, known as "E.A.R. Primo."  However, Union Pacific rejected his proposal on the grounds that this device did not have a noise reduction rating ("NRR").  For these reasons, Union Pacific declined to recertify Mlsna as a conductor, and his employment was terminated.  To help Mlsna plan his "next steps," Union Pacific also referred him to its Disability Management Department (also known as the "Vocational-Rehabilitation Department").  Rather than contact the department, however, Mlsna applied for disability benefits from the railroad retirement board ("RRB"). On his application, he represented that his medical conditions prevented him from working.  (RRB App. (dkt. #53-2) 10.) Mlsna abandoned his disability benefits application, however, upon learning that he could obtain retirement benefits.

Mlsna next filed this lawsuit, claiming that Union Pacific's decision not to recertify him as a train conductor violated the ADA.  Following discovery, defendant moved this court for summary judgment, which was granted.  On appeal, however, the Seventh Circuit reversed and remanded the case for trial, concluding on September 14, 2020, that fact issues existed as to whether:  (1) wearing hearing protection was an essential function of Mlsna working as a conductor; and (2) Union Pacific reasonably accommodated Mlsna's hearing disability.  *Mlsna v. Union Pac. R.R. Co.*, 975 F.3d 629 (7th Cir. 2020).

OPINION

## I.  Plaintiff's Motions in Limine (dkt. #194)

### A.  MIL No. 1: Exclude Withheld Dosimetry Data

While previously having produced some dosimetry data early on in this case, defendant produced *new* and previously undisclosed dosimetry data on May 12, 2021, two months after discovery had closed for a *second* time.[2]  Plaintiff seeks to exclude this new data, arguing that it was not timely produced.  Defendant objects, arguing that a "close review" of plaintiff's requests shows that he never *specifically* requested this dosimetry data. (Def.'s Resp. (dkt. #206) 3.)

Defendant's argument that it did not provide the data because it was not "asked" to do so reflects a fundamental misunderstanding of its discovery obligations.  The Federal Rules of Civil Procedure require that a party "must, *without awaiting a discovery request*, provide to the other parties . . . a copy -- or a description by category and location -- of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1)(A)(ii) (emphasis added).  The Rules further require a party to "supplement or correct its [Rule 26(a)] disclosure or response . . . in a timely manner" should it later learn "that in some material respect the disclosure or response [wa]s incomplete or incorrect."  Fed. R. Civ. P. 26(e). From the beginning, defendant's argument has been that its dosimetry testing indicated

---

[2] The records appear to indicate that the new data was gathered between February 2014 and July 2017.

that Mlsna was required to wear hearing protection.  Even if plaintiff never requested these documents, defendant was required to disclose this evidence (and timely supplement it) if it planned to use the dosimetry data to defend against Mlsna's claims.

Although a failure to timely disclose evidence may be overlooked if the failure was "substantially justified or harmless," neither excuse is available to defendant.  *See* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless.").  As discussed above, defendant's explanation simply does not justify its actions.  Moreover, the later disclosure of the new evidence is not harmless.   In 2019, plaintiff understandably forwarded defendant's earlier-produced, dosimetry evidence to an expert, whom he then paid to analyze the data and produce an expert report.  (Dkt. #56 at 2-3.)  Defendant's failure to produce meant that plaintiff's expert did not have the benefit of the data, on which defendant *now* apparently intends to rely on at trial, when completing his report.  Moreover, defendant provided new data long after the *second* close of discovery and less than two months before the start of trial.  As a result, plaintiff is not only denied a fair opportunity to review this new evidence with its expert, and revise his opinions accordingly, but obviously has no opportunity to take follow-up discovery from the defendant.

Because defendant failed to provide the new dosimetry data timely, and because its failure was neither justified nor harmless, the evidence must be excluded and plaintiff's first motion in limine is GRANTED.

5

**B.  MIL No. 2: Exclude Evidence of Mlsna's Retirement Benefits**

Next, plaintiff seeks to exclude reference to his application for and receipt of railroad retirement benefits.  Notably, this is distinct from Mlsna's application for *disability* benefits, which he specifically does *not* seek to exclude.  Even so, plaintiff's general request is proper, and the court will GRANT his motion unless he should "open the door."  *See Lawson v. Trowbridge*, 153 F.3d 368, 379 (7th Cir. 1998) (recognizing "the general rule that evidence of payments received from collateral sources is inadmissible"); *Hodgson v. Wisconsin Cent. Ltd.*, No. 19-CV-15-JDP, 2020 WL 3251187, at *1 (W.D. Wis. June 16, 2020) (granting motion in limine seeking to exclude evidence of railroad retirement benefits in Federal Employers' Liability Act case).

While not objecting to this motion, defendant suggests that plaintiff may open the door to this evidence at trial in two ways.  First, defendant notes that Mlsna testified in his deposition that he did not receive disability benefits because he opted instead to pursue retirement benefits.  Second, defendant predicts that Mlsna may explain that he declined to work with Union Pacific's Vocational-Rehabilitation department in order to preserve his railroad retirement benefits.  Without opining whether either scenario would constitute opening the door to evidence of his application for railroad retirement benefits, much less his receipt of actual benefits or the amount of those benefits, the court will discuss with the parties at the FPTC what would constitute opening the door in this case, as well as improper invitations or bating to do so by defendant.

6

### C. MIL No. 3: Exclude Evidence of Union Pacific's Vocational-Rehabilitation Department

After deciding not to recertify Mlsna as a train conductor, Union Pacific sent a letter referring him to its Vocational-Rehabilitation Department. This letter explained in part:

> What are my options now that I am unable to return to my railroad job?
> . . .
> Assistance is available to help you look at your job options both inside the Union Pacific Railroad and outside of the railroad in your local community. You may access this assistance by calling . . . . and indicating your interest in vocational services.

(Jan. 30, 2015 Letter (dkt. #57-2) 3.) The letter also provided information regarding disability and retirement benefits. There is no dispute that Mlsna never contacted the department.

Now, plaintiff seeks to exclude evidence of Union Pacific's Vocational-Rehabilitation Department entirely. Without evidence, plaintiff argues that Union Pacific created this entire department to limit its legal exposure, enabling it to argue that an employee could have mitigated damages by taking advantage of the department's services.[3] If so, we will never know since plaintiff chose not to follow up.[4] Regardless, as defendant points out, this evidence is probative of Mlsna's mitigation of damages. In addition,

---

[3] Plaintiff points to a protective order from a circuit court in Missouri to support his theory, but that case involved a letter from Union Pacific that was sent to the former employee *over one year* after he stopped working and after he had filed suit. *Galloway v. Union Pac. R.R. Co.*, No. 042-01789, Order (Mo. Cir. Ct. Oct. 18, 2006) (available at dkt. #194-10) (emphasis added). Because the plaintiff at that time was represented by counsel, the court also concluded the letter, which was sent directly to the plaintiff, was an improper *ex parte* communication.

[4] If plaintiff's theory were correct, he need only have taken discovery to determine whether the department was just a front and no employee ever actually received assistance with an alternative job placement. Since if was not offered, the court assumes plaintiff has no such evidence.

defendant suggests that this evidence is relevant to whether he failed to engage in the interactive process.[5]   Although the court will allow plaintiff to reply to the latter, the evidence is plainly relevant to mitigation.   Accordingly, plaintiff's motion to exclude evidence of the Vocational-Rehabilitation Department is DENIED IN PART as to introduction of this evidence in the damages phase of trial, and RESERVED IN PART as to its introduction in the liability phase.

### D. MIL No. 4: Exclude Reference to the Federal Employers' Liability Act

Plaintiff's final motion in limine seeks to exclude reference to the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 *et seq.*   At summary judgment, defendant argued in part that its requirement that Mlsna wear hearing protection was reasonable because *not* requiring protection might subject it to liability under FELA for potential hearing injuries caused by a known or potential workplace hazard.   (Defs.' Summ. J. Br. (dkt. #51) 23.)   Plaintiff argues that defendant's "fear of liability is entirely speculative and, therefore, irrelevant."   (Pl.' Br. (dkt. #194) 8.)   Alternatively, plaintiff argues that any minimal relevance is outweighed by a danger of unfair prejudice, undue delay, and jury confusion.   Defendant objects to this motion, arguing that it "has a right to explain to the jury why it requires conductors to wear hearing protection, including to avoid liability."   (Def.'s Resp. (dkt. #206) 10.)

---

[5] "After an employee has disclosed that she has a disability, the ADA requires an employer to 'engage with the employee in an 'interactive process' to determine the appropriate accommodation under the circumstances.'"   *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1061 (7th Cir. 2014) (quoting *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005)).

Union Pacific's possible exposure to liability based on proposed accommodations appears relevant to this case if only to provide context to its decision-making.  In particular, the Seventh Circuit has explained that an employer is not required to implement an accommodation that would place it "on the 'razor's edge' of being sued under the ADA . . . or eventually being sued for negligence."  *Webb v. Clyde L. Choate Mental Health & Dev. Ctr.*, 230 F.3d 991, 1000 (7th Cir. 2000) (*Palmer v. Circuit Court of Cook County, Ill.*, 117 F.3d 351, 352 (7th Cir. 1997)).  Additionally, the ADA implementing regulations provide that "[i]t may be a defense to a charge of discrimination under this part that a challenged action is required or necessitated by another Federal law or regulation . . . that would otherwise be required by this part."  29 C.F.R. § 1630.15(e).

Having acknowledged that, the court is concerned that a focus on speculative liability and FELA may result in jury confusion and wasted time.  Accordingly, the court will RESERVE on this motion until hearing argument at the FPTC on possible prejudice, and the value of a curative instruction.

## II. Defendant's Motions in Limine (dkt. #187)

### A. MIL No. 1: Exclude "Evidence About Any Alleged Device that Has Not Been Tested"

Defendant first argues that plaintiff should be precluded from presenting evidence about hearing devices have not been subjected to "audiological tests," apparently defined as a test in which Mlsna actually puts on the device at issue, then has his hearing tested to see if he meets the FRA hearing acuity standards *while wearing* the device.  However, this definition ignores the Seventh Circuit's holding that

> the plain text of the hearing acuity regulation does *not* mention wearing hearing protection.  Rather, the hearing test must show, without qualification, that "[t]he person does not have an average loss in the better ear greater than 40 decibels with or without the use of a hearing aid, at 500 Hz, 1,000 Hz, and 2,000 Hz."  49 C.F.R. § 242.117(i). If the hearing acuity regulation was meant to require hearing protection, it could have said so, but it does not. . . .  [O]n this record it does not follow as a matter of law that an essential function of Mlsna's job as a conductor was to pass the hearing acuity test while wearing compliant hearing protection.

*Mlsna*, 975 F.3d at 636-37 (emphasis added).

Still, as noted above, the FRA regulations set a floor, not a ceiling.  Thus, Union Pacific was not prohibited under the FRA regulations from imposing more stringent requirements, *if* those requirements complied with the ADA.  So while Union Pacific may argue that its own internal policy required Mlsna to meet minimum hearing acuity requirements while wearing hearing protection, it *cannot* argue that the FRA regulations mandated this, and it will be up to the jury to determine whether Union Pacific's more stringent policy was lawful under the ADA.

Applying this law to defendant's motion, the court sees no basis to preclude other reliable evidence regarding the efficacy of various hearing protection devices under FRA regulations, subject to defendant arguing that its more stringent "audiological tests" was essential for Mlsna's job as a conductor under the ADA.  Accordingly, this motion is DENIED.

## B. MIL No. 2: Preclude Plaintiff From "Presenting Evidence About Any Alleged Device or Technology that Did Not Exist During the Interactive Process"

Defendant next argues that plaintiff "should not be allowed to introduce evidence

on hearing devices or technology that did not exist in 2015." (Def.'s Br. (dkt. #187) 6.)
Plaintiff responds simply that he "does not plan on doing so." (Pl.'s Resp. (dkt. #213).)
Regardless, the court agrees that any devices that did not exist in 2015 are not relevant,
and so it will GRANT defendant's motion at least in principle.

Importantly, however, defendant goes on to argue against the admissibility of
evidence regarding a device manufactured by Personal Medical in 2019. This device was
custom-made for Mlsna, and plaintiff's expert Dr. Douglas Kloss tested Mlsna's hearing
aided by this device. When asked about the age of the technology, however, Dr. Kloss
testified that he asked the company how old the technology used in the device was, and
they responded that it had been available since 2014. (Kloss Dep. (dkt. #162) 110:19-
112:17.) Understandably, defendant now argues that this evidence is hearsay, and cannot
be used to support plaintiff's claim that the technology existed before 2015. Plaintiff
argues that this evidence presents no hearsay concerns because it was relied on by Dr. Kloss
to form his opinions.

This dispute is governed by Federal Rule of Evidence 703, which provides in full:

> An expert may base an opinion on facts or data in the case that
> the expert has been made aware of or personally observed. If
> experts in the particular field would reasonably rely on those
> kinds of facts or data in forming an opinion on the subject,
> they need not be admissible for the opinion to be admitted.
> But if the facts or data would otherwise be inadmissible, the
> proponent of the opinion may disclose them to the jury only if
> their probative value in helping the jury evaluate the opinion
> substantially outweighs their prejudicial effect.

Fed. R. Evid. 703. The Advisory Committee Notes also explain that Rule 703 was amended
in 2000 to "emphasize that when an expert reasonably relies on inadmissible information

to form an opinion or inference, *the underlying information is not admissible* simply because the opinion or inference is admitted."  Fed. R. Evid. 703 Committee Note (2000) (emphasis added).  As the text of the rule makes clear, an expert may rely on inadmissible evidence in forming his opinion, and that evidence may even be presented to the jury but only for the limited purpose of evaluating the expert's opinion and *not* for the truth of the matter asserted.  Here, however, Dr. Kloss's general opinion that adequate technology existed at the time with respect to the Personal Medical device appears to be based on nothing more than reliance on hearsay, rather than the application of any independent expertise.  Unless his expert report or deposition testimony reflects otherwise, he may not escort in naked hearsay for the truth of the matter asserted under the guise of expert opinion.  Fed. R. Evid. 801.  Accordingly, absent a further proffer by plaintiff at the FPTC, this motion is GRANTED.

### C.  MIL No. 3: Preclude Plaintiff From "Offering Testimony that the E.A.R. Primo has an NRR"

Defendant's third motion in limine seeks to preclude plaintiff from arguing that the E.A.R. Primo (the device initially proposed by Mlsna in 2015) has an NRR.  Plaintiff counters that his expert Dr. Trangle "learned" that the E.A.R. Primo "does have an NRR of 31 to 32 decibels," which Dr. Trangle apparently discovered after "researching the device and speaking to a manufacturer representative."  (Pl./s Resp. (dkt. #213) 15.)  According

to plaintiff, "there is nothing wrong with presenting this testimony." (*Id.*)[6] As noted above, that is not entirely correct. While Dr. Trangle may have used what he learned from the manufacturer to formulate his opinion, this hearsay testimony also cannot be presented to the jury for the truth of the matter asserted, nor even offered as support for his opinion unless his report or deposition testimony discloses more than simply taking a manufacturer's word for it. Thus, the court again GRANTS this motion subject to a further proffer by plaintiff at the FPTC.

### D. MIL No. 4: Preclude Plaintiff From "Arguing that Union Pacific Should Have Individually Tested His Noise Exposure"

To measure decibel levels, the FRA regulations require railroads to conduct either "area sampling," which takes several noise measurements at different locations within a workplace, *or* "representative personal sampling," which measures the exposures of employees who operate similar equipment under similar conditions. 49 C.F.R. § 227.103(b)(2). Thus, the FRA regulations do not *require* railroads to individually test a conductor's noise level exposure. At the same time, there is nothing in the regulations that prohibit such testing. *Id.*; *cf.* 71 Fed. Reg. 63,074, 63,087 (explaining that "while FRA does not require the use of continuous monitoring, FRA also does not prohibit its use. Railroads are free to employ continuous monitoring if they so wish.").

---

[6] Plaintiff also explains that he "does not intend to make the NRR the centerpiece of his case" because the FRA regulations do not require a hearing protection device to have an NRR. (Pl.'s Resp. (dkt. #213) 13.) Plaintiff's interpretation of the law is generally correct -- under the FRA regulations, there are *three* methods for assessing the adequacy of hearing protection, only one of which mentions an NRR. *See* 49 C.F.R. Pt. 227, App. B. However, this does not mean the Rules of Evidence are suspended to the extent that the NRR method is introduced at trial. Of course, plaintiff is free to abandon this method and moot the motion.

Here, defendant represents that it employed the "representative personal sampling" method in compliance with the FRA regulations, and so seeks to prevent plaintiff from arguing that it should have performed individual noise exposure testing.  Arguably, at least, individual testing to see if *Mlsna* was *in fact personally* exposed to noise levels that would require his wearing hearing protection under the FRA may again be found by the jury as a reasonable accommodation under the ADA, even though not required by the FRA regulations.  Defendant is free to argue that such testing was *not* reasonable, but this evidence is relevant and admissible, so this motion is DENIED.

### E.  MIL No. 5: Preclude Plaintiff From "Arguing That Union Pacific Was Required To Offer a Variety of Hearing Amplification Devices"

In its fifth motion in limine, defendant argues that plaintiff should be precluded from arguing that Union Pacific must offer multiple hearing amplification devices.  Under the FRA regulations, defendant acknowledges that railroads must "give employees the opportunity to select their hearing protectors from a variety of suitable hearing protectors," including "devices with a range of attenuation levels."   49 C.F.R. § 227.115(a)(4).  Defendant insists that it complied with this regulation by offering Mlsna and its other conductors a catalogue of different protection devices to choose from, even though that catalog only includes one *amplification* device.  Once again, even if Union Pacific complied with the FRA regulations, the question is whether it violated the *ADA*.  Arguably, offering more than a single device as an option to Mlsna was a reasonable accommodation, and plaintiff is free to argue as much.  Thus, this motion is DENEID.

However, plaintiff goes further in response, arguing that the FRA regulations *required*

Union Pacific to offer a variety of hearing amplification devices.  For support, he points to the Federal Register entry discussing the FRA regulations, which states in relevant part:

> When offering hearing protectors, employers should offer employees several different types, whether ear plugs, ear muffs, and/or electronic headsets.  *Within any given type*, the employer should offer several different designs and models.  For example, with respect to ear plugs, there are several options, including, but not limited to, roll down foam earplugs, push-in foam earplugs, premolded-flanged earplugs, premolded-unflanged earplugs, banded ear protectors.

71 Fed. Reg. 63,104 (emphasis added).  The court finds nothing in this language that would require more than several different designs of electronic headsets, not more than one *amplifying* electronic headset.  Regardless, as has been emphasized, the remaining claim in this case is under the ADA, not the FRA, and the court will have further discussion with the parties at the FPTC as to what evidence, legal instructions, and arguments will be appropriate before the jury regarding the FRA.

### F.  MIL No. 6: Preclude Plaintiff From "Arguing that 'Newer Technology' is Causing Allegedly Lower Decibel Readings in Dosimetry Data"

In 2006, the FRA issued a new regulation requiring that "all locomotives of each design or model that are manufactured after October 29, 2007, shall average less than or equal to" a TWA of 85 decibels. 49 C.F.R. § 229.121(a)(1).  Given that Mlsna's exposure to noise is central to this case, and much of the dosimetry data relied on by Union Pacific pre-dates 2007, plaintiff contends that this 2006 regulation mandating quieter locomotives is highly relevant to plaintiff's claim arising almost ten years later in 2015.  Still, defendant argues that plaintiff should not be permitted to argue "that new technology is *causing* supposedly lower decibel readings . . . because he has no expert opinion to support that

15

theory." (Def.'s Br. (dkt. #187) 15.)

Plaintiff responds by pointing again to the Federal Register in which the FRA explained that it "expect[ed] that this rule will reduce the likelihood of noise-induced hearing loss for railroad operating employees." 71 Fed. Reg. 63,066. However, a statutory "expectation" is not evidence. Accordingly the court will rule as follows: plaintiff may present evidence that the FRA mandated quieter locomotives manufactured after October of 2007, and the parties may argue to the jury whatever inferences they like from that information, particularly as to defendant's having been placed on notice of the possibility that a conductor's actual exposure to higher decibel levels may have declined, but the Federal Register is *not* itself evidence as to the effect of those regulations, if any, and may not be introduced to prove or argued as proving that noise levels *in fact* went down. This motion is accordingly GRANTED IN PART and DENIED IN PART.

### G. MIL No. 7: Preclude Plaintiff From "Providing the Jury with Information About Other Lawsuits Against Defendant"

Defendant also seeks to exclude evidence regarding other lawsuits filed against it. Plaintiff objects to this motion, arguing that he should be permitted to discuss other ADA lawsuits against defendant -- in particular, a purported class action brought by Charles Waldschmidt in the U.S. District Court for the District of Colorado. He contends that this case is at least relevant to his claims for punitive damages, but also as evidence of defendant's motives, intent, and knowledge. To cure any risk of prejudice, plaintiff further suggests that the court could simply issue a limiting instruction.

As a general proposition, evidence regarding the existence of other lawsuits or claims

against a party is not admissible.  *Hodgson v. Wis. Cent. Ltd.*, No. 19-cv-15-jdp, 2020 U.S.

Dist. LEXIS 105952, at *14 (W.D. Wis. June 16, 2020).   This is because the mere

existence of other related lawsuits, particularly ones in which no judgment has been

entered, has minimal, if any, probative value, while the risk of unfair prejudice is great.  *See*

*Ross v. Am. Red Cross*, 567 F. App'x 296, 308 (6th Cir. 2014) (affirming district court order

to withhold evidence of other lawsuits involving the defendant in negligence action).  Here,

the action plaintiff seeks to discuss is still in the pleading stage, and it is yet to be seen

whether the factual allegations are supported, much less legit merit.  *Montgomery v. Union*

*Pac. R.R. Co.*, No. CV-17-00201-TUC-RM, 2019 WL 1787326, at *7 (D. Ariz. Apr. 24,

2019) (explaining that other cases against defendant involving allegations of

discrimination under the ADA had "limited, if any, relevance" because the cases

"involve[d] mere allegations against Defendant, not facts that could be used to establish

motive or intent").  Accordingly, defendant's motion will be GRANTED.

### H. MIL No. 8: Preclude Plaintiff From "Asking About, Referencing, or Arguing Inferences Based on Privileged Discussions with In-House Counsel"

Defendant's eighth motion in limine relates to testimony provided by Terry Owens,

Union Pacific's director of disability management.  In her deposition, Owens testified to

the following:

> Q:  Ultimately a conclusion was reached that the hearing
> protection was not a reasonable accommodation, right?
> A:  Correct.
> Q:  Do you know who made that decision?
> A:  That would have come between Dr. Holland [Union
> Pacific's Chief Medical Officer] and [Union Pacific's]
> industrial hygiene [department], as well as input from our legal
> staff to help us know we have looked at everything from the

obligatory side.
Q:  Did anyone communicate to you why it was being denied?
A:  . . . It was denied because that particular product didn't meet our safety standards according to industrial hygiene, and then the cost of that apparatus was in question of its reasonability.

(Owens Dep. (dkt. #37) 22:2-:17.)

Later on in that same deposition, Owens was asked about an email that she sent to Kathy Hughes, a lawyer for Union Pacific.  Specifically, plaintiff's counsel asked Owens: "Without telling me what you wrote to [Hughes], I just want to hear your reasoning for reaching out to her.  Why in this case were you reaching out to the law department?"  (*Id.* at 33:10-:12.)  Defense counsel objected on the grounds of privilege, and after an off-the-record conversation, plaintiff's counsel decided not to press the issue, but instead moved on to ask about an email that Owens had sent to Dr. Holland, in which she acknowledges having "probably jumped the gun on this case."  (*Id.* at 34:22-:24.)  When asked about that statement, Owens could not "quite remember exactly" her reasons for writing that, but indicated it was "most likely . . . in regard to the cost" and acknowledged she "didn't have a right to tell Mr. Mlsna that cost was any factor."  (*Id.* at 35:1-:10.)  The following exchange then occurred:

Q:  Got it.  I think I've got the timeline right, I just want to make sure I understand.  So you were told by someone, probably [industrial hygiene], that there were two reasons for denying the request, right?
A:  Correct.
Q:  And one of those was cost, right?
A:  Correct.
Q:  You communicated that to Mr. Mlsna?
A:  Correct.
Q:  You then talked to UP's law department?
A:  Yes.

> Q:  And you then reached out to Dr. Holland and said you should not have communicated that to Mr. Mlsna?
> A:  I believe that's what this refers to.
> Q:  As we sit here today, do you know one way or the other whether cost was a reason for denying the accommodation?
> A:  As it boiled down, it was not.
> Q:  Okay.  So it was just an issue that those hearing protection wouldn't satisfy Union Pacific's policy?
> A:  Correct.

(*Id.* at 35:15-36:11.)

Given these deposition exchanges, defendant argues that plaintiff "should not be allowed to ask about, reference, or argue any inferences based on privileged discussions between Union Pacific's law department and its employees" at trial.  (Def.'s Br. (dkt. #187) 19.)  Plaintiff opposes this motion, contending that defendant seeks to exclude non-privileged evidence or, in the alternative, that defendant has waived any privilege by failing to object during the deposition.

As a general proposition, the court agrees that evidence falling under the attorney-client privilege may not be offered at trial.  The purpose of this privilege is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).  Here, evidence that Owens consulted with the Union Pacific legal department is only probative if the jury infers that Owens was told by the attorneys that cost was not a permissible reason for denying the accommodation. This inference goes to the substance of the communications between Owens and the legal department, and accordingly is protected by the privilege. *See Parker v. Prudential Ins. Co. of Am.*, 900 F.2d 772, 775 (4th Cir. 1990) (where the only probative value of evidence

establishing that the plaintiff spoke with her attorney was an inference as to the substance of the communication, that evidence intruded on the attorney-client privilege).  Moreover, defendant did not waive this privilege, since its counsel objected to testimony regarding Owens' communications with the legal department *during the deposition* and there is no question that Owens was authorized to do so for the company.  Plaintiff is of course free to offer evidence of Union Pacific's changing rationale for denying his proposed accommodation; however, he may not offer evidence regarding privileged communications between Union Pacific employees and the Union Pacific legal department.  Thus, this motion is GRANTED unless a Union Pacific witness offers it as a shield to their own actions or statements.[7]

## I.   MIL No. 9: Exclude "References to Pretrial Motions and Orders, including the Seventh Circuit's Opinion"

The court will also GRANT defendant's ninth motion in limine which seeks to exclude references to pretrial motions and orders, including the Seventh Circuit's opinion. Such facts are simply not evidence, and will have no probative value to the jury in their attempt to resolve the issue presented to them.  To the extent that previous rulings affect the scope of the facts or issues to be presented *or this court's* instructions to the jury, both parties are free, of course, to argue that to the court.

## J.   MIL No. 10: Exclude the "FRA's Operating Crew Review Board Decision"

In 2019 -- over one year after this lawsuit was filed -- the Operating Crew Review

---

[7] Even then, plaintiff's counsel would be wise to confirm the witness has "opened the door" at side bar or a break in the trial before proceeding.

Board of the FRA reviewed Union Pacific's decision to revoke Mlsna's conductor certification. (Dkt. #109.) Ultimately, the Board concluded that Union Pacific's decision was improper under the FRA regulations. (*Id.*) Now, defendant argues that evidence of this decision should be excluded at trial because: (1) the decision has no binding effect on plaintiff's claim; (2) the decision was brought under the *FRA regulations*, not the ADA; and (3) any probative value from the decision is outweighed by its risk of unfair prejudice.

As plaintiff points out, however, from the outset of this case, defendant has argued that its decision to deny Mlsna's certification was *required* by the FRA guidelines. The Operating Crew Review Board's decision to the contrary is certainly relevant to that defense. However, the court is concerned about a mini-trial regarding FRA regulations when, again, the statute at issue in this case is the ADA. Indeed, the relevance and admissibility of evidence regarding the FRA regulations is a reoccurring issue that appears at various points in the parties' other pretrial submissions. Accordingly, the court will RESERVE on this motion, pending further discussion at the final pretrial conference.

## ORDER

IT IS ORDERED that the parties' motions in limine are GRANTED, DENIED, or RESERVED as set forth above.

Entered this 16th day of June, 2021.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

21