IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

MARK MLSNA,

                          Plaintiff,                          OPINION AND ORDER

    v.
                                                             18-cv-37-wmc

UNION PACIFIC RAILROAD COMPANY,

                          Defendant.

On July 1, 2021, a jury found in favor of plaintiff Mark Mlsna as to his disparate treatment and failure to accommodate claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 1210, *et seq.*  Still pending before the court is plaintiff's Rule 52 as to his disparate impact claim, which was not presented to the jury, and two remaining issues with respect to the damages award.  The first concerns defendant's motion to reduce the jury's award of almost $4 million in compensatory damages and over $40 million in punitive damages to the statutory total cap award of $300,000 mandated by 42 U.S.C. § 1981(a)(b)(3)(D); the second is plaintiff's request for an award of both back pay and front pay.  This opinion will resolve all of these matters, bringing the case to a close.

FINDINGS OF FACT

**A. Background, Trial, and Jury Verdict**

Having made its way to the Seventh Circuit and back already, this case has a long history.  Briefly, plaintiff Mark Mlsna has a hearing impairment and has worn hearing aids for over twenty years.  Despite this disability, Mlsna was able to work as a thru-freight train conductor for Union Pacific for nearly a decade.  After implementing a new hearing

acuity and conservation policy, however, Union Pacific declined to recertify Mlsna as a train conductor and held him out of service on January 8, 2015.  This court originally granted summary judgment in defendant's favor, but after remand and a three-day trial, a jury found on July 1, 2021, that Union Pacific discriminated against Mlsna because of his disability and failed to reasonably accommodate his disability, both in violation of his rights under the ADA.  The jury further found that:  (1) allowing Mlsna to continue working would not have posed a direct threat to himself or others in the workplace; and (2) accommodating Mlsna's disability would not have imposed an undue hardship on Union Pacific.  Finally, the jury awarded Mlsna $3,670,000 in compensatory damages and $40,300,000 in punitive damages.

### B.  FRA Regulations

In 2006, the Federal Railroad Administration ("FRA") promulgated certain new regulations requiring railroads to protect the hearing of vulnerable employees by establishing hearing conservation policies.  Among other things, this regulation requires railroad employees who are exposed to sound levels equivalent to an eight-hour, time-weighted average ("TWA") of 90 decibels or greater to wear hearing protection.  49 C.F.R. § 227.115(c).  To measure these decibel levels, railroads are required to conduct dosimetry testing.  49 C.F.R. § 227.103.

If an employee is required to wear hearing protection, then an employer must offer employees "a variety of suitable hearing protectors," including a selection of devices with a range of attenuation levels.  49 C.F.R. § 227.115(a).  Moreover, the railroad must evaluate the effectiveness of these devices using one of three methods to ensure that they

attenuate employee noise exposure to an eight-hour TWA of 90 decibels or lower.  49 C.F.R. § § 227.117(a), (b); App. B to Part 277.  The first method for estimating the adequacy of hearing protector attenuation is to derate attenuation using the devices published Noise Reduction Rating ("NRR").  49 C.F.R. Pt. 227 App. B.  The second method is to use specific laboratory-based procedures for measuring, analyzing, and reporting the noise-reducing capabilities of hearing protection devices set forth by the American National Standards Institute.  *Id.*  The third method is to use actual measurements of the level of noise exposure inside the hearing protector when employees wear the hearing protector in their actual work environment.  *Id.*

The FRA promulgated additional regulations in 2012 requiring railroads to ensure that individuals met certain minimum hearing acuity benchmarks before certifying them as train conductors.  Specifically, to be certified as a train conductor, an individual must "have a hearing test or audiogram that shows . . . [t]he person does not have an average hearing loss in the better ear greater than 40 decibels with or without use of a hearing aid, at 500 Hz, 1,000 Hz, and 2,000 Hz."  49 C.F.R. § 242.117(i)(3)(i).  A person who fails this hearing test may still be certified as a conductor, however, with or without "special restrictions," "[i]f, after consultation with a railroad officer, the medical examiner concludes that . . . the person has the ability to safely perform as a conductor." 49 C.F.R. §§ 242.117(j); 242.117(c)(2).  Although the railroad is initially responsible for certifying train conductors, an individual may appeal a certification denial to the FRA Operating Crew Review Board.  49 C.F.R. § 242.501.

3

Importantly, both the FRA hearing conservation regulation and the conductor certification regulation set only "minimum" standards, and railroads are not prohibited from adopting more stringent requirements.  *See* 49 C.F.R. § 227.1 ("This part prescribes minimum Federal health and safety noise standards . . . .  This part does not restrict a railroad . . . from adopting and enforcing additional or more stringent requirements."); § 242.1(b) ("This part prescribes minimum Federal safety standards for the eligibility, training, testing, certification and monitoring of all conductors to whom it applies. This part does not restrict a railroad from adopting and enforcing additional or more stringent requirements consistent with this part.").

## C. Union Pacific's Policies

In 2013, Union Pacific did just that by creating and implementing an employee hearing conversation policy with more stringent requirements than those set forth in the FRA regulations.  Under its policy, all employees, including conductors, are required to wear approved hearing protection in identified areas demarcated by signs and whenever they are within 150 feet of a locomotive, unless they are inside the locomotive's cab with the doors and windows closed.

Union Pacific also provides all employees working in these areas with hearing protection, including conductors.  Consistent with FRA regulations, employees are offered a variety of approved devices to choose from, although Union Pacific approved only one Amplified Hearing Protection Device ("AHPD") -- the "Pro Ears - Gold."  An AHPD is an electronic, ear-muff-style hearing protector designed to *both* amplify ambient sound and block harmful noise.  Employees are not permitted to wear hearing aids under hearing

protection, nor are other hearing aids permitted in areas where hearing protection is required.

In addition, Union Pacific prohibits the use of -- and will not approve -- *any* hearing protection device that does not include an NRR from the manufacturer.  Union Pacific also prohibits custom earplugs as hearing protection.   As for the hearing acuity requirements, Union Pacific requires all conductors to have a minimum hearing threshold in the better ear of 40 decibels or less (at 500, 1000, and 2000 hertz), either with unaided hearing or when using a Union Pacific-approved AHPD.

### D. Union Pacific Declines to Recertify Mlsna as a Train Conductor

On December 18, 2014, Mlsna sat for his first, required hearing exam.[1]  Mlsna's hearing was tested under four conditions: (1) without hearing aids and without hearing protection; (2) with hearing aids and without hearing protection; (3) without hearing aids but wearing an AHPD with the volume turned off; (4) without hearing aids but wearing an AHPD with the volume turned all the way up.  Because Mlsna only met the 40 decibel hearing acuity threshold under the second scenario, Union Pacific then initiated a fitness-for-duty determination.  At Union Pacific's direction, Mlsna visited an audiologist on January 8, 2015, who tested Mlsna under the same four conditions as before.  Again, Mlsna only met the hearing acuity threshold with his hearing aids and without hearing protection.

---

[1] The FRA hearing acuity regulations "grandfathered in" current conductors for 36 months; thus, Mlsna had to complete his hearing certification test by February 2015.

The audiologist additionally tested Mlsna while he was wearing both the Pro Ears-Gold *and* his hearing aids; Mlsna also met the acuity threshold using this configuration.

Based on these test results, Union Pacific concluded that Mlsna could not be certified as a conductor and could not continue working for Union Pacific in that capacity. After he was removed from service on January 8, 2015, Mlsna contacted Union Pacific's director of disability management to explore possible accommodations for his disability. In particular, Mlsna asked whether a custom-made, hearing-protection device manufactured by EAR Primo would work. Union Pacific rejected the EAR Primo because it lacked an NRR from the manufacturer. Ultimately, no accommodation acceptable to Union Pacific was identified.

Mlsna later appealed Union Pacific's decertification decision to the FRA Operating Crew Review Board, which decided on June 4, 2019, that Union Pacific's denial was improper, explaining that the FRA hearing acuity standards may be met with use of a hearing aid. After this decision, Mlsna and Union Pacific entered into a confidential settlement agreement. Ultimately, Union Pacific reinstated Mlsna's conductor certification under the FRA standards, but still refused to return him to his previous job on the grounds that Mlsna did not meet *Union Pacific's* more stringent hearing acuity and hearing conservation policies.

To support his disparate impact claim, plaintiff produced a spreadsheet from 2010 showing the audiology data of Union Pacific's employees. Although the spreadsheet was discussed at the final hearing with respect to plaintiff's disparate impact claim and damages, and the proper foundation appears to have been laid for its admission (Trial Tr.

6

June 29, 2021, afternoon session (dkt. #301) 110-16), it was never formally admitted at trial. (Trial Tr. July 1, 2021 (dkt. #303) 3.) Nevertheless, while appearing to have limited relevance to plaintiff's disparate impact claim, the court will reopen the factual record to admit this spreadsheet formally into evidence.

OPINION

## I. Disparate Impact Claim

Although plaintiff's disparate treatment and failure to accommodate claims have already been presented to and resolved by a jury, his disparate impact claim was reserved for decision by the court.[2] (Dkts. #218, 271.) Here, to the extent that the claims presented to the jury involved common factual issues to the disparate impact claim presented to the court, the court must respect both the facts explicitly found by the jury, as well as "findings implied by the jury's verdict." *Pals v. Schepel Buick & GMC Truck, Inc.*, 220 F.3d 495, 501 (7th Cir. 2000). For those issues not determined by the jury, however, it is the court's obligation as trier of fact to weigh the evidence presented and set forth its factual findings and conclusions of law. Fed. R. Civ. P. 52(a)(1); *Khan v. Fatima*, 680 F.3d 781, 785 (7th Cir. 2012).

---

[2] As the court had previously explained, jury trials do not appear to be available for ADA disparate impact claims. 7th Cir. Civ. Jury Instructions § 3.08 (2017) ("The Committee did not include a disparate impact instruction because there are no jury trials under Title VII for disparate impact, 42 U.S.C. § 1981a(a)(1) & (c)."); *Gaffney v. Riverboat Servs. of Indiana, Inc.*, 451 F.3d 424, 460 n.35 (7th Cir. 2006) (explaining that the remedies for violations of Title VII and the ADA are both found in the 1964 Civil Rights Act, 42 U.S.C. § 1981a(a)(1) & (c)); 3d Cir. Civ. Jury Instructions § 9.1.6 (2018) ("Disparate impact claims are cognizable under the ADA. . . . No instruction is provided on disparate impact claims, however, because a right to jury trial is not provided under the ADA for such claims.").

Under the ADA, it is unlawful for an employer to use "qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity."  42 U.S.C. § 12112(b)(6).  Such a claim is referred to as a "disparate impact" discrimination claim. *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003).  Under a disparate impact theory of liability, an employment practice may be deemed unlawful "without evidence of the employer's subjective intent to discriminate."  *Id.* at 52-53.

In *Roberts v. City of Chicago*, 817 F.3d 561 (7th Cir. 2016), one of the few Seventh Circuit cases addressing a disparate impact claim brought under the ADA, the court indicated that a plaintiff must show that the challenged standard "'caused a relevant and statistically significant disparity between' disabled and non-disabled applicants."  *Id.* at 566 (quoting *Adams v. City of Indianapolis*, 742 F.3d 720, 733 (7th Cir. 2014)).  Here, plaintiff has failed to produce *any* evidence of an adverse action against any employee other than himself.  In particular, plaintiff's spreadsheet from 2010 is of little help, since all it purports to show is the audiology test results of Union Pacific's employees without connecting these scores to any adverse action against hearing impaired employees. Moreover, that data *pre-dates* Union Pacific's 2013 hearing conversation policy that impacted Mlsna, and so, it provides no information as to any disparate impact that policy may have on other individuals with a hearing disability.

8

Plaintiff argues in part that he need not produce statistical proof of a disparate impact if the discrimination is "evident from the face of Union Pacific's policies." (Pl.'s Br. (dkt. #284) 29.) However, to the extent that this may be true, a facially discriminatory claim would appear more properly framed as a matter of disparate treatment, rather than disparate impact. *See Valencia v. City of Springfield, Illinois*, 883 F.3d 959, 965 (7th Cir. 2018) ("[C]ases involving facially discriminatory statutes present cases of disparate treatment, not disparate impact.") (citing *Larkin v. Mich. Dep't of Soc. Servs.*, 89 F.3d 285, 290 (6th Cir. 1996)). Since plaintiff has already prevailed on his disparate treatment claim, the court obviously need not relitigate it here, and absent actual evidence that Union Pacific's policy affected any individual with disabilities other than Mlsna, will deny his disparate impact claim.

## II. Damages

### A. Compensatory and Punitive Damage Award

The ADA imposes a cap on compensatory and punitive damages depending upon the number of employees the defendant employs. 42 U.S.C. § 1981a(b)(3). Here, because Union Pacific has more than 500 employees, the parties agree that the applicable cap is $300,000 despite the jury's award of almost fifteen times that amount. However, the ADA "contains no command as to how a district court is to conform a jury award to the statutory cap," *Jonasson v. Lutheran Child & Fam. Servs.*, 115 F.3d 436, 441 (7th Cir. 1997), and the Seventh Circuit has previously "upheld a decision that took the entire cut out of the award of punitive damages and another that took the entire cut out of the award of compensatory

9

damages." *Lust v. Sealy, Inc.*, 383 F.3d 580, 589 (7th Cir. 2004) (citing *Gile v. United Airlines, Inc.*, 213 F.3d 365, 371, 376 (7th Cir. 2000) and *Jonasson*, 115 F.3d at 441). Still, in *Lust*, the Seventh Circuit has suggested helpfully that "probably the sensible thing for a judge to do is . . . determine the maximum reasonable award of compensatory damages, subtract that from [the statutory cap], and denote the difference [as] punitive damages." *Id. See also Arroyo v. Volvo Grp. N. Am., LLC*, No. 12-CV-6859, 2017 WL 2985649, at *4 (N.D. Ill. July 13, 2017) (in ADA case, reducing $2.6 million compensatory damage award to $300,000 and vacating $5.2 million punitive damage award); *Alford v. Aaron's Rents, Inc.*, No. 08-CV-0683-MJR, 2011 WL 2669626, at *2 (S.D. Ill. July 7, 2011) (reducing $4 million compensatory damage award to $300,000 and vacating $50 million punitive damage award).

Following this guidance, the "sensible thing" in this case is unquestionably to apply the jury's compensatory award toward the entire statutory cap. Indeed, a compensatory damage award at the $300,000 cap does not even cover a tenth of the jury's award of $3,670,000 in compensatory damages. Because that award exhausts the entire $300,000 limit, the court must vacate the jury's punitive damage award.

## B. Back pay and Front pay

The court next turns to the issue of back pay and front pay.[3] Plaintiff seeks $582,940.74 for the six-and-a-half years past wage loss between the time Mlsna was

---

[3] Because back pay and front pay under the ADA are equitable remedies to be decided by the court, they were neither by considered nor submitted to the jury. *See* Pattern Civil Jury Instr. 7th Cir. § 3.10.

removed from service and the jury returned its verdict, as well as $493,257.55 for future wage loss assuming he were to work to his stated goal of 74 years old.  Plaintiff also seeks $319,715.37 for the value of past benefits lost and $270,528.39 for the value of future benefits.  Finally, he seeks $246,446.45 in prejudgment interest.

### 1.  Back Pay

As the Seventh Circuit has explained, "[c]omplete relief for a victim of discrimination generally will include an award of back pay; indeed, such an award is presumptively proper once a violation has been shown."  *EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1580 (7th Cir. 1997).  Still, "the plaintiff has the burden of proving the damages caused her."  *Horn v. Duke Homes, Div. of Windsor Mobile Homes, Inc.*, 755 F.2d 599, 606 (7th Cir. 1985).[4]  Back pay does not have to be calculated with unrealistic exactitude, and uncertainties in the calculations may be resolved against the discriminating employer.  *Stewart v. General Motors Corp.*, 542 F.2d 445, 452 (7th Cir. 1976); *Ortega v. Chicago Bd. of Educ.*, 280 F. Supp. 3d 1072, 1092-93 (N.D. Ill. 2017).  For the reasons discussed below, the court concludes that Mlsna is owed 6.48 years of back pay at a wage rate of $89,683.19 per year and a benefit rate of $26,409.57 per year, totaling an award of $752,281.08 in back pay.  Except for the wage rate, defendant disputes some aspect of almost every component of plaintiff's claim; these issues are addressed separately below.

---

[4] Although the general burden is on the plaintiff to prove damages, it is the defendant's burden to prove that the plaintiff failed to mitigate damages. *Ilona of Hungary, Inc.*, 108 F.3d at 1581.  Here, defendant has not argued that Mlsna's award should be reduced because of a failure to mitigate, and so the court need not address that question.

### a. Wage Rate

As a preliminary matter, plaintiff has produced evidence showing that Mlsna earned $82,210.51 in the twenty-two, bi-monthly pay periods immediately before Union Pacific removed him from service.  Thus, his average pay per period was $3,736.84 and his average yearly wage at the time of his termination was $89,683.19, which plaintiff uses to calculate Mlsna's lost wages.

### b. Benefit Rate

Because benefits "are an integral part of an employee's compensation package," the value of those benefits may also be recoverable as a part of a backpay award.  *Graefenhain v. Pabst Brewing Co.*, 870 F.2d 1198, 1212 (7th Cir. 1989); *see also EEOC v. Accurate Mech. Contractors, Inc.*, 863 F. Supp. 828, 837 (E.D. Wis. 1994) ("Backpay awards . . . should include fringe benefits that the claimant would have received absent the employer's discrimination.").  This court has held that the proper measure of lost benefits is *not* based on the amount that would have been paid by the employer.  *Barnes v. Dep't of Corr.*, No. 18-CV-105-JDP, 2020 WL 94799, at *3 (W.D. Wis. Jan. 8, 2020) (citing *Gunter v. Bemis Co., Inc.*, 906 F.3d 484, 493 (6th Cir. 2018); *Lubke v. City of Arlington*, 455 F.3d 489, 499 (5th Cir. 2006); *EEOC v. Farmer Bros. Co.*, 31 F.3d 891, 902 (9th Cir. 1994)).  Rather, to obtain an award for lost benefits, a plaintiff must adduce evidence of actual replacement costs or expenses that would have been covered under the benefits policy.  *Id.*

To support his claim for benefits, plaintiff has produced a document which enumerates various categories of benefits and shows that the fringe benefits "paid by the carrier" amounted to $49,186.98 per year.  Defendant contests Mlsna's claim to some of

12

the categories of benefits included in this figure -- namely, unemployment and health, dental, and vision coverage -- on the grounds that plaintiff has failed to offer evidence of the amount of actual costs, if any, he incurred that might otherwise have been covered under Union Pacific's benefit plan.  In fact, Mlsna was only in the process of switching from his wife's health care plan to Union Pacific's plan at the time he was held from service. Thus, defendant's requested reduction is appropriate.   Since plaintiff has only demonstrated the amount that would have been paid by *Union Pacific* for his unemployment and health, dental, and vision coverage, rather than any unnecessary costs he incurred by not being able to switch coverage (or savings he might have enjoyed), he has produced no evidence supporting an award for this coverage.

Presumably because the remaining claimed benefits would have been directly received by an employee, defendant does not challenge Mlsna's receipt of lost railroad retirement benefits, vacations, holidays, and "other" benefits.  Given defendant's lack of objection, the court agrees that the value of these benefits -- amounting to $26,409.57 per year -- are owed to Mlsna.

### c.  Duration

Union Pacific removed Mlsna from his position on January 8, 2015, and the jury returned its verdict on July 1, 2021.  According to Mlsna, this means that he is owed nearly six-and-a-half years of past wage and benefit loss.  Defendant, however, argues that Mlsna's claim must be cut off much earlier because of: (i) Mlsna's railroad disability benefits application and (ii) two unexplained episodes in which Mlsna has since lost consciousness. As discussed below, defendant's arguments are not persuasive, and so the court concludes

that the proper backpay period is the 6.48 years between January 8, 2015, and July 1, 2021.

### i.   Railroad disability benefits application

After Mlsna was held out of service by Union Pacific, he filed an application for railroad disability benefits ("RDB").  The application form asked if Mlsna's conditions "prevent [him] from working now," to which Mlsna responded, "Yes."  (Def.'s Trial Ex. 507 at 10.)  In the form, Mlsna stated that a number of conditions caused him to file the application in addition to the hearing problems in both ears that was the unchallenged cause of his termination -- specifically, the loss of his right leg,[5] high blood pressure, diabetes, an enlarged prostate, and high cholesterol.  (*Id.*)  When asked how his conditions prevented him from work, Mlsna wrote:  "Has problems hearing, unable to jump from train to train because of the loss of right leg, difficult bending-needs support, difficult to walk on tracks especially uneven tracks, has to make sure he takes pills to keep the diabetes under control."  (*Id.*)  He also represented on the form that he could no longer work as of the date of his termination by the defendant, January 8, 2015. (*Id.*)  Mlsna signed this application form on November 23, 2015, affirming that the information provided "represents the complete truth" to the best of his knowledge under penalty of civil and criminal penalties.  (*Id.* at 31.)  Ultimately, although Mlsna withdrew his application before receiving any disability benefits, defendant now contends that Mlsna's sworn statement that he could not work because of various medical conditions precludes any award of back

---

[5] Well before beginning his employment at Union Pacific, Mlsna lost his leg in a train accident while employed by the Canadian Pacific Railroad.

14

or front pay after November 23, 2015.

In *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795 (1999), the U.S. Supreme Court held that the "pursuit, and receipt, of [Social Security Disability Insurance ("SSDI")] benefits does not automatically estop the recipient from pursuing an ADA claim." *Id.* at 797. However, the Court cautioned that "an ADA plaintiff cannot simply ignore her SSDI contention that she was too disabled to work"; rather, "she must explain why that SSDI contention is consistent with her ADA claim that she could 'perform the essential functions' of her previous job, at least with 'reasonable accommodation.'" *Id.* at 798.

In this case, the court finds Mlsna's statements in his RDB application were consistent with his claim that he was and remains qualified to perform the essential functions of his train conductor job. First, the court observed in *Cleveland* that a "representation of total disability" in an SSDI application "differs from a purely factual statement in that it often implies a context-related legal conclusion, namely, 'I am disabled for purposes of the Social Security Act.'" *Id.* at 802. Thus, Mlsna's representation that his medical conditions prevented him from working must be read in the context of his claim for RDB under the Railroad Retirement Act ("RRA"), 45 U.S.C. § 231 *et seq.* (the relevant statute governing Mlsna's application for disability benefits). The RRA provides that individuals who have: a current connection with the railroad industry, completed ten years of service, attained the age of sixty, and a permanent physical or mental condition that is "disabling for work" in the individual's regular occupation are entitled to railroad disability benefits. 45 U.S.C. § 231a(a)(1)(iv). The Act further states that "[a]n

15

individual's condition shall be deemed to be disabling for work in his regular occupation if he will have been disqualified by his employer for service in his regular occupation." 45 U.S.C. § 231a(a)(2).

Read in this context, Mlsna's representations that he was too disabled to work for the purposes of the RDB application could have been intended to mean nothing more than that he was deemed disqualified by Union Pacific from performing his job and otherwise met the RRA eligibility requirements. Not only is this wholly consistent with the precipitating event -- his termination by Union Pacific -- but Mlsna appears to otherwise be eligible for disability benefits, having had a current connection to the railroad industry at the time of his application, achieved ten years of service (nine-and-a-half years at Union Pacific, plus nearly one year at Canadian Pacific), and reached sixty years of age or more at the time of his application. Moreover, to the extent Mlsna may have thought he needed to "gild the lily" by listing other disability conditions, all of those conditions were preexisting, and none had precluded his working as a railroad conductor until his termination. In addition, Mlsna's withdrawing the application before ever receiving benefits suggests a change of heart. Finally, as discussed more fully below, Mlsna's farm work and testimony at trial left the jury obviously convinced that he would have continued working as a conductor but for Union Pacific's violations of the ADA. Therefore, the court not only accepts, as did the jury, that the representation in the RDB applications was not inconsistent with his contention that he remained qualified to perform the essential functions of his job, but that he would have continued working as a conductor at least through the date of trial.

16

### ii. Episodes of lost consciousness

Defendant additionally contends that Mlsna's backpay period should be cut short because of two instances in which Mlsna suddenly lost consciousness, referred to as "syncopal episodes." Specifically, Mlsna's medical record shows that on June 27, 2018, Mlsna presented to Gundersen Lutheran Medical Center after such an episode. (Def.'s Trial Ex. 554 at 512.) About two years later, on July 23, 2020, Mlsna again reported to the Gundersen Medical Center after he briefly passed out. (*Id.* at 873.) Union Pacific's former Chief Medical Officer, John Holland, testified that a syncopal event would trigger a fitness for duty evaluation of that employee and could result in work restrictions. At the same time, however, Dr. Holland acknowledged that he would have had to perform an individualized analysis of any employee before prohibiting him from working, and further that he had not conducted such an assessment of Mlsna or reviewed Mlsna's other medical records. Accordingly, Dr. Holland's testimony does not establish that Mlsna's two, seemingly isolated syncopal episodes would have resulted in work restrictions. Moreover, there is *no* evidence that these syncopal episodes, even with work restrictions, would preclude Mlsna from continuing to work with accommodation, something the jury also implicitly found as well. Regardless, Dr. Holland's speculative testimony is simply not enough to support shortening Mlsna's back-pay window.

### C. Prejudgment Interest

Prejudgment interest is routinely granted in ADA cases. *E.g., Baier v. Rohr-Mont Motors, Inc.*, 175 F. Supp. 3d 1000, 1011 (N.D. Ill. 2016); *Ortega*, 280 F. Supp. 3d at 1095; *Best v. Shell Oil Co.*, 4 F. Supp. 2d 770, 773 (N.D. Ill. 1998). "Courts award prejudgment

interest because 'compensation deferred is compensation reduced by the time value of money,' and only prejudgment interest can make the plaintiff whole." *Frey v. Coleman*, 903 F.3d 671, 682 (7th Cir. 2018) (quoting *In re Milwaukee Cheese Wisconsin, Inc.*, 112 F.3d 845, 849 (7th Cir. 1997)).  To calculate prejudgment interest, the Seventh Circuit has advised district courts to use the average of the prime rate for the years in question.  *Id.*; *Cement Div., Nat'l Gypsum Co. v. City of Milwaukee*, 144 F.3d 1111, 1114 (7th Cir. 1998). Moreover, compound interest, as opposed to simple interest, is generally recognized as the norm in federal matters. *Am. Nat. Fire Ins. Co. ex rel. Tabacalera Contreras Cigar Co. v. Yellow Freight Sys., Inc.*, 325 F.3d 924, 938 (7th Cir. 2003).  Finally, prejudgment interest is typically calculated from the date of the violation and ends when damages have been ascertained in a meaningful way, which is usually when judgment is entered. *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 836 (1990); *Baier v. Rohr-Mont Motors, Inc.*, 175 F. Supp. 3d 1000, 1011 (N.D. Ill. 2016).

Here, plaintiff contends that the average prime rate during the relevant period is 4.03%, and that interest should be compounded annually on his award of back pay for the time between his effective termination in January of 2015 until the entry of judgment. Although challenging the underlying base pay award requesting by plaintiff, defendant does not otherwise challenge plaintiff's method for calculating prejudgment interest on that award. Applying plaintiff's method to the adjusted back pay award discussed above, the

court concludes that Mlsna is entitled to a total of $222,960.32 in prejudgment interest.[6]

### D. Front Pay

Finally, the court turns to plaintiff's request for front pay.[7]  But for his termination, Mlsna testified credibly that he had planned to work until 2026 -- at which point he would be seventy-four years old -- and so requests an award of five-and-a-half years of front pay as well, discounted by the current prime rate.  Defendant contends that *no* front pay award is appropriate because he could not reasonably continue working in light of his current age and disabilities.

The goal of front pay is to make the victim whole, putting him in the same financial position he would have enjoyed had his rights not been violated.  *Biondo v. City of Chicago, Ill*, 382 F.3d 680, 691 (7th Cir. 2004).  An award of front pay may be based on a number of factors, including "whether the plaintiff has a reasonable prospect of obtaining comparable employment, whether the time period for the award is relatively short, whether the plaintiff intended to work or was physically capable of working and whether liquidated

---

[6] The court applied the following formula -- $((P(1 + r)^t) - P)$ -- where P is the principal (the court's award of $752,281.08 in back pay), r is the interest rate compounded annually (4.03%), and t is time in years (6.57 years, running from January 8, 2015, through the date of judgment, August 3, 2021).

[7] Generally, reinstatement is the preferred remedy for victims of discrimination.  *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 861 (7th Cir. 2001).  Although plaintiff represented during the damages trial to the court that Mlsna is seeking reinstatement (Trial Tr. July 1, 2021 (dkt. #303) 35-36), Regardless, he does not appear to be pursuing reinstatement in his briefing, perhaps because Union Pacific has indicated it would oppose that remedy.  Given the parties' positions, reinstatement would not appear to be in the cards.  *See McNeil v. Econ. Lab'y, Inc.*, 800 F.2d 111, 118 (7th Cir. 1986) ("[A] plaintiff need not request reinstatement as a prerequisite to recovering front pay when reinstatement would be inappropriate.").

damages have been awarded." *Downes v. Volkswagen of Am., Inc.*, 41 F.3d 1132, 1141 (7th Cir. 1994).

Here, the first three factors generally cut in favor of plaintiff's requested award. First, Mlsna has no reasonable prospect of obtaining comparable employment. He is sixty-nine years old, with only a high school education and a professional background primarily in farming and as a train conductor. Moreover, the number of jobs available to him would likely be limited given his prosthetic leg and hearing loss. Second, the time period for the award -- five-and-a-half years -- is of middling length. *See Padilla v. Metro-N. Commuter R.R.*, 92 F.3d 117, 126 (2d Cir. 1996) (affirming award of front pay for a period "well over 20 years" for a railroad employee who was unlawfully discharged); *Feldman v. Philadelphia Housing Auth.*, 43 F.3d 823, 832-33, 841 (3d Cir.1995) (upholding 38 year-old's front pay award to retirement age of 65); *Whittlesey v. Union Carbide Corp.*, 742 F.2d 724, 729 (2d Cir. 1984) (stating that a front pay period of four years was "relatively short"); *Buckley v. Reynolds Metals Co.*, 690 F. Supp. 211, 217 (S.D.N.Y. 1988) (awarding front pay for a period covering nine years). Third, no liquidated damages have been awarded.

As the parties' sparring reflects, the closer question is whether Mlsna actually intends to work or would be physically capable of working for the next five-and-a-half years. Mlsna testified that he planned on working "as long as [he] could," and more specifically that his "goal was to try to [finish] 20 years [of service with Union Pacific]. I knew I couldn't make more than that because of my age. I knew if I made 20, I'd have been

perfectly happy with making that." (Trial Tr. July 1, 2021 (dkt. #303) 17.)[8]  On the one hand, the court recognizes that Mlsna suffers from various physical impairments and also that he appears to have already passed the age in which he would to be eligible for full retirement benefits.  *See* U.S. Railroad Retirement Board, Full Retirement Age (last accessed July 28, 2021), https://rrb.gov/Benefits/G-177/FRA (full retirement age for railroad workers with less than 30 years of service born in 1954 is age 66); Social Security Administration, An Overview of the Railroad Retirement Program (2008), https://www.ssa.gov/policy/docs/ssb/v68n2/v68n2p41.html ("To be eligible for aged retirement benefits through RRB, a worker must have worked at least 10 years in covered service for the railroad industry, or at least 5 years after 1995.").

Still, working into one's seventies is not unheard of -- according to census data, in 2018 approximately 23.8% of men between the age of seventy and seventy-four were still in the workforce.[9]  And the court has substantial reason to believe that Mlsna in particular would have, and could have, worked as a train conductor until he was seventy-four but for his wrongful termination.  For example, despite his impairments, Mlsna has demonstrated remarkable capacity to work labor-intensive jobs on his farm and at Union Pacific well into his sixties.  Moreover, there is no persuasive evidence that his physical capacity is

---

[8] According to plaintiff's counsel, Mlsna meant twenty-years of railroad service, which would be through 2026.  Plaintiff's counsel represents that "[t]wenty years of service is the minimum number necessary for railroad employees to qualify for certain benefits." (Pl.'s Br. (dkt. #293) 6.)  However, plaintiff includes no citation to support this, and from what the court can tell, Mlsna would have been eligible for full retirement benefits by age sixty-six as noted in the text below.

[9] Society of Actuaries, A Review of Demography of Retirement in the United States (Jan. 2020), https://www.soa.org/globalassets/assets/files/resources/essays-monographs/2020-living-to-100/complete-paper-2b-siegel.pdf.

diminishing beyond the normal toll taken by aging.[10]   Additionally, at trial, Mlsna described his seemingly sincere passion for his work as a conductor, real pride in his work, and a deep desire to continue that work.   The jury's significant compensatory damage award in part supports these findings, as it implies that they found Mlsna to have suffered a great deal of emotional distress after having been abruptly withheld from service and being denied the ongoing opportunity to continue to work at Union Pacific.

Still, the Seventh Circuit has recognized the speculative nature of someone working past the average retirement age.   In particular, the Seventh Circuit vacated a district court's front pay award in *Hybert v. Hearst Corp.*, 900 F.2d 1050 (7th Cir. 1990), noting

> the highly speculative nature of the front pay requested by and awarded to Hybert.   In language keenly applicable to this case, we stated in *Graefenhain* [*v. Pabst Brewing Co.*, 870 F.2d 1198 (7th Cir. 1989)] that the combination of front pay with liquidated damages is less appropriate when the former is "highly speculative due to the lengthy period for which damages are sought and the lack of certainty that plaintiff would have remained employed during such a lengthy period." 870 F.2d at 1205.

*Id*. at 1056.  In *Hybert*, the court further explained that:

> Judge Parsons calculated Hybert's front pay under the following assumptions: that Hybert would have continued to work at his present level of activity until age 72 (Hybert was 67 years old when the trial ended, so the court's five-year front pay award would carry him to age 72); that Hearst would have continued to employ Hybert in his last-held position for five more years until he retired at age 72; and that Hearst would have continued to employ Hybert at his last-held salary level for five more years until he retired at age 72.   The record provides an inadequate predicate for these assumptions.   No

---

[10] For the reasons discussed above, there is insufficient evidence for the court to conclude that Mlsna's more recent episodes of syncope would limit his ability to work, and he has successfully worked as a conductor for years with his other physical limitations.

record evidence speaks to whether advertising space salesman for magazines like *Good Housekeeping* generally work to age 72, nor whether Hybert in particular could or would have done so (other than Hybert's "apparent good health" and his "professed willingness"). Further, although there was sufficient evidence to support the jury's conclusion that Hybert's discharge was age-based, the evidence regarding complaints from advertisers, tension with management, and other performance-related problems should not be ignored in making the front pay determination. . . . Thus, given the evidence currently in the record, it was impermissibly speculative to award Hybert front pay in such a large amount and covering such an extended length of time.

*Id.* at 1056-57.

Of course, age seventy is not the same on average in 2021 as it was even in 1990 when *Hybert* was decided.[11] Plus, Mlsna is not average by any means, having demonstrated remarkable ability to push through adversity and obstacles that would have stopped most men from pursuing another railroad conductor job, much less continue into his mid-sixties with *no* appearance of slowing down, as a parade of his fellow conductors and train engineers who worked with him took the time to testify before the jury. Indeed, not only did Mlsna's fellow workers attest to his continued ability to do the job of conductor well, even exceptionally well, until his unlawful termination, but unlike in *Hybert* and some of the other cited cases above, Union Pacific offered no evidence of Mlsna ever falling short of expectations on the job. Thus, while the court finds seventy-four might be a bit

---

[11] Ignoring the past years under COVID-19, the average life expectancy of males at age sixty-five increased from 15.1 years (i.e., an overall life expectancy of 80.1 years) in 1990 to 18.1 in 2018 (an overall life expectancy of 83.1 years). Life expectancy at birth, at age 65, and at age 75, by sex, race, and Hispanic origin: United States, selected years 1900–2016, CDC (2017), https://www.cdc.gov/nchs/data/hus/2017/015.pdf; National Vital Statistics Reports, CDC (Nov. 17, 2020), https://www.cdc.gov/nchs/data/nvsr/nvsr69/nvsr69-12-508.pdf.

ambitious, seventy-two seems reasonable and far from speculative.  The court will award three-and-a-half years of front pay to plaintiff's award.

As for the wage rate, courts begin with the plaintiff's wage rate at the time of termination, account for raises, then discount the award to account for the interest it will earn.  *Arroyo*, 2017 WL 2985649, at *14.  Generally, the discount rate is the Federal Reserve prime interest rate at the time of judgment.  *Allman v. Smith*, No. 112CV00568TWPDML, 2017 WL 6527342, at *2 (S.D. Ind. Mar. 31, 2017).  Here, plaintiff's wage rate at the time of his unlawful termination was $89,683.19, and the union's average negotiated raise increase between 2015 and 2019 was 2.9%, which the court finds to be an appropriate estimated annual raise.  SMART TD members ratify National Rail Agreement, SMART (Dec. 1, 2017), https://smart-union.org/news/tag/collective-bargaining-agreement/.  With a current prime rate of 3.25%, U.S. Federal Reserve, Selected Interest Rates (Daily), https://www.federalreserve.gov/releases/h15/, this results in an award of $309,743.54 for front wages.[12]

As for benefits, plaintiff does not present any evidence that those would increase over time, so the court will simply begin with the benefit rate at the time of his termination

---

[12] The court added $33,031.68 to account for raises, calculated again using the $(P(1 + r)^t - P)$ formula, where P is the principal ($313,891.17, which is Mlsna's wage rate of $89,683.19 times the 3.5 year front pay period), r is the rase rate compounded annually (2.9%), and t is the time in years (3.5 years).  The court then subtracted $37,179.31 using the same formula, except replacing the raise rate with the prime interest rate of 3.25%.

and apply the 3.25% discount rate, which results in an award of $81,485.08 in front benefits.[13]  Added together, plaintiff is granted a front pay award of $391,228.62.

ORDER

IT IS ORDERED that:

1) Plaintiff's Rule 52 motion for judgment as to his disparate impact claim (dkt. #283) is DENIED.

2) Defendant's motion to conform the jury's award of compensatory and punitive damages to the statutory cap (dkt. #289) is GRANTED.  Plaintiff's compensatory damage award is REDUCED to $300,000, and his punitive damage award is VACATED.

3) Plaintiff's request for back pay and front pay (dkt. #293) is GRANTED IN PART and DENIED IN PART.  Plaintiff is awarded $752,281.08 in back pay, $222,960.32 in prejudgment interest, and $391,228.62 in front pay, for a total of $1,366,470.02

Entered this 3rd day of August, 2021.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

---

[13] The same formula discussed in the preceding footnote was applied, with a principal of $92,433.50 (the annual benefit rate of $26,409.57 time 3.5 years) and rate of 3.25%.